No. 22-____

*In the*

# United States Court of Appeals
### *for the*
## Third Circuit

---

THE PJM POWER PROVIDERS GROUP,

*Petitioner*,

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

## SUPPLEMENTAL PETITION FOR REVIEW

---

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*, and Rule 15(a) of the Federal Rules of Appellate Procedure, The PJM Power Providers Group ("Petitioner") hereby petitions the Court for judicial review of the following orders issued by Respondent, Federal Energy Regulatory Commission (the "Commission"):

- *PJM Interconnection, L.L.C.,* Order on Voluntary Remand, Docket Nos. EL19-58-006, ER19-1486-003, 177 FERC ¶ 61,209 (Dec. 22, 2021) ("December 22 Order").

- *PJM Interconnection, L.L.C.,* Order Addressing Arguments Raised on Rehearing and Dismissing Request for Clarification, Docket Nos. EL19-58-007, ER19-1486-00, 180 FERC ¶ 61,051 (July 28, 2022) ("Rehearing Order").

1

The December 22 Order and the Rehearing Order are attached hereto as **Exhibits A** and **B**, respectively.

On January 21, 2022, Petitioner timely filed a request for rehearing of the December 22 Order. Rather than addressing that rehearing request on its merits, on February 22, 2022, the Commission issued a notice stating that Petitioner's rehearing request "may be deemed denied" by operation of law because FERC had failed to act on it within 30 days, but reserving the right to take further action. *Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration*, Docket Nos. EL19-58-007, ER19-1486-004, 178 FERC ¶ 62,108 (Feb. 22, 2021) ("February 22 Notice"); *see* 16 U.S.C. § 825*l*.

On March 10, 2022, Petitioner filed a petition for review of the December 22 Order, based on the holding of the en banc D.C. Circuit, in *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc), that such operation-of-law rehearing denials do not prevent immediate judicial review. *See PJM Power Providers Group v. FERC*, No. 22-1452 (3d Cir. filed Mar. 10, 2022). The Commission issued the Rehearing Order several months later, on July 28, 2022. *See generally* Ex. B.

Petitioner therefore files this supplemental petition for review to encompass the Rehearing Order that issued after Petitioner filed its

previous petition, and requests that the Court consolidate this matter with No. 22-1452.

Venue is appropriate in this Court, because Section 313(b) of the Federal Power Act provides that a party aggrieved by a Commission order may obtain "review of such order in the United States court of appeals for any circuit wherein the . . . public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia." 16 U.S.C. § 825*l*(b). PJM Interconnection, L.L.C., the entity that oversees the market to which FERC's order relates, is located in part in, and has its principal place of business in, the Third Circuit. Moreover, Petitioner's members—which as participants in PJM's markets, are public utilities to which the order relates—also own and operate numerous electric generation assets located in this circuit.

Dated: August 8, 2022

Respectfully submitted,

/s/ *Paul W. Hughes*

PAUL W. HUGHES
DAVID G. TEWKSBURY
ANDREW A. LYONS-BERG
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Petitioner The*
*PJM Power Providers Group*

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and
Statement of Financial Interest**

No. 22-_____

The PJM Power Providers Group

v.

Federal Energy Regulatory Commission

Instructions

      Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

      Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

      In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

      The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

      The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

      If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

**The PJM Power Providers Group**
_____
(Name of Party)

1) For non-governmental corporate parties please list all parent corporations:    None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:
None.

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:
None.

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.
N/A

**/s/ Paul W. Hughes**
_____
(Signature of Counsel or Party)

Dated: August 8, 2022
_____

**rev: 09/2014**                    (Page 2 of 2)

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 15(c), I hereby certify that on August 8, 2022, I caused the foregoing Supplemental Petition for Review to be served upon the Office of the Solicitor of the Federal Energy Regulatory Commission, and on all parties to the proceedings before the Commission under Docket Nos. EL19-58 and ER19-1486 by email and U.S. mail at the addresses listed below:

| Party | Address |
|---|---|
| Federal Energy Regulatory Commission | Robert Solomon<br>Solicitor<br>888 First St NE<br>Room 9A-01<br>Washington, DC 20426<br>Robert.solomon@ferc.gov |
| Advanced Energy Management Alliance | Katherine Hamilton<br>Chair<br>1701 Rhode Island Ave., NW<br>Washington, DC 20036<br>katherine@38northsolutions.com |
| Advanced Energy Economy | Jeffery Dennis<br>General Counsel, Regulatory Af<br>Advanced Energy Economy<br>1000 Vermont Ave. NW, Suite 300<br>Washington, DC 20005<br>jdennis@aee.net |
| American Electric Power Service Corporation | Jessica Cano<br>Senior Counsel<br>AEP Service Corporation<br>1 Riverside Plaza<br>Columbus, OH 43215<br>jacano@aep.com |

1

| | |
|---|---|
| American Municipal Power, Inc. | Lisa McAlister Deputy General Counsel - FERC/<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OH 43229<br>lmcalister@amppartners.org |
| American Petroleum Institute | Ben Norris<br>Senior Counsel<br>American Petroleum Institute<br>200 Massachusetts Ave., NW<br>Washington, DC 20001<br>norrisb@api.org |
| American Public Power Association | John McCaffrey<br>Regulatory Counsel<br>American Public Power Association<br>2451 Crystal Drive<br>Suite 1000<br>Arlington, VA 22202<br>jmccaffrey@publicpower.org |
| American Wind Capital Company, LLC; American Wind Energy Association | Eugene Grace, Regulatory Attorney<br>1501 M St NW, Ste 1000<br>washington, DC 20005<br>ggrace@awea.org |
| Appian Way Energy Partners | Abram Klein<br>Managing Partner<br>Appian Way Energy Partners<br>25 Mount Auburn Street, Suite 400<br>Cambridge, MA 02138<br>aklein@appianwayenergy.com |
| Calpine Corporation | Sarah Novosel<br>Senior VP and Managing Counsel<br>Calpine Corporation<br>805 15th Street, NW<br>Suite 708<br>Washington, DC 20005<br>snovosel@calpine.com |

| | |
|---|---|
| Constellation Energy Generation, LLC | Christopher A Wilson<br>Director, Federal Regulatory A<br>Constellation Energy Generation, LLC<br>101 Constitution Ave, NW<br>Suite 400E<br>Washington, DISTRICT OF<br>COLUMBIA20001<br>FERCe-filings1@Constellation.com |
| The Dayton Power and Light Company | Randall Griffin<br>Chief Regulatory Counsel<br>The AES Corporation<br>1065 Woodman Drive<br>Dayton, OH 45432<br>randall.griffin@aes.com |
| Delaware Division of the Public Advocate | Regina Iorii<br>Deputy Attorney General<br>Delaware Department of Justice<br>820 N. French Street, 4th Floor<br>Wilmington, DE 19801<br>regina.iorii@delaware.gov |
| Delaware Municipal Electric Corporation, Inc. | Thomas Rudebusch<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>Washington, DC 20006<br>tlr@dwgp.com |
| Direct Energy; Direct Energy Business Marketing LLC; Direct Energy Business, LLC | Cortney Slager<br>Assistant General Counsel<br>NRG Companies<br>804 Carnegie Center<br>Princeton, NJ 08540<br>cortney.slager@nrg.com |

| | |
|---|---|
| Dominion Energy Services Company, Inc. | Wesley Walker<br>Senior Assistant General Counsel<br>Dominion Companies<br>PO Box 25615<br>Richmond,VA 23260-5615<br>wesley.walker@dominionenergy.com |
| Duke Energy Corporation | Molly Suda<br>Duke Energy Corporation<br>1301 Pennsylvania Ave NW<br>Suite 200<br>Washington, DC<br>20004<br>molly.suda@duke-energy.com |
| Dynegy Marketing and Trade, LLC | Kenneth Irvin<br>Partner<br>Sidley Austin LLP<br>1501 K ST NW<br>Sidley Austin LLP<br>Washington DC 20005<br>kirvin@sidley.com |
| East Kentucky Power Cooperative, Inc. | Daniel Frank<br>Eversheds Sutherland (US) LLP<br>700 Sixth Street, N.W.<br>Suite 700<br>Washington, DC<br>20001<br>DanielFrank@eversheds-sutherland.com |
| EDP Renewables North America LLC | John Brodbeck<br>Sr. Manager Transmission<br>EDP Renewables North America LLC<br>202 W Park Ave<br>Langhorne, PA 19047<br>john.brodbeck@edpr.com |

| | |
|---|---|
| Electric Power Supply Association | Nancy Bagot<br>Vice President<br>Electric Power Supply Association<br>1401 New York Ave NW STE 950<br>Washington, DC 20005<br>NancyB@epsa.org |
| Enel X NorthAmerica, Inc. | Brian Kauffman<br>Manager of Regulatory Affairs<br>One Marina Park Drive, Suite 400<br>Boston, MA 02210<br>brian.kauffman@enel.com |
| Energy Harbor LLC | Scott D. Johnson<br>Senior Counsel<br>2001 K Street, N.W.<br>Robert S. Strauss Tower<br>Washington, DC 20006<br>sdjohnson@akingump.com |
| Energy Trading Institute | Noha Sidhom<br>600 Pennsylvania Ave<br>Suite 300<br>Washington, DC 20001<br>noha@tpcenergyfund.com |
| Exelon Corporation, Exelon Generation Company, LLC and its Affiliates | Carrie Allen<br>Assistant General Counsel<br>Exelon Corporation<br>101 Constitution Ave. NW Suite 400 East<br>Washington, DC 20001<br>carrie.allen@exeloncorp.com |
| FirstEnergy Solutions Corp. | J. Porter Wiseman<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K St. NW<br>Washington, DC 20001<br>jwiseman@akingump.com |

| | |
|---|---|
| The FirstEnergy Utility Companies | Morgan Parke<br>FirstEnergy<br>76 South Main Street<br>Akron, OHIO 44308-1890<br>mparke@firstenergycorp.com |
| Illinois Commerce Commission | Christine Ericson<br>Special Assistant Attorney Gen<br>Illinois Commerce Commission<br>160 N. LaSalle St.<br>Suite C-800<br>Chicago, IL 60601<br>Christine.Ericson@illinois.gov |
| Illinois Municipal Electric Agency | Troy Fodor<br>Illinois Municipal Electric Agency<br>3400 Conifer Drive<br>Springfield, IL 62711<br>tfodor@imea.org |
| Indiana Office of Utility Consumer Counselor | Arthur Iler<br>Deputy Consumer Counsel<br>Indiana Office of Utility Consumer Counselor<br>115 W Washington St<br>Ste 1500 South<br>Indianapolis, INDIANA 46204<br>ailer@oucc.in.gov |
| Kentucky Attorney General | Larry Cook<br>Kentucky Attorney General<br>700 Capitol Ave.<br>Frankfort, KY 40601<br>larry.cook@ky.gov |
| Long Island Power Authority and its Operating Subsidiary, Long Island Lighting Company d/b/a LIPA | Darshana Singh<br>Attorney<br>Van Ness Feldman LLP<br>1050 Thomas Jefferson Street, NW<br>Washington, DC 20007<br>dxs@vnf.com |

| | |
|---|---|
| LS Power Associates, LLC | Neil Levy<br>McDermott Will & Emery LLP<br>500 North Capitol Street, NW<br>Washington, DC 20001<br>nlevy@mwe.com |
| Maryland Office of People's Counsel | William Fields<br>Deputy People's Counsel<br>6 St. Paul St., Ste 2102<br>Baltimore, MD 21202<br>william.fields@maryland.gov |
| Maryland Public Service Commission | Miles Mitchell<br>Deputy General Counsel<br>Maryland Public Service Commission<br>6 St. Paul Street<br>16th Floor, William Donald Schaefer Tower<br>Baltimore, MD<br>miles.mitchell@maryland.gov |
| Mercuria Energy America, Inc. | Chloe Cromarty<br>Compliance Manager<br>Mercuria Energy America, Inc.<br>20 E. Greenway Plaza<br>Suite 650<br>Houston, TX 77046<br>ccromarty@mercuria.com |
| Midwest Generation LLC | Cortney Slager<br>Assistant General Counsel - Re<br>NRG Companies<br>804 Carnegie Center<br>Princeton, NJ 08540<br>cortney.slager@nrg.com |
| Michigan Public Service Commission | Nicholas Taylor<br>Assistant Attorney General<br>Michigan Attorney General<br>7109 W Saginaw Hwy<br>3rd floor<br>Lansing, MI 48917<br>taylorn10@michigan.gov |

| | |
|---|---|
| Monitoring Analytics, LLC | Jeffrey Mayes<br>General Counsel<br>Monitoring Analytics, LLC<br>2621 Van Buren Avenue, Suite 160<br>Valley Forge Corporate Center<br>Eagleville, PA 19403<br>jeffrey.mayes@monitoringanalytics.com |
| National Rural Electric Cooperative Association | Randolph Elliott<br>Partner<br>National Rural Electric Cooperative Association<br>1301 K Street N.W.<br>Washington, DC 20005<br>relliott@mccarter.com |
| New Jersey Board of Public Utilities | Paul Youchak<br>New Jersey Department of Law and Public Safety<br>25 Market Street<br>Trenton, NJ 08611<br>paul.youchak@law.njoag.gov |
| New Jersey Division of Rate Counsel | T. David Wand<br>Division of Rate Counsel<br>New Jersey Division of Rate Counsel<br>140 E. Front St.<br>4th Flr.<br>Trenton, NJ 08625<br>dwand@rpa.nj.gov |
| North Carolina Electric Membership Corporation | Sean Beeny<br>Attorney<br>McCarter & English LLP<br>1301 K Street N.W.<br>Suite 1000 West<br>Washington, DC 20005<br>sbeeny@mccarter.com |

| | |
|---|---|
| NRDC/FERC Project | Tom Rutigliano<br>Sr. Advocate<br>NRDC/FERC Project<br>1124 15th St. NW<br>Suite 300<br>Washington, DC 20005<br>trutigliano@nrdc.org |
| NRG Power Marketing LLC and Midwest Generation, LLC | Cortney Slager<br>Assistant General Counsel - Re<br>NRG Companies<br>804 Carnegie Center<br>Princeton, NJ 08540<br>cortney.slager@nrg.com |
| Nuclear Energy Institute | Jonathan Rund<br>Associate General Counsel<br>Nuclear Energy Institute<br>1201 F Street, NW, Suite 1100<br>Washington, DC 20004<br>jmr@nei.org |
| Office of the People's Counsel for the District of Columbia | Frederick Heinle<br>Assistant People's Counsel<br>Office of the People's Counsel for the District of Columbia<br>1133 15th Street, N.W., Suite 500<br>Washington, DC 20111<br>fheinle@opc-dc.gov |
| Old Dominion Electric Cooperative | Adrienne Clair<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DC 20006<br>aclair@thompsoncoburn.com |

| | |
|---|---|
| Organization of PJM States, Inc | Gregory Carmean<br>Executive Director<br>Organization of PJM States, Inc.<br>700 Barksdale Road<br>Suite 1<br>Newark, DE 19711<br>greg@opsi.us |
| Panda Power Funds | Robert O'Connell<br>Consultant<br>Panda Power Funds<br>53 Village Sq<br>Paoli, PA 19301<br>boconnell@pandafunds.com |
| Pennsylvania Office of Consumer Advocate | David Evrard<br>Assistant Consumer Advocate<br>Pennsylvania Office of Consumer Advocate<br>555 Walnut St Fl 5<br>Harrisburg, PA 17101<br>devrard@paoca.org |
| Pennsylvania Public Utility Commission | Christian McDewell<br>Assistant Counsel<br>Pennsylvania Public Utility Commission<br>400 North Street<br>Harrisburg, PA 17120<br>cmcdewell@pa.gov |
| PJM Industrial Customer Coalition | Robert Weishaar<br>McNees Wallace & Nurick LLC<br>1200 G Street, NW<br>Suite 800<br>Washington, DC 20005<br>bweishaar@mcneeslaw.com |
| PJM Interconnection, L.L.C. | Ryan Collins<br>Attorney<br>Wright & Talisman, PC<br>1200 G Street, N.W., Suite 600<br>Washington, DC 20005<br>collins@wrightlaw.com |

| | |
|---|---|
| PJM Power Providers Group | Glen Thomas<br>GT Power Group, LLC<br>101 Lindenwood Drive, Suite 225<br>Malvern, PA 19355<br>gthomas@gtpowergroup.com |
| PPANJ | Jill Barker<br>Betts & Holt LLP<br>1101 Connecticut Ave., NW<br>Suite 450<br>Washington, DC 20036<br>jmb@bettsandholt.com |
| PSEG Power LLC; PSEG Companies; PSEG Energy Resources & Trade LLC; Public Service Electric and Gas Company | Hesser McBride, Jr.<br>PSEG Companies<br>80 park Plaza<br>Newark, NJ 07102<br>hesser.mcbride@PSEG.com |
| Public Citizen, Inc. | Tyson Slocum<br>Director<br>Public Citizen's Energy Program<br>215 Pennsylvania Ave SE<br>Washington, DC<br>20003<br>tslocum@citizen.org |
| Public Power Association of New Jersey | Susan Bruce<br>100 Pine St<br>Harrisburg, PA 17101<br>sbruce@mcneeslaw.com |
| Public Service Commission of the District of Columbia | Richard S Herskovitz<br>D.C. Public Service Commission<br>1333 H Street, N.W.<br>7th Floor, East Tower<br>Washington, DC 20005<br>rherskovitz@psc.dc.gov |

| | |
|---|---|
| Public Utilities Commission of Ohio | Lori Sternisha<br>Public Utilities Commission of Ohio<br>180 East Broad Street<br>3rd Floor<br>Columbus, OHIO 43215<br>lori.sternisha@puco.ohio |
| Rockland Electric Company | Margaret Comes<br>Consolidated Edison Development, Inc.<br>4 Irving Place, room 1875-s<br>New York, NY 10003<br>comesm@coned.com |
| Shell Energy North America (US), L.P. | Matthew Picardi<br>Vice President<br>Shell Energy North America (US), L.P.<br>36 Pinewood Ave.<br>Saratoga Springs, NY 12866<br>Matthew.Picardi@shell.com |
| Sierra Club | Casey Roberts<br>Senior Attorney<br>Sierra Club<br>1536 Wynkoop St, Suite 200<br>Denver, CO 80202<br>casey.roberts@sierraclub.org |
| Southern Maryland Electric Cooperative, Inc. | Mark MacDougall<br>Senior Vice President<br>Southern Maryland Electric Cooperative, Inc.<br>PO Box 1937<br>Hughesville, IN 20637-1937<br>mark.macdougall@smeco.coop |
| Steel Producers | Damon Xenopoulos<br>Principal<br>Stone Mattheis Xenopoulos & Brew, PC<br>1025 Thomas Jefferson ST NW<br>Washington, DC 20007<br>dex@smxblaw.com |

| | |
|---|---|
| Talen Energy Corporation; Talen Energy Marketing, LLC | Debra Raggio<br>Talen Energy Corporation<br>117 Oronoco Street Alexandria, VA 22314<br>debra.raggio@talenenergy.com |
| Union of Concerned Scientists | Michael Jacobs<br>Sr. Energy Analyst<br>Union of Concerned Scientists<br>2 Brattle Square<br>Cambridge, MA 02138<br>mjacobs@ucsusa.org |
| Virginia Municipal Electric Association No. 1 | James Horwood<br>Partner<br>Spiegel & McDiarmid LLP<br>1875 Eye Street, N.W., Suite 700<br>Washington, DC 20006<br>james.horwood@spiegelmcd.com |
| Vistra Energy Corp. | Kenneth Irvin<br>Partner<br>Sidley Austin LLP<br>1501 K ST NW<br>Sidley Austin LLP<br>Washington DC 20005<br>kirvin@sidley.com |
| West Virginia Consumer Advocate | Bobby Lipscomb<br>Staff Attorney<br>Consumer Advocate Div / WV PublicServ. Comm.<br>Suite 810<br>300 Capitol Street<br>Charleston, WV 25306<br>blipscomb@cad.state.wv.us |

Dated: August 8, 2022                    */s/ Paul W. Hughes*

# Exhibit A

Document Accession #: 20211222-3063    Filed Date: 12/22/2021

177 FERC ¶ 61,209
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                        James P. Danly, Allison Clements,
                        and Mark C. Christie.

PJM Interconnection, L.L.C.                          Docket Nos.  EL19-58-006
                                                                  ER19-1486-003

ORDER ON VOLUNTARY REMAND

(Issued December 22, 2021)

1.      This case is before the Commission on voluntary remand from the United States
Court of Appeals for the District of Columbia Circuit (D.C. Circuit).[1]  At issue on remand
is whether the Commission erred in:  (1) deeming PJM Interconnection, L.L.C.'s (PJM)
Open Access Transmission Tariff (Tariff) and the Amended and Restated Operating
Agreement of PJM (Operating Agreement) unjust and unreasonable as they pertain to the
PJM reserve market; and (2) setting a replacement rate.

2.      In this order, as further discussed below, we affirm in part, and reverse in part the
determinations in the Commission's prior orders.  Specifically, we affirm the
Commission's finding that PJM satisfied its burden under section 206 of the
Federal Power Act (FPA)[2] to show that the bifurcation of Tier 1 and Tier 2 Synchronized
Reserve products, misalignment of the day-ahead and real-time reserve markets, and the
provisions regarding resources' reserve capability and offer rules are unjust and
unreasonable.  However, we reverse the Commission's prior determination and find that
PJM failed to meet its burden to show that the currently effective Reserve Penalty Factors
and two-step Operating Reserve Demand Curves (ORDCs) are unjust and unreasonable.
We also reverse the Commission's determination that the prior backward-looking energy

---

[1] *Am. Mun. Power, Inc. v. FERC*, No. 20-1372 (D.C. Cir. Aug. 23, 2021) (order
granting unopposed motion for voluntary remand).  The consolidated appeals involve
challenges to *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153 (May 2020 Order), *order
on reh'g*, 173 FERC ¶ 61,123 (2020) (November 2020 Rehearing Order); and *PJM
Interconnection, L.L.C.*, 173 FERC ¶ 61,134 (2020) (November 2020 Compliance
Order), *order on reh'g*, 174 FERC ¶ 61,180 (2021) (March 2021 Compliance Rehearing
Order).

[2] 16 U.S.C. § 824e.

and ancillary services offset (E&AS Offset) is unjust and unreasonable, as that determination was based in large part on the findings regarding the Reserve Penalty Factors and ORDCs. Given the reversal of the Commission's prior determinations regarding Reserve Penalty Factors and ORDCs, we also direct PJM to submit a compliance filing within 60 days of the date of this order to revise its Tariff and Operating Agreement records previously accepted in this proceeding (to become effective May 1, 2022) to reflect the currently effective Reserve Penalty Factors and the ORDCs and restore its Tariff provisions related to its prior backward-looking E&AS Offset, effective November 12, 2020. Additionally, we recognize that PJM will need to delay the base residual auction (BRA) for the 2023/2024 delivery year to incorporate the revised E&AS Offset in the BRA for the 2023/2024 delivery year. Accordingly, we direct PJM to submit a compliance filing within 30 days of the date of this order proposing a new schedule for that BRA and subsequent BRAs. We will not require PJM to re-run auctions that utilized the forward-looking offset as doing so would undermine the expectations of the entities who are making commitments for the 2022/2023 delivery year.

## I.   **Background**

3.     A detailed background of this proceeding is explained in prior orders, and we need not repeat it here.[3] As relevant to this order on remand, on March 29, 2019, PJM submitted filings pursuant to FPA sections 205 and 206[4] asserting that the reserve market provisions of its Tariff and Operating Agreement are unjust and unreasonable and proposing revisions to the Tariff and Operating Agreement as a just and reasonable replacement rate.[5]

---

[3] For a comprehensive history, see March 2021 Compliance Rehearing Order, 174 FERC ¶ 61,180; November 2020 Rehearing Order, 173 FERC ¶ 61,123.

[4] 16 U.S.C. §§ 824d-824e.

[5] May 2020 Order, 171 FERC ¶ 61,153 at P 1. PJM filed the proposed revisions to the Operating Agreement pursuant to section 206 of the FPA, in Docket No. EL19-58-000, and filed pursuant to section 205 to include the same revisions to its Tariff, Attachment K-Appendix, which merely repeats certain provisions of the Operating Agreement, in Docket No. ER19-1486-000. PJM Transmittal at 1 n.1. As PJM recognized in its transmittal letter, because PJM does not have authority under its Operating Agreement to file these revisions unilaterally pursuant to section 205, its section 205 filing remains subject to the requirements of section 206 of the FPA. *Id.* All citations to the "PJM Transmittal" herein, unless otherwise noted, refer to the transmittal filed in Docket No. EL19-58-000, which, aside from the cover letter and Attachments A and B, is identical to the transmittal filed in Docket No. ER19-1486-000.

Document Accession #: 20211122-3065  Filed Date: 12/22/2021

4.      PJM contended that:  (1) its currently effective ORDCs fail to address uncertainties around load, wind, and solar forecasts, and unanticipated supply resource outages, which require PJM operators to frequently bias the load forecasts used to schedule supply resources and make out-of-market generator commitments not reflected in market prices to preserve reliability; (2) reserve market clearing prices do not reflect the operational value of flexibility; (3) a Reserve Penalty Factor of $850/MWh is below the legitimate opportunity cost some resources could face in shortage or near-shortage conditions, as a result of the $2,000/MWh energy offer price cap; (4) its Synchronized Reserve product definition has led to under-compensation and poor performance because it is subdivided into Tier 1 and Tier 2 reserve products with disparate rules for commitment, compensation, and non-performance; and (5) its reserve products are misaligned between the day-ahead and real-time markets, leading to inadequate procurement of forward reserves and inefficient commitment and pricing outcomes.[6]

5.      PJM proposed a replacement rate design that would:  (1) establish Reserve Penalty Factors of $2,000/MWh to align with the maximum price-setting energy offer cap of $2,000/MWh; (2) revise the shape of the ORDCs to be based on a probabilistic calculation of the risk of a reserve shortage due to operational uncertainties; (3) consolidate the Tier 1 and Tier 2 reserve products into one product with uniform commitment, compensation, and non-performance penalty structures; and (4) align reserve procurement in the day-ahead and real-time markets by establishing two 10-minute reserve requirements (Synchronized Reserve Requirement and Primary Reserve Requirement) and one 30-minute reserve requirement (30-minute Reserve Requirement) in each market.[7]  PJM states that, based on simulations, it estimates the annual increase in energy and reserve market billing from its proposal to be approximately $556 million.[8]

6.      In the May 2020 Order, the Commission granted PJM's complaint and found that PJM's existing reserve market design is no longer just and reasonable.  The Commission largely adopted PJM's proposed revisions as the just and reasonable replacement rate, subject to certain modifications in a compliance filing.[9]  The Commission also found that the adoption of the proposed revisions rendered the backward-looking E&AS Offset aspect of PJM's Reliability Pricing Model (RPM) capacity market unjust and

---

[6] May 2020 Order, 171 FERC ¶ 61,153 at P 8; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 4.

[7] May 2020 Order, 171 FERC ¶ 61,153 at P 9; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 5.

[8] PJM Transmittal at 114.

[9] May 2020 Order, 171 FERC ¶ 61,153 at PP 2, 22, 24, 74.

unreasonable.[10]  The Commission established a forward-looking E&AS Offset as the just
and reasonable replacement rate and directed PJM to submit a compliance filing within
45 days of the date of the order.[11]

7.       In the May 2020 Order, the Commission found the bifurcation of Tier 1 and Tier 2
Synchronized Reserve products, misalignment of the day-ahead and real-time reserve
markets, and various provisions related to resources eligibility for reserves, resources'
reserve capability, and offer rules unjust and unreasonable.  Specifically, the Commission
found that PJM demonstrated that its current reserve product definitions and procurement
across the day-ahead and real-time markets are inefficient, provide perverse incentives
for resource performance, and inhibit efficient procurement of the types of reserves
needed to address various operational uncertainties.[12]  The Commission found that "the
Tier 1/Tier 2 reserve product distinction among Synchronized Reserves, and particularly
the lack of performance obligations and non-performance penalties for resources
providing Tier 1 reserves, has failed to properly incentivize performance from Tier 1
reserves when they are called upon to convert reserves into energy."[13]  The Commission
explained that "counting resources toward satisfying the critically important
Synchronized Reserve Requirement when those resources have no explicit obligation to
respond to a Synchronized Event and face no consequences for failing to respond
unnecessarily increases operational uncertainty and is inconsistent with a general market
design that seeks to align incentives for resources with the needs of the PJM system."[14]
Further, the Commission agreed that PJM's "procurement of only 30-minute Reserves in
the day-ahead market and only 10-minute reserves in the real-time market hinders true
co-optimization of energy and reserves in the resource commitment timeframe."[15]

8.       In finding PJM's existing reserve market design unjust and unreasonable, the
Commission also determined, among other things, that PJM's existing ORDCs do not
reflect the actual quantity of reserves that PJM operators require to operate the system

---

[10] *Id.* PP 2, 308.

[11] *Id.* PP 2, 308, 310.

[12] *Id.* PP 74, 84-89, 95.

[13] *Id.* P 84.

[14] *Id.* P 85.

[15] *Id.* P 84.

reliably, and thus the reserve prices that emerge from the market do not properly reflect the marginal cost of procuring necessary reserves.[16]

9.      In determining the replacement rate, as relevant to the instant remand order, the Commission:  (1) adopted PJM's proposed Reserve Penalty Factors of $2,000/MWh for all reserve products;[17] (2) adopted PJM's proposal to establish a downward-sloping portion of its ORDCs to the right of the applicable minimum reserve requirement, using empirical probability formulas, to value reserves in excess of the minimum reserve requirements;[18] (3) adopted PJM's proposal to consolidate Tier 1 and Tier 2 Synchronized Reserve products;[19] (4) adopted PJM's proposal to align its day-ahead and real-time reserve markets;[20] and (5) adopted various changes related to resources' eligibility for reserves, determining resources' reserve capability, and offer rules.[21]

10.      In light of the replacement rate adopted in the May 2020 Order, the Commission found the backward-looking E&AS Offset unjust and unreasonable.  Specifically, the Commission found that the changes to the shape of the ORDCs and the increase to the Reserve Penalty Factors that anchor those ORDCs significantly alter expectations about future energy and ancillary services revenues, and thus the historical approach of the backward-looking E&AS Offset would not reflect future prices.[22]  The Commission determined that the magnitude of the expected impact these changes will have on reserve procurement and energy and ancillary services revenues must be recognized in the E&AS Offset.[23]

---

[16] *Id.* P 81 & nn.149-150 (citing PJM Transmittal at 34-35 and attach. E, Pilong Aff. ¶ 27).

[17] *Id.* PP 8, 153.

[18] *Id.* PP 219-225.

[19] *Id.* PP 115-121.

[20] *Id.* PP 254-256.

[21] *Id.* PP 271-278.

[22] *Id.* PP 310-315.

[23] *Id.* PP 310-314.  The Commission stated that the increase in the Reserve Penalty Factors, removal of the cap on the additivity of Reserve Penalty Factors, and addition of a new reserve product with its own Reserve Penalty Factor increase the potential for very high prices during extreme shortage conditions.  Therefore, the Commission found that the energy and ancillary services revenues received in the past would not be

11.    The November 2020 Rehearing Order reached the same results.  In the November 2020 Compliance Order, the Commission accepted PJM's Tariff and Operating Agreement revisions regarding the reserve market reforms, effective May 1, 2022, and the revisions to incorporate a forward-looking E&AS Offset, effective November 12, 2020.[24]

## II.    **Voluntary Remand**

12.    On August 13, 2021, prior to briefs being filed with the D.C. Circuit, the Commission submitted an unopposed motion for voluntary remand of the agency record in the consolidated appeals of the Commission orders to permit the Commission to further consider, and to issue a further order on, the matters set for judicial review.[25]

13.    On August 23, 2021, the D.C. Circuit issued an order granting the Commission's unopposed motion for voluntary remand of the record of these proceedings for further proceedings consistent with the Commission's motion.[26]

---

representative of the revenues a generation developer would expect to receive in the future, and thus a backward-looking E&AS Offset is no longer just and reasonable.  *Id.* P 315.

[24] November 2020 Compliance Order, 173 FERC ¶ 61,134 at P 3.

[25] *Am. Mun. Power, Inc. v. FERC*, Motion for Voluntary Remand, No. 20-1372 (filed D.C. Cir. Aug. 13, 2021) (Remand Motion).  In the Remand Motion, the Commission stated it contacted all parties to the proceeding and that petitioner IMM consents to the motion; all other petitioners, as well as intervenor-respondent P3 do not oppose the motion; intervenor-respondent Exelon Corporation takes no position on the motion, and intervenor-respondent PJM takes no position on the motion at that time. Remand Motion at 1-2.

[26] *Am. Mun. Power, Inc. v. FERC*, No. 20-1372 (D.C. Cir. Aug. 23, 2021) (order granting unopposed motion for voluntary remand).  *See also* 16 U.S.C. § 825*l*(a) (providing that the Commission retains authority to act while it retains the record); *see also id*. § 825*l*(b) (providing that the court obtains exclusive jurisdiction upon the Commission's filing of the record with the reviewing court).  The Commission previously has been granted voluntary remand in a number of cases and issued orders on the remanded record without additional briefing.  *See, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 162 FERC ¶ 61,173 (2018); *ISO New England Inc.*, 155 FERC ¶ 61,023 (2016); *Pub. Utils. With Existing Contracts in the Calif. Indep. Sys. Operator Corp. Region*, 125 FERC ¶ 61,228 (2008).

Document Accession #: 20211222-3069    Filed Date: 12/22/2021

14.     On October 9, 2021, the Public Interest and Customer Organizations (PICOs)[27] filed a motion for expedited order on remand.  PICOs request that the Commission issue an order on remand that:  (1) resolves in its entirety the proceeding in Docket No. ER19-105-000 pertaining to PJM's quadrennial review of and associated proposed Tariff revisions to the Variable Resource Requirement (VRR) Curve used in PJM capacity auctions pursuant to *Delaware Division of Public Advocate*;[28] and (2) removes the 10% adder from the going-forward calculation of the E&AS Offset in the Net Cost of New Entry (Net CONE) calculation.[29]  PICOs further request that the Commission issue the order on remand in time for the BRA for the 2023/2024 delivery year.[30]  PICOs assert that because the Commission's determination on the 10% adder for the E&AS Offset may also affect the unit-specific market seller offer cap determinations for combustion turbines, which the Independent Market Monitor must make by October 31, 2021, an order by that date would reduce uncertainty regarding the upcoming auction and best facilitate smooth implementation of the next BRA.[31]  PICOs note that several Commissioners expressed skepticism of the 10% adder on grounds similar to those of the D.C. Circuit in *Delaware Division of Public Advocate*.[32]  PICOs state that they seek only prospective relief and are not asking that the Commission direct PJM to rerun or re-clear past auctions.[33]  PICOs contend that more fundamental changes are needed to PJM's

---

[27] PICOs consist of the Office of the People's Counsel for:  the District of Columbia; Maryland Office of the People's Counsel; Delaware Division of the Public Advocate; the Pennsylvania Office of Consumer Advocate; Sierra Club; Natural Resources Defense Council; American Municipal Power, Inc. (AMP); and the PJM Industrial Customer Coalition.

[28] *Del. Div. of the Pub. Advoc. v. FERC*, 3 F.4th 461 (D.C. Cir. 2021) (*Delaware Division of the Public Advocate*)).  In *Delaware Division of the Public Advocate*, the D.C. Circuit remanded the Commission's application of a 10% adder to estimates of hypothetical combustion turbine resources' energy offers in PJM in orders in Docket No. ER19-105.

[29] PICOs Motion at 1-2.  PICOs submitted their motion in Docket No. ER19-105-006 in addition to the dockets of the instant proceeding.

[30] *Id.* at 2.  PICOs note that PJM requested a waiver to delay the December 1, 2021 BRA by 55 days.  *Id.* at 2 n.2.  The Commission granted PJM's waiver request on October 25, 2021.  *PJM Interconnection, L.L.C.*, 177 FERC ¶ 61,050 (2021).

[31] PICOs Motion at 2, 11.

[32] *Id.* at 7-8.

[33] *Id.* at 8-9.

VRR Curve that may be better addressed in response to PJM's forthcoming filing from PJM's fifth quadrennial review.[34]  PICOs also note that other issues concerning PJM's ORDC presented by the voluntary remand may be addressed in a separate order.

15.     On October 22, 2021, PJM Power Providers Group (P3) submitted comments requesting that the Commission deny PICOs' motion and reaffirm the use of the 10% adder for the VRR Curve.  P3 argues that the Commission should respond to the D.C. Circuit's remand in *Delaware Division of Public Advocate* by considering the publicly-available evidence and cite that as support for why continuing to include the 10% adder is the product of reasoned decision-making.[35]

16.     On November 10, 2021, PICOs submitted a motion for leave to answer and answer arguing that the data P3 cites do not support P3's contentions and that P3 misapprehends the evidentiary standard.[36]  PICOs also assert that adjusting the Net CONE value to not include the 10% adder should be implemented in the January 2022 BRA.

17.     On November 12, 2021, PJM submitted a motion to answer and answer in response to PICOs' answer limited to the timelines and feasibility of implementation. PJM asserts that it would need at least 45 days to update auction parameters and recalculate the market seller offer cap for combustion turbine resources in advance of an RPM auction should the Commission order the removal of the 10% adder on remand. PJM requests that in the event the Commission directs the removal of the 10% adder for the BRA for the 2023/2024 delivery year, it should issue an order no later than December 10, 2021.

18.     On November 12, 2021, PJM submitted a motion requesting an extension of the effective date for the Tariff and Operating Agreement revisions accepted in this proceeding effective May 1, 2022 to October 1, 2022.  PJM states that it requests the extension because of vendor and testing issues and the need to avoid implementation

---

[34] *Id.* at 9.

[35] P3 October 22, 2021 Comments at 2.  P3 submitted its motion in Docket No. ER19-105-006 in addition to the dockets of the instant proceeding.  To the extent the comments address Docket No. ER19-105-006, they are outside the scope of the instant proceeding.

[36] PICOs Answer at 5-7.

during the summer months.[37]  PJM notes that the timeline and dates may change subject
to the outcome of further Commission action on remand.[38]

19.     On December 2, 2021, P3 submitted comments stating that, while frustrated that
PJM will need more time and money to implement the reforms, "P3 reluctantly
understands the folly of implementing market reforms that PJM's internal systems are
incapable of managing."[39]  P3 also requests that the Commission allow the revised
reserve pricing rules to remain in place, noting that changes to the reserve pricing rules
would impact the E&AS calculations used to set market offer caps and inject additional
uncertainty into the markets.[40]

20.     On December 7, 2021, Joint Movants[41] submitted a supplemental and renewed
protest, a motion for an order on remand that grants rehearing, and a motion to lodge new
evidence.[42]  Joint Movants contend that it is in the public interest to reopen the record and
consider newly available evidence from Winter Storm Uri, that occurred in
February 2021, after the May 2020 Order and November Rehearing Order.[43]  Joint
Movants assert that PJM's proposed changes to its ORDC were based in part on the

---

[37] PJM Motion at 3-4.

[38] *Id.* at 4.  PJM proposes to leave the applicable tariff records in the eTariff
system with the existing effective date of "12/31/9998" and if a revised target
implementation date is warranted, PJM commits to, in consultation with its stakeholders,
submit an informational filing describing the revised target implementation date, and
ultimately memorialize the final implementation date in the eTariff system when there is
greater certainty regarding the outcome of the proceeding.  *Id.* at 4-5.

[39] P3 December 2, 2021 Comments at 3.

[40] *Id.* at 3-7.

[41] Joint Movants consist of:  AMP; Delaware Division of the Public Advocate;
District of Columbia Office of the People's Counsel; Maryland Office of People's
Counsel; Old Dominion Electric Cooperative; Pennsylvania Office of Consumer
Advocate; PJM Industrial Customer Coalition; Public Power Association of New Jersey;
and Southern Maryland Electric Cooperative, Inc.

[42] On December 14, 2021, the Commission issued a notice shortening the answer
period to Joint Movants' motion to December 20, 2021.

[43] Joint Movants Motion at 12.

Document Accession #: 20211222-3069    Filed Date: 12/22/2021

ORDC utilized by the Electric Reliability Council of Texas (ERCOT).[44]  Joint Movants state that during Winter Storm Uri, pursuant to the ORDC, real-time prices in ERCOT reached at or near the high system-wide offer cap for most of the four-day event.[45] Joint Movants argue that the Commission should consider how the events of Winter Storm Uri in ERCOT impact and call into question PJM's proposed reserve market changes.[46]  Joint Movants also argue that there has been no demonstration that PJM's reserve market provisions were unjust and unreasonable.[47]

21.    On December 20, 2021, PJM submitted an answer to Joint Movants' December 7, 2021 motions.  PJM argues that there is no legal basis for reopening the record in this proceeding because the events in ERCOT, which is a non-jurisdictional, single-state entity with a market design, resource mix, and underlying regulatory structure distinct from PJM's, do not in any way constitute "a change in core circumstances that go to the very heart of the case." [48]  PJM argues that there are no facts in dispute concerning Winter Storm Uri and that the Commission completed an analysis of that event.[49]  PJM argues that this case involves the Commission's analysis under the FPA of whether PJM's existing reserve market is unjust and unreasonable, and the Commission's statutory duty to set the just and reasonable replacement rate.[50]  PJM contends that the extensive record in this proceeding provides the Commission with more than enough evidence to adjudicate the central questions at issue.  PJM argues that if the attenuated legal and factual nexus between Winter Storm Uri and this proceeding can be used as a basis for reopening the record, then any party may invoke Winter Storm Uri or other

---

[44] *Id* at 13.  Joint Movants note that PJM's proposal to enable the summation of Reserve Penalty Factors to rise up to $12,000/MWh is higher than the $9,000/MWh high system-wide offer cap value used in ERCOT's energy-only market.  *Id.* (citing May 2020 Order (Glick, Cmm'r, *dissenting* at P 25)).

[45] *Id.* at 14.

[46] *Id.* at 15.

[47] *Id.* at 20-23.

[48] PJM December 20, 2021 Answer at 3-4.

[49] *Id.* at 3.

[50] *Id.* at 4.

reliability events as grounds for reopening any proceeding subject to the Commission's general rate and transmission jurisdiction under FPA section 201.[51]

22.     On December 20, 2021, the Electric Power Supply Association (EPSA) and P3 submitted an answer to Joint Movants' December 7, 2021 motions.  P3 and EPSA argue that if the Commission does not intend to reaffirm the orders, the Commission should establish additional procedures to permit all interested parties to supplement the record and fully brief any issues of concern.[52]  P3 and EPSA state that full briefing is important because the Joint Movants presented a skewed and incomplete view of actions by the Public Utility Commission of Texas (PUCT) in the wake of Winter Storm Uri, including misrepresenting the scope of issues that the PUCT identified as needing correction.[53]  P3 and EPSA contend that the broad range of reforms required in ERCOT and any lessons from Winter Storm Uri are not necessarily helpful for purposes of evaluating the instant proceeding.[54]

## III.  **Procedural Matters**

23.     Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2021), prohibits an answer to an answer unless otherwise ordered by the decisional authority.  We are not persuaded to accept PICOs' November 10, 2021 and PJM's November 12, 2021 answers to answers related to PICOs' October 9, 2021 motion for expedited order on remand and will, therefore, reject them.[55]  We also deny Joint Movants' motion to lodge and reopen the record.  Rule 716 provides that a proceeding may be reopened for good cause only when reopening is warranted by a change in condition of fact or law or by the public interest.[56]  A decision to reopen the record is a discretionary one for the Commission, and Commission policy discourages reopening records, except in extraordinary circumstances, in order to prevent

---

[51] 16 U.S.C. § 824.

[52] *Id.* at 3.

[53] *Id.* at 3-4.

[54] *Id.* at 5.

[55] We note that PICOs' motion, P3's comments, and PICOs' and PJM's answers were also filed in Docket No. ER19-105.  While we reject the answers with respect to the instant proceeding, this order does not address the filings with respect to Docket No. ER19-105.

[56] 18 C.F.R. § 385.716(c).

Document Accession #: 20211222-3003     Filed Date: 12/22/2021

administrative chaos and provide finality to proceedings.[57] Further, a demonstration of extraordinary circumstances requires a showing of a material change that goes to the very heart of the case.[58] We find that Joint Movants have failed to show compelling changes of law or fact or that it is in the public interest that would necessitate reopening the record to lodge the materials that they seek to lodge. Joint Movants have not demonstrated that Winter Storm Uri and the actions in ERCOT are extraordinary circumstances, as it relates to this proceeding, that warrant reopening the record. Moreover, the Commission is aware of Winter Storm Uri, so there is no need to reopen the record for this purpose.

## IV.    **Commission Determination**

24.    Upon further consideration of the record in this proceeding, we affirm the Commission's findings regarding the unjustness and unreasonableness of PJM's separate treatment of Tier 1 and Tier 2 Synchronized Reserve products;[59] its current misalignment of the day-ahead and real-time reserve markets;[60] and various provisions related to resources' eligibility for reserves, determining resources' reserve capability, and offer rules.[61] We rely on the specific findings the Commission made on these issues in the May 2020 Order and the November 2020 Rehearing Order.

25.    However, we revise the Commission's findings regarding several aspects of the reserve market provisions in the PJM Tariff and Operating Agreement. As further explained below, we find that PJM failed to meet its burden under section 206 of the FPA to show that two aspects of its currently effective reserve market are unjust and unreasonable and thus deny PJM's complaint regarding those two aspects. Specifically, we find that PJM failed to demonstrate that the currently effective Reserve Penalty

---

[57] *See, e.g.*, *Ass'n of Bus. Advocating Tariff Equity Coal. of MISO Transmission Customers v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion No. 569-A, 171 FERC ¶ 61,154, at P 29, *order on reh'g*, Opinion No. 569-B, 173 FERC ¶ 61,159 (2020); *Gas Producing Enters., Inc.*, 28 FERC ¶ 61,008 (1984) (citing *Consolidated Gas Supply Corp.*, 24 FERC ¶ 61,283 (1983), *Transcontinental Gas Pipe Line Corp.*, 23 FERC ¶ 61,152 (1983), and *ICC v. Jersey City*, 322 U.S. 503 (1944)).

[58] *See, e.g.*, *CMS Midland, Inc.*, 56 FERC ¶ 61,177, at 61,624 (1991).

[59] May 2020 Order, 171 FERC ¶ 61,153 at PP 84-85, 88-90, 115-121; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at PP 25-28.

[60] May 2020 Order, 171 FERC ¶ 61,153 at PP 86, 254-256.

[61] *Id.* PP 271-278.

Docket Nos. EL19-58-006 and ER19-1486-003                                    - 13 -

Factors and two-step ORDCs are unjust and unreasonable.[62]  Further, because the May 2020 Order based its finding that the backward-looking E&AS Offset is unjust and unreasonable largely on the Reserve Penalty Factors and ORDCs being unjust and unreasonable, we reverse that finding here.  As discussed below, we are not determining that a forward-looking E&AS Offset is unjust and unreasonable.  Rather, due to the lack of a record that the backward-looking offset is unjust and unreasonable, we are merely restoring the *status quo ante* with respect to the E&AS Offset given the findings that we now reverse on remand.

26.      Given our findings, we direct PJM to submit a compliance filing to revise its Tariff and Operating Agreement records previously accepted in this proceeding (to become effective May 1, 2022) to reflect the currently effective Reserve Penalty Factors and the ORDCs, and restore its tariff provisions related to its prior backward-looking E&AS Offset, effective November 12, 2020, as discussed in the body of this order.  Given that PJM will have to revise various capacity auction parameters that depend on the E&AS Offset directed in this order, including the VRR Curve and market seller offer caps, we recognize that PJM will need to delay the BRA for the 2023/2024 delivery year that is currently planned for January 25, 2022 so that PJM may implement the rate directed in this order prior to that BRA.  We direct PJM to propose a new schedule, including all relevant dates, for the upcoming BRA and subsequent BRAs in a compliance filing within 30 days of the date of this order.

27.      We deny PJM's November 12, 2021 motion seeking an extension of the May 1, 2022 effective date for certain Tariff and Operating Agreement revisions accepted in the November 2020 Compliance Order.  As PJM notes in its motion, the timeline and dates discussed in PJM's motion may change based on this order on remand.  With the changes adopted here, it is unclear whether PJM still requires an extension of time for the effective date of the reserve market revisions not revised by this order (e.g., the revisions to the Tier 1 and Tier 2 Synchronized Reserve products, alignment of the day-ahead and real-time reserve markets, and various provisions related to resources' eligibility for reserves, determining resources' reserve capability, and offer rules).  PJM should address any necessary revisions to the effective dates for these provisions in its compliance filing.

### A.      ORDC - Reserve Penalty Factors

28.      In the May 2020 Order, the Commission relied on broad statements regarding the amount of operational uncertainty PJM faces and the performance of PJM's reserve

---

[62] While we need not address PJM's proposed replacement rate with respect to Reserve Penalty Factors and the ORDCs, we note that PJM states that, based on simulations, it estimates the annual increase in energy and reserve market billing from its proposal to be approximately $556 million.  PJM Transmittal at 114.

markets to find several discrete aspects of PJM's markets unjust and unreasonable, including its currently effective Reserve Penalty Factors of $850/MWh for the Synchronized Reserve Requirement and Primary Reserve Requirement, and $300/MWh for the Extended Synchronized Reserve Requirement and Extended Primary Reserve Requirement. The May 2020 Order's sole finding specific to the justness and reasonableness of PJM's currently effective Reserve Penalty Factors was that "the recent increase in the energy market offer cap . . . increases the probability that resources will face opportunity costs of providing reserves in excess of the existing Reserve Penalty Factors."[63] Upon reconsideration, we find there is insufficient evidence to find PJM's Reserve Penalty Factors unjust and unreasonable, for the reasons discussed below. Accordingly, we deny this aspect of PJM's complaint, and direct PJM to submit a compliance filing to revise its Tariff and Operating Agreement records previously accepted in this proceeding (to become effective May 1, 2022) to maintain the currently effective Reserve Penalty Factors.

29.    PJM's primary argument is that its $850/MWh Reserve Penalty Factors are no longer just and reasonable because Order No. 831[64] directed PJM to increase its cost-based incremental energy market offer cap to $2,000/MWh, and thus "$2,000/MWh is the lowest reasonable level at which the penalty factor can be set and still be consistent with the actions that system operators are required to take to maintain reserves."[65] We disagree. The costs of a resource providing reserves are mainly based on that resource's lost opportunity costs: the difference between the prevailing locational marginal price (LMP) and its energy offer, i.e., its foregone net energy market revenues. Thus, even when LMPs in the PJM region exceed $1,000/MWh, there is usually reserve capacity available at a cost much less than $1,000/MWh.

30.    PJM relies on a hypothetical example where a resource's opportunity cost could exceed $850/MWh and cause a "false positive" economic shortage.[66] While the Commission may rely on economic theory to justify a filing,[67] it may do so only when

---

[63]  May 2020 Order, 171 FERC ¶ 61,153 at P 82.

[64]  *Offer Caps in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 831, 157 FERC ¶ 61,115 (2016), *order on reh'g & clarification*, Order No. 831-A, 161 FERC ¶ 61,156 (2017), *amended by* 165 FERC ¶ 61,136 (2018).

[65]  PJM Transmittal at 33.

[66]  *See id.* at 29-30.

[67]  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 65 (D.C. Cir. 2014) ("[a]gencies do not need to conduct experiments in order to rely on the prediction that an unsupported

that theory is based on "reasonable economic propositions."[68] Here PJM does not
provide support for concluding that its hypothetical situation has or is likely to occur with
sufficient frequency that it renders PJM's currently effective rules unjust and
unreasonable. As Monitoring Analytics, LLC, acting in its capacity as the Independent
Market Monitor of PJM (IMM) and the Maryland Public Service Commission (Maryland
Commission) explain, actual observed short-run marginal costs in PJM have rarely
exceeded $850/MWh,[69] and PJM itself previously declined to suggest changes to the
Reserve Penalty Factors after finding that "so few busses experienced >$1,000 prices in
only one five-minute interval" during two reserve shortage events that occurred in
2018.[70]

31.     In addition to its claim of changed circumstances caused by the adoption of a
$2,000/MWh cost-based incremental energy market offer cap, PJM cites four actions
operators might take to maintain reserves that have costs greater than $850/MWh:
(1) deploying 30-minute emergency and pre-emergency demand response at a cost up to
$1,849/MWh; (2) deploying one-hour emergency and pre-emergency demand response at
a cost up to $1,425/MWh; (3) deploying two-hour emergency and pre-emergency
demand response at a cost up to $1,100/MWh; and (4) purchasing emergency energy
from neighboring regions at a cost that is capped at $2,700/MWh for price-setting
purposes.[71] None of these actions show that PJM's existing tariff is unjust and
unreasonable because, as PJM explains in its filing, it sets the prices of emergency and
pre-emergency demand response and emergency energy purchases at amounts that
exceed the Reserve Penalty Factors by design.[72] Specifically, PJM explains that the
currently effective market rules cap energy market offers submitted by 30-minute
emergency and pre-emergency demand response at "$1,000/megawatt-hour, plus the

---

stone will fall") (quoting *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1008
(D.C. Cir. 1987)).

[68] *Id.*

[69] IMM Protest at 32-33.

[70] Maryland Commission Protest at 7 (citing PJM, *PJM Market Participants'
Response to Prices Exceeding $1,000/MWh* (2019), https://www.pjm.com/-
/media/committees-groups/committees/mc/20190422-webinar/20190422-item-07b-ferc-
required-reserve-shortage-report.ashx).

[71] PJM Transmittal at 48-49. Neither the May 2020 Order nor the November 2020
Rehearing Order relied on these points in finding PJM's then-existing tariff unjust and
unreasonable.

[72] *Id.* at 93, 103.

Docket Nos. EL19-58-006 and ER19-1486-003                                    - 16 -

applicable Reserve Penalty Factor for the Primary Reserve Requirement [$850/MWh], minus $1.00," cap offers submitted by one-hour emergency and pre-emergency demand response at "$1,000/MWh plus half of that Reserve Penalty Factor," cap offers submitted by two-hour emergency and pre-emergency demand response at $1,100/MWh, and cap offers for emergency energy at "the energy offer cap plus the sum of the applicable Reserve Penalty Factors for the Synchronized Reserve Requirement and Primary Reserve Requirement."[73]

32.    Therefore, under the existing reserve market design, the prices for emergency actions exceed the Reserve Penalty Factors, and the fact that PJM may have to call on such resources does not render the Reserve Penalty Factors unjust and unreasonable. Moreover, PJM failed to provide a factual record demonstrating that PJM operators routinely incur costs greater than $850/MWh by dispatching emergency resources to maintain reserves.

33.    In its answer, PJM attempts to demonstrate that its $850/MWh Reserve Penalty Factors are unjust and unreasonable by citing "a review of all the LMPs and energy and Synchronized Reserve offers for [the] period from January 1, 2014, through April 30, 2019," which found that "lost opportunity costs, which constitute the bulk of offers used in forming the Synchronized Reserve supply stack, exceeded $1,000/MWh on 3.6% of the days (70 of 1,947 days)."[74]

34.    We disagree that these data show that Reserve Penalty Factors are unjust and unreasonable.  First, PJM cites the percentage of days in which offers with lost opportunity costs over $1,000/MWh were used in forming the Synchronized Reserve supply stack.  However, these data say nothing about how often those resources with lost opportunity cost offers that exceeded $850/MWh would have been selected to provide Synchronized Reserve, even if the Reserve Penalty Factor were set at $2,000/MWh (i.e., how often PJM actually went economically short of reserves at a $850/MWh Reserve Penalty Factor when it would have been able to procure sufficient reserves if the Reserve Penalty Factor were $2,000/MWh).

35.    Second, the data showing that the Synchronized Reserve supply stack contained offers that exceeded $1,000/MWh on 3.6% of the days, overstates the degree of the problem because it fails to take into account the number of pricing intervals in which the offers exceeded $1,000.  Reserves are settled on an interval basis rather than a daily basis and a day has 288 five-minute pricing intervals.  Citing the percentage of days with at least (and as few as) one pricing interval that met the criteria may overstate the degree of

---

[73] *Id.*

[74] PJM Answer at 51.

the problem. Therefore, the additional data PJM provides in its answer are not sufficient to demonstrate that its $850/MWh Reserve Penalty Factors are unjust and unreasonable.

## B.    ORDC - Reserves Beyond the Minimum Reserve Requirement

36.    In the May 2020 Order, the Commission relied on broad statements regarding the amount of operational uncertainty PJM faces, PJM operators' practice of load forecast biasing, and the prevalence of reserve market uplift to find several discrete aspects of PJM's markets unjust and unreasonable, including the shape of its ORDCs beyond the minimum reserve requirements.[75]  Upon reconsideration, we find that PJM failed to demonstrate that the operator bias it cited is caused by its currently effective ORDCs, and thus that the biasing data PJM provides does not demonstrate that its ORDCs are unjust and unreasonable.  Accordingly, we deny this aspect of PJM's complaint, and we direct PJM to submit a compliance filing to revise its Tariff and Operating Agreement records previously accepted in this proceeding (to become effective May 1, 2022) to maintain the currently effective ORDCs for Synchronized Reserve and Primary Reserve.[76]

37.    PJM's currently effective ORDCs consist of $850/MWh Reserve Penalty Factors associated with the Synchronized Reserve Requirement and Primary Reserve Requirement, and $300/MWh Reserve Penalty Factors associated with the Extended Synchronized Reserve Requirement and Extended Primary Reserve Requirement.  In other words, PJM's currently effective ORDCs consist exclusively of discrete steps associated with discrete reserve requirements and do not procure any reserves beyond those minimum requirements.

38.    PJM's principal argument is that its ORDCs are unjust and unreasonable because its operators routinely bias the forecasts input to its intermediate-term security-constrained economic dispatch (IT SCED) software, and without this bias PJM would be unable to maintain reliability and, for example, would have been short reserves in 29.1% of all real-time pricing intervals in 2018.[77]  However, we agree with the IMM that PJM's analysis of operator bias unreasonably focuses solely on positive forecast bias and does not systematically analyze operator bias overall.[78]  In fact, PJM operators bias the IT SCED forecast upwards approximately one third of the time, bias it downwards

---

[75] *See* May 2020 Order, 171 FERC ¶ 61,153 at PP 77-81.

[76] Given our findings in this order, we also eliminate the informational posting requirements tied to the changes to the ORDCs.  *See* May 2020 Order, 171 FERC ¶ 61,153 at PP 240-241.

[77] *See* PJM Transmittal at 33-37, 54-55, Pilong Aff. ¶ 16.

[78] IMM First Answer at 6-7.

approximately half of the time, and apply no bias for the balance of time.[79]  This biasing pattern does not indicate that PJM operators systematically "put their thumb on the scale" to compensate for a deficiency in PJM's ORDCs, but rather indicates that IT SCED bias is part of a continuum that starts with longer-term forecasts, transitions to near-term forecasts, and then ultimately relies on operators' independent judgment to reliably operate the PJM system.[80]  A pattern of operators reflecting their expert judgment in imperfect computer-generated forecasts is not sufficient to demonstrate that PJM's ORDCs are unjust and unreasonable.

39.    Furthermore, PJM's claim that it would have been short reserves in 29.1% of all real-time pricing intervals in 2018 if not for IT SCED bias incorrectly assumes a one-for-one causal relationship between the positive MW bias applied to IT SCED and the amount of additional reserves committed.[81]  As the IMM explains, IT SCED is an advisory tool that PJM operators use to conduct a form of sensitivity analysis, and PJM operators do not necessarily follow IT SCED recommendations.[82]  PJM provided the same characterization of IT SCED in its comments in the uplift cost allocation and transparency rulemaking in Docket No. RM17-2-000, where it explained:

> . . . in PJM there are no "automated" commitments either real-time or day-ahead.  Instead, several applications, including PJM's intermediate-term security constrained economic dispatch (IT SCED) software, provide commitment suggestions to PJM operators while considering maintaining power balance and controlling transmission constraints.  PJM operators perform additional analyses once these suggestions are received, including running transmission studies to ensure committing the resource will not result in overloads prior to finally committing a unit.  Both these analyses and the operators' decisions all occur after the clearing of the Day-ahead Energy Market, which occurs by 1:30 PM on the day prior to the Operating Day.[83]

---

[79] *Id.* at 7; IMM Protest at 46, tbl. 2.

[80] IMM First Answer at 6-7.

[81] PJM Transmittal at 54-55, Pilong Aff. ¶ 16.

[82] IMM First Answer at 10; IMM Second Answer at 6-7; IMM Rehearing Request at 13-14.

[83] PJM, Comments, Docket No. RM17-2-000, at 13 (filed Apr. 10, 2017).

We find that PJM has failed to demonstrate the actual impacts that IT SCED bias has on PJM's market or its reserve levels. As a result, the evidence PJM provides regarding IT SCED bias fails to demonstrate that the currently effective ORDCs are unjust and unreasonable. Additionally, we note that PJM's currently effective ORDCs have not caused PJM to fall short of the North American Electric Reliability Corporation (NERC)-specified minimum reserve requirement. As the IMM explains, PJM rarely enters reserve shortage conditions and had zero five-minute market intervals of Primary Reserve shortage in 2018.[84]

40.    To bolster its claims about the ill effects of operator actions, PJM points to the January 30-31, 2019 cold snap event, wherein Synchronized Reserve prices were $0/MWh for 29 hours of the 48-hour period, and less than $10/MWh for 41 hours of the 48-hour period.[85] PJM claims that "[o]ut-of-market actions by PJM dispatchers to ensure adequate reserves during these stressed conditions led to a spike in uplift."[86] However, the IMM's comprehensive analysis of the cold snap[87] demonstrates that "PJM supply was readily available, . . . [g]enerator outage rates were low, natural gas prices remained below the cost of fuel oil, and reserves were plentiful, as a number of generators scheduled their capacity beyond PJM's dispatch instructions . . . to prepare for the winter peak that morning."[88] Further, the IMM explains that uplift increased due to above-average natural gas prices, but remained at "unremarkable levels."[89] In fact, the total uplift for January 2019, at $7.9 million, was less than the monthly average uplift amounts for 2018 and 2017, which were $16.5 million and $10.6 million, respectively.[90] Accordingly, we find that the market outcomes observed during the January 2019 cold snap event do not demonstrate that the currently effective ORDCs are unjust and unreasonable.

41.    Similar to its arguments regarding the January 2019 event, PJM claims that operator actions and the deficiencies of its reserve markets have caused unreasonably low

---

[84] IMM Protest at 44.

[85] PJM Transmittal at 20-21.

[86] *Id.* at 21.

[87] *See* IMM Protest, Attach. A.

[88] *Id.* at 10-11; IMM Rehearing Request at 14-15. *See also* PJM Load/Customer Coalition Protest at 18-20; PJM Load/Customer Coalition Rehearing Request at 12.

[89] IMM Protest at 10-11.

[90] *Id.* at 18.

reserve prices and unreasonably high uplift throughout the year.[91]  But as the IMM explains, $0/MWh reserve prices occur when, in advance of the peak hour of the day, PJM schedules generating units such as coal and combined-cycle natural gas units that have inflexibility in starting up and shutting down yet have a large dispatchable range.[92] PJM must commit these resources several hours before the peak hour of the day to meet expected energy demand, even if their full dispatchable range will not be in economic merit for energy in the interim.  The portion of these resources' dispatchable range that is not in economic merit for energy is available to provide reserves at a cost of $0/MWh (i.e., their lost opportunity costs for providing these reserves is $0/MWh) until the peak of the day, and PJM is often able to fulfill its reserve requirements with these resources with $0/MWh opportunity costs in other hours with lower energy demand.[93]  In other words, the price for these reserves is low because the cost of providing them is free or close to it.  The IMM explains that coal units provided 28.6% of PJM's energy output in 2018 and offered 47.3% of their capacity as dispatchable, and natural gas combined-cycle units provided 30.9% of PJM's energy output in 2018 and offered 49.6% of their capacity as dispatchable.[94]  Given the fact that many of the resources in PJM have inflexibility in starting up and shutting down that necessitates committing them hours ahead of time and have a large dispatchable range that allows them to offer a large amount of reserves, we find that the observed reserve prices are a reflection of supply and demand conditions in the PJM market, and not a demonstration that PJM's reserve markets are unjust and unreasonable.

42.    With respect to uplift, the IMM explains that Synchronized Reserve uplift payments largely stem from incorrect settlement calculations and a mismatch between the dispatch interval and the pricing interval,[95] an issue PJM recently corrected.[96]  The IMM

---

[91] PJM Answer at 12-13 (explaining that, in 2018, the Synchronized Reserve price was $0/MWh in 56.8% of hours, the Non-Synchronized Reserve price was $0/MWh in 97.5% of hours, and roughly 50% of the current reserve market was settled through uplift payments).

[92] IMM Protest at 13-14; IMM Rehearing Request at 15.

[93] *See* PJM Transmittal at 26 (explaining that PJM's Synchronized Reserve Requirement of approximately 1,600 MW and Primary Reserve Requirement of approximately 2,300 MW are 1.05% and 1.51%, respectively, of PJM's peak demand of approximately 150,000 MW).

[94] IMM Protest at 14 & n.19.

[95] IMM Second Answer at 8-9, attach. A; IMM Rehearing Request at 16-17.

[96] *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,104 (2021).

also explains that reserve market uplift is caused by PJM's practice of co-optimizing Non-Synchronized Reserve using the IT SCED run rather than the real-time security-constrained economic dispatch (RT SCED) run and simplifying lost-opportunity cost calculations.[97]  We agree with the IMM that reserve market uplift does not stem from any deficiency of PJM's ORDCs.  Therefore, we find that the uplift data PJM cites do not demonstrate that its ORDCs are unjust and unreasonable.

43.     Furthermore, we find nothing in the Commission's price formation policies that supports finding the currently effective ORDCs unjust and unreasonable.  While the Commission recognized in its uplift cost allocation and transparency final rule, Order No. 844, that "operator-initiated commitments . . . can affect energy and ancillary services prices and can result in uplift," it only required that RTOs/ISOs post information about all operator-initiated commitments on their websites.[98]  The Commission did not establish an across-the-board policy that market rules will be deemed unjust and unreasonable if they permit uplift—i.e., if operator actions are not unfailingly reflected in market prices.

44.     Finally, PJM cites the Commission's finding in the order addressing PJM's RPM settlement that "a downward sloping [capacity market] demand curve provides a better indication of the incremental value of different capacity levels than the current vertical demand curve" to argue that its current stepped ORDCs are unjust and unreasonable.[99]  While the Commission did find PJM's prior capacity construct unjust and unreasonable, it did so based on myriad factors in addition to the fact that the prior capacity construct effectively created a vertical capacity demand curve; it did not categorically find that vertical demand curves are unjust and unreasonable.[100]  For the reasons discussed above,

---

[97] IMM Second Answer at 8-9, attach. A; IMM Rehearing Request at 17.

[98] *Uplift Cost Allocation & Transparency in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 844, 163 FERC ¶ 61,041, at P 99 (2018).

[99] PJM Transmittal at 37-38 (citing *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, at P 76 (2006)).

[100] Specifically, in the initial order on the RPM, the Commission found

> PJM's existing capacity construct to be unjust and
> unreasonable.  PJM has shown that the existing construct will,
> in the future, fail to achieve the intended goal of ensuring
> reliable service.  It does not enable market participants to see
> the reliability problems in particular locations, does not
> provide price signals that would elicit solutions to reliability
> problems in enough time before the problems occur, and does

we find that the evidence PJM presents in this proceeding is not sufficient to demonstrate that the currently effective ORDCs are unjust and unreasonable, and therefore our prior findings regarding the tradeoffs between vertical and sloped demand curves are not alone sufficient to meet PJM's burden to show that the currently effective ORDCs unjust and unreasonable. Here, PJM's proposal was submitted pursuant to FPA section 206, which requires more than a showing that an alternative rate would be just and reasonable to demonstrate that the existing rate is unjust and unreasonable.[101]

## C.    Energy and Ancillary Services Offset

45.    The energy, ancillary services, and capacity markets are designed to work together to ensure that PJM can meet its reserve targets in each delivery year and that competitive resources have an opportunity to earn sufficient revenues to cover their costs.[102]  An important aspect of PJM's capacity market design is the E&AS Offset, which is an estimate of the net revenues a capacity resource will earn from the energy and ancillary services markets during a given delivery year. Among other things, PJM uses the E&AS Offset for the reference resource to determine its Net CONE, which in turn influences the shape of the VRR Curve, i.e., the capacity market demand curve. Prior to the instant proceeding, PJM utilized a backward-looking E&AS Offset, which predicted revenues during the upcoming delivery year based on LMPs, fuel prices, and other conditions

---

not allow transmission and demand response to compete on a level playing field with generation to solve reliability problems. These factors, in conjunction with other factors (such as load growth in particular locations, and the lack of price signals sent by the energy markets) render PJM's current construct unreasonable on a long-term basis. While one or more of the elements of PJM's current capacity construct may exist and be just and reasonable in other regional transmission organizations, the Commission finds the combination of these elements, results in an unjust and unreasonable capacity construct within PJM.

*PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079, at P 29 (2006).

[101] *Emera Me. v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017) ("The proponent of a rate change under section 206 … bears 'the burden of proving that the existing rate is unlawful. …' Therefore, unlike section 205, section 206 mandates a two-step procedure that requires FERC to make an explicit finding that the existing rate is unlawful before setting a new rate.") (internal citations omitted)).

[102] PJM Transmittal at 68.

observed during the three calendar years prior to the auction for a given delivery year three years in the future.

46.    In its filing, PJM estimated that its proposed change to the ORDCs would result in a marked increase in energy and ancillary services revenues.[103]  In the May 2020 Order, the Commission found that, as a result of this projected increase, PJM's backward-looking E&AS Offset was unjust and unreasonable:

> the significant reserve market reforms adopted herein, and in particular the changes to the shape of the ORDCs and the increase to the Reserve Penalty Factors that anchor those ORDCs, have fundamentally changed the design of the PJM reserve market in a way that will impact the amount of reserves procured, the price paid for those reserves, related energy prices, and energy and ancillary services revenues received by resources participating in those markets.[104]

Our finding here that PJM failed to demonstrate that its Reserve Penalty Factors and ORDCs are unjust and unreasonable has undermined the fundamental basis for the Commission's determination that the backward-looking offset is unjust and unreasonable. Without these fundamental changes to the reserve market, there is insufficient evidence in the record to find that E&AS revenues will increase to such an extent that the backward-looking offset does not reasonably reflect future E&AS revenues and is therefore unjust and unreasonable.  Given this finding, we direct PJM to submit a compliance filing to remove the forward-looking E&AS Offset from its Tariff and return to the prior backward-looking E&AS Offset.  To be clear, we are not finding that a forward-looking E&AS offset is unjust and unreasonable or that PJM cannot propose a forward-looking E&AS offset.  Instead, we find only that the Commission lacks a basis to impose such an offset under section 206 on the present record.

---

[103] *See id.*, Keech Aff. ¶ 46 ("PJM estimates the increase in energy and reserve market billing from its proposal to be approximately $556 million.  This is based on the net increase in costs from the removal of the Tier 1 product of $1.0 million plus $555 million increase in energy and reserve billing resulting from the ORDC and the addition of the 30-minute reserve market.").  Because PJM's simulations also indicated a weighted Secondary Reserve market clearing price of $0.00, we infer that the $555 million increase is due almost entirely to the tariff revisions related to the ORDCs and Reserve Penalty Factors.  *Id.* at 115, fig. 11.

[104] May 2020 Order, 171 FERC ¶ 61,153 at P 310.

## V.    **Compliance**

47.    PJM is directed, within 60 days of the date of this order, to submit a compliance filing with tariff revisions to reflect the determinations made in this order.[105] With respect to the ORDCs and Reserve Penalty Factors, we direct PJM to revise its Tariff and Operating Agreement records previously accepted in this proceeding (to become effective May 1, 2022) to reflect the currently effective Reserve Penalty Factors and ORDCs. As noted earlier, we are unsure whether PJM will be able to implement the reserve market changes not revised by this order (e.g., the revisions to the Tier 1 and Tier 2 Synchronized Reserve products, alignment of the day-ahead and real-time reserve markets, and various provisions related to resources' eligibility for reserves, determining resources' reserve capability, and offer rules) by May 1, 2022. If PJM determines that it cannot implement those changes by May 1, 2022, it should include tariff records proposing a new effective date for those changes.[106] With respect to the changes to the E&AS Offset, which became effective November 12, 2020, we direct PJM to revise those tariff records to become effective November 12, 2020.

48.    Further, as noted above, because we direct PJM to implement the revised E&AS Offset in the BRA for the 2023/2024 delivery year and recognize that PJM will need to delay the BRA for the 2023/2024 delivery year, we direct PJM to submit a

---

[105] In its filing, PJM proposed the same Reserve Penalty Factors for all reserve requirements, including Synchronized Reserve, Primary Reserve, and 30-minute Reserve. PJM Transmittal at 52-53. We note that the Commission accepted PJM's 30-minute Reserve product as part of the replacement rate to align the day-ahead and real-time markets, and PJM, therefore, should include in its compliance filing Reserve Penalty Factors for 30-minute Reserve that are the same as the Reserve Penalty Factors for Synchronized Reserve and Primary Reserve, and ORDCs consistent with these penalty factors.

[106] PJM is reminded to include a higher priority code for tariff records to become effective May 1, 2022 that are different than the previously accepted tariff records, because the Commission accepted the previous tariff records in eTariff to become effective May 1, 2022. We note that eTariff currently reflects the May 1, 2022 effective date directed in the November 2020 Compliance Order rather than the 12/31/9998 effective date referenced by PJM in its motion for those previously accepted tariff records. Should PJM determine that a later effective date is required for any tariff records, it needs to file two sets of tariff records: one set of records to become effective May 1, 2022 with its currently effective tariff provisions (and any tariff provisions accepted by the Commission in other proceedings prior to the compliance filing that will be effective prior to or including May 1, 2022); and a second set of records with the provisions to be effective on a later proposed effective date.

Document Accession #: 20211222-3059    Filed Date: 12/22/2021

Docket Nos. EL19-58-006 and ER19-1486-003                                      - 25 -

compliance filing within 30 days of the date of this order proposing a new schedule, including all relevant dates, for that BRA and subsequent BRAs.  In line with the Commission's general policy, we do not see a need to require PJM to re-run auctions that utilized the forward-looking offset as doing so would undermine the expectations of the parties who are making commitments for the 2022/2023 delivery year.[107]

The Commission orders:

    (A)    The Commission hereby affirms in part, and reverses in part, the determinations in the Commission's prior orders, as discussed in the body of this order.

    (B)    PJM is hereby directed to file tariff revisions to reflect the determinations in this order, as discussed in the body of the order, within 60 days of the date of this order.

---

[107] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 322; *PJM Interconnection, L.L.C.*, 161 FERC ¶ 61,252, at P 55 (2017) ("The Commission generally does not order a remedy that requires rerunning a market because market participants participate in the market with the expectation that the rules in place and the outcomes will not change after the results are set."); *Md. Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,169, at P 49, *order on reh'g*, 125 FERC ¶ 61,340 (2008) ("In a case involving changes in market design, we generally exercise our discretion over remedies and do not order refunds that require rerunning a market."); *see also Bangor Hydro-Elec. Co. v. ISO New England Inc.*, 97 FERC ¶ 61,339 (2001) (finding that rerunning markets, even when a software error results in clearing prices that are inconsistent with the market rules, would do more harm to electric markets than is justifiable), *reh'g denied*, 98 FERC ¶ 61,298 (2002); *Cal. Indep. Sys. Operator Corp.*, 120 FERC ¶ 61,271, at P 25 (2007) (identifying market reruns as the exception, not the rule).

Document Accession #: 20211222-3089    Filed Date: 12/22/2021

Docket Nos. EL19-58-006 and ER19-1486-003                                  - 26 -

(C)    PJM is hereby directed to submit a compliance with a revised schedule for the BRA for the 2023/2024 delivery year and subsequent BRAs, as discussed in the body of this order, within 30 days of the date of this order.

By the Commission.   Commissioner Danly is dissenting with a separate statement
                     to be issued at a later date.
                     Commissioner Christie is concurring with a separate statement
                     attached.
                     Commissioner Phillips is not participating.


( S E A L )




                              Kimberly D. Bose,
                              Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                    Docket No.    EL19-58-006
                                                            ER19-1486-003

(Issued December 22, 2021)

CHRISTIE, Commissioner, *concurring*:

1.      Consumers deserve a reliable supply of power at the least cost (consistent with applicable laws).  The issues implicated by PJM's proposal to make major changes to its reserve market construct involve both reliability and consumer costs.  Achieving the right balance is always the challenge in utility regulation.

2.      In general, certain changes to PJM's reserve market construct that were approved in 2020 pose an unacceptable risk that hundreds of millions of dollars of additional costs could be placed on consumers[1] without a conclusive demonstration, in my view, of a commensurate increase in reliability.

3.      More specifically, I agree that PJM failed to meet its demanding burden under section 206 of the FPA to show that the aspects of its currently effective reserve construct addressed by today's order are unjust and unreasonable.  I also agree that since the replacement Operating Reserve Demand Curve (ORDC) construct and Reserve Penalty Factors formed the bases to change the energy and ancillary services (E&AS) Offset from backward-looking to forward-looking and since the findings in today's order are that the ORDCs and the Reserve Penalty Factors were not shown to be unjust and unreasonable, given this record there is insufficient evidence under section 206 of the FPA to find the backward-looking E&AS Offset to be unjust and unreasonable.[2]  Although, as today's

---

[1] *See* Order at P 5 ("PJM states that, based on simulations, it estimates the annual increase in energy and reserve market billing from its proposal to be approximately $556 million." (footnote omitted)); *see also id*. at n.62 ("While we need not address PJM's proposed replacement rate with respect to Reserve Penalty Factors and the ORDCs, we note that PJM states that, based on simulations, it estimates the annual increase in energy and reserve market billing from its proposal to be approximately $556 million." (citation omitted)).

[2] Order at P 46.

Document Accession #: 20211222-3069     Filed Date: 12/22/2021

order emphasizes, nothing in this order prevents the approval of a forward-looking offset in the future.[3]

4.      Finally, I agree that reserve resources should be accurately calculated and compensated for their reliability benefits and that penalties for non-performance should be applied without discrimination and should be adequate – principles that should apply in all market constructs.[4]  I believe PJM made a good-faith effort to achieve these goals, and today's order leaves in place a number of the changes PJM proposed and the Commission approved in its prior orders.  Further, today's order does not prevent PJM from proposing additional modifications to its reserve market construct in the future.

       For these reasons, I respectfully concur.

_____
Mark C. Christie
Commissioner

---

[3] *Id.*

[4] *See, e.g, PJM Interconnection, L.L.C.* 176 FERC ¶ 61,056 (2021) (Christie, Comm'r, dissenting at P 2 and *passim*) (quoting *PJM Interconnection, L.L.C*, 175 FERC ¶ 61,084 (2021) (Christie, Comm'r, concurring at P 2) "'It is absolutely essential that RTO/ISO capacity markets value and compensate capacity resources as accurately as practicable, for two primary reasons:  First, reliability depends on it, and second, consumers should only pay for capacity that actually performs when needed.'").

Document Accession #: 20211222-3083    Filed Date: 12/22/2021

Document Content(s)

EL19-58-006.docx.................................................................1

Exhibit B

180 FERC ¶ 61,051
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                            James P. Danly, Allison Clements,
                            and Mark C. Christie.

PJM Interconnection, L.L.C.                     Docket Nos.  EL19-58-007
                                                    ER19-1486-004

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING AND
DISMISSING REQUEST FOR CLARIFICATION

(Issued July 28, 2022)

1.       On December 22, 2021, the Commission issued an Order on Voluntary Remand[1] affirming in part and reversing in part the determinations in the Commission's prior orders that found PJM Interconnection, L.L.C.'s (PJM) Open Access Transmission Tariff (Tariff) and the Amended and Restated Operating Agreement of PJM (Operating Agreement) unjust and unreasonable as they pertain to the PJM reserve market and set a replacement rate.[2]

2.       Electric Power Supply Association (EPSA) and PJM Power Providers Group (P3) (collectively, EPSA/P3); Exelon Corporation and Exelon Generation Company, LLC[3] (collectively, Exelon); and PJM (with EPSA/P3 and Exelon, Petitioners) timely requested

---

[1] *PJM Interconnection, L.L.C.*, 177 FERC ¶ 61,209 (2021) (Remand Order).

[2] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153 (May 2020 Order), *order on reh'g*, 173 FERC ¶ 61,123 (2020) (November 2020 Rehearing Order, together with the May 2020 Order, the 2020 Orders); *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134 (2020) (November 2020 Compliance Order), *order on reh'g*, 174 FERC ¶ 61,180 (2021).

[3] On February 4, 2022, Constellation Energy Generation LLC (Constellation), recently renamed from Exelon General Company, LLC, filed a motion to intervene out-of-time. The Commission granted Constellation's intervention in the February 22, 2022 order accepting PJM's compliance filing. *See PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,122, at P 11 (2022) (February 2022 Compliance Order).

rehearing of the Remand Order.  Public Interest and Consumer Organizations (PICO)[4] timely requested clarification and, in the alternative, rehearing of the Remand Order.

3.      Pursuant to *Allegheny Defense Project v. FERC*,[5] the rehearing requests filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the Federal Power Act (FPA),[6] we are modifying the discussion in the Remand Order and continue to reach the same result in this proceeding, as discussed below.[7]  We also dismiss as moot PICOs' request for clarification of the Remand Order, as discussed below.

## I.    **Background**

4.      Reserves play an important role in maintaining the reliability of the bulk power system.  The North American Electric Reliability Corporation (NERC) has established the base requirement that each regional transmission organization and independent system operator (RTO/ISO), as a Balancing Authority, must maintain sufficient reserves to respond within 15 minutes to the loss of the largest single contingency on its system (i.e., unexpected failure or outage of a system component that would result in the greatest loss of megawatt (MW) output).[8]  However, RTOs/ISOs set additional requirements with the goal of maintaining sufficient reserves to address other real-time operational uncertainties, such as deviations of load, generator availability, and performance from

---

[4] PICOs comprise the following:  the Office of the People's Counsel for the District of Columbia, the Maryland Office of the People's Counsel, the Delaware Division of the Public Advocate (Delaware Public Advocate), the Pennsylvania Office of Consumer Advocate, Sierra Club, Natural Resources Defense Council, American Municipal Power, Inc., and the PJM Industrial Customer Coalition.

[5] 964 F.3d 1 (D.C. Cir. 2020) (*en banc*).

[6] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[7] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Remand Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[8] *See* NERC Reliability Standard BAL-002-3 – (Disturbance Control Standard – Contingency Reserve for Recovery from a Balancing Contingency Event) (2019).

forecast values.  RTOs/ISOs use different reserve product specifications and set different minimum reserve requirement quantities to accomplish this goal.[9]

5.      In PJM, reserve products generally are divided between the reserve capability of resources that can be converted fully into energy within 30 minutes or less, and the reserve capability of resources that can be converted into energy within 10 minutes or less.  The latter category of 10-minute reserves, which PJM uses to meet NERC Reliability Standard BAL-002, are sub-divided into Synchronized and Non-Synchronized Reserves (depending on whether the supplying resource is synchronized to the transmission system).[10]  Prior to the instant proceeding, PJM's Synchronized Reserve product was further sub-divided into:  (1) Tier 1 reserves, representing the headroom on online resources that could be converted to energy within 10 minutes based on the resources' current dispatch point and ramp rate, which were generally not compensated and not subject to performance requirements or associated non-performance penalties; and (2) Tier 2 reserves, provided by resources that, absent the need for additional reserves, would be dispatched to their profit-maximizing output for energy, and which were eligible for compensation and subject to non-performance penalties.[11]

6.      In Order No. 719, the Commission required each RTO/ISO to reform or demonstrate the adequacy of its existing market rules to ensure that the market price for

---

[9] *See* PJM Mar. 29, 2019 Transmittal Letter, at 2 (explaining that "PJM has long had extensive Tariff rules designed to ensure that necessary reserves are obtained, and the parties that supply those reserves are fairly compensated") (PJM Transmittal).  As explained *infra* note 20, PJM submitted nearly identical filings pursuant to FPA sections 205 and 206 in Docket Nos. ER19-1486-000 and EL58-000, respectively.  All citations to the "PJM Transmittal" herein, unless otherwise noted, refer to the transmittal filed in Docket No. EL19-58-000, which, aside from the cover letter and Attachments A and B, is identical to the transmittal filed in Docket No. ER19-1486-000.

[10] There is a slight distinction between PJM's reserve products and reserve requirements.  Under the reforms maintained in the Remand Order, PJM establishes requirements for Synchronized Reserve, Primary Reserve (i.e., total 10-minute reserves) and 30-minute Reserves.  PJM meets these requirements by procuring Secondary Reserves (which can contribute to only the 30-minute Reserve Requirement), Non-Synchronized Reserves (which can contribute to the 30-minute Reserve Requirement and Primary Reserve Requirement), and Synchronized Reserves (which can contribute to all three of the requirements).  *See* PJM Transmittal at 73, fig. 10.

[11] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 4; Remand Order, 177 FERC ¶ 61,209 at PP 5, 9.

energy reflects the value of energy during an operating reserve shortage.[12] The Commission stated that each RTO/ISO may propose one of four suggested approaches to pricing reform during an operating reserve shortage, or develop its own alternative approach to achieve the same objectives.[13] In addition to being just and reasonable, not unduly discriminatory, and appropriately tailored to the RTO/ISO, Order No. 719 required that the RTO/ISO demonstrate that its shortage pricing proposal would: (1) improve reliability by reducing demand and increasing generation during periods of operating reserve shortage; (2) make it more worthwhile for customers to invest in demand response technologies; (3) encourage existing generation and demand resources to continue to be relied upon during an operating reserve shortage; (4) encourage entry of new generation and demand resources; (5) ensure that comparability in treatment of and compensation to all resources is not discarded during periods of operating reserve shortage; and (6) ensure market power is mitigated and gaming behavior is deterred during periods of operating reserve shortage.[14]

7.      In compliance with Order No. 719, PJM implemented, and currently uses, step-function Operating Reserve Demand Curves (ORDC) to represent the demand for reserves in its markets. The horizontal segments in PJM's ORDCs represent the maximum price the market is willing to pay for the associated quantity of reserves.[15]

---

[12] *Wholesale Competition in Regions with Org. Elec. Mkts.*, Order No. 719, 125 FERC ¶ 61,071 (2008), *as amended*, 126 FERC ¶ 61,261, *order on reh'g*, Order No. 719-A, 128 FERC ¶ 61,059, *order on reh'g*, Order No. 719-B, 129 FERC ¶ 61,252 (2009).

[13] The four approaches are: (1) RTOs/ISOs would increase the energy supply and demand bid caps above the current levels only during an emergency; (2) RTOs/ISOs would increase bid caps above the current level during an emergency only for demand bids while keeping generation bid caps in place; (3) RTOs/ISOs would establish a demand curve for operating reserves, which has the effect of raising prices in a previously agreed-upon way as operating reserves grow short; and (4) RTOs/ISOs would set the market-clearing price during an emergency for all supply and demand response resources dispatched equal to the payment made to participants in an emergency demand response program. Order No. 719, 125 FERC ¶ 61,071 at P 208.

[14] *Id*. PP 238, 247.

[15] PJM has described the shape of the existing ORDCs as "vertical . . . with step functions." *See* PJM Transmittal at 23. The Commission has described the ORDCs' shape as "step-function. . ., where the horizontal segments represent the maximum price the market is willing to pay for the associated quantity of reserves." May 2020 Order,

These maximum prices are known as Reserve Penalty Factors. Reserve Penalty Factors can also be thought of as the maximum cost PJM will incur, within market, to redispatch its system to procure an additional megawatt of reserves. PJM currently uses ORDCs with two steps: (1) a step at a Reserve Penalty Factor of $850/MWh that extends to the minimum requirement for the particular reserve requirement (Step 1); and (2) a step at a Reserve Penalty Factor of $300/MWh that extends 190 MW beyond the minimum reserve requirement quantity (Step 2A). In certain circumstances, PJM can extend the second step of the ORDCs beyond 190 MW (Step 2B).

### A.     PJM's FPA Section 205 and 206 Filings and the 2020 Orders

8.     Under the PJM Operating Agreement, PJM has authority to file changes to its market rules with the Commission on behalf of its members under FPA section 205,[16] but in the absence of the requisite majority[17] must submit such proposals pursuant to FPA section 206.[18] As PJM recognized in this proceeding, it does not have authority to file the revisions at issue here unilaterally pursuant to section 205, and its section 205 filing remains subject to the requirements of FPA section 206.[19]

9.     On March 29, 2019, PJM submitted filings pursuant to sections 205 and 206 of the FPA[20] asserting that various reserve market provisions of its Tariff and the Operating

---

171 FERC ¶ 61,153 at P 5. For ease of discussion below, we will refer to the shape of the existing ORDCs as "stepped."

[16] 16 U.S.C. § 824d; *see* PJM Intra-PJM Tariffs, Operating Agreement, OA § 10, § 10.4 (Duties and Responsibilities) (3.0.0), §10.4(xiii) (PJM has the responsibility to "[f]ile with FERC on behalf of the Members any amendments to [the Operating Agreement] or the Schedules hereto, any new Schedules hereto, and make any other regulatory filings on behalf of the Members or the LLC necessary to implement [the Operating Agreement]").

[17] PJM Intra-PJM Tariffs, 8.4, Operating Agreement, OA § 8, § 8.4 (Manner of Acting) (1.0.0) ("[t]he sum of affirmative Sector Votes necessary to pass a pending motion in a Senior Standing Committee shall be greater than (but not merely equal to) the product of .667 multiplied by the number of sectors that have at least five Members and that participated in the vote").

[18] 16 U.S.C. § 824e.

[19] PJM Transmittal at 1 n.1.

[20] PJM filed the proposed revisions to the Operating Agreement pursuant to FPA section 206 and filed pursuant to section 205 to include the same revisions to its Tariff,

Agreement are unjust and unreasonable, and proposing revisions to the Tariff and Operating Agreement as a just and reasonable replacement rate.  PJM's filings arose from a stakeholder proceeding initiated in January 2018 to explore PJM's procurement and pricing of reserves, including how reserves are priced during shortage conditions when reserve requirements cannot be met.[21]  When, as of December 2018, PJM was unable to achieve stakeholder consensus on a proposal, PJM's Board sent a letter to stakeholders indicating that if consensus had not been achieved by January 31, 2019, as needed to allow PJM to submit a proposal under FPA section 205, PJM management would make an FPA section 206 filing.[22]  PJM did not obtain stakeholder support to file its proposal pursuant to section 205[23] and therefore proceeded to file its proposal pursuant to FPA

---

Attachment K-Appendix, which merely repeats certain provisions of the Operating Agreement.  *Id*.

[21] PJM, Energy Price Formation – Frequently Asked Questions (Jan. 22, 2018), https://www.pjm.com/-/media/committees-groups/task-forces/epfstf/postings/epfstf-faqs.ashx (describing PJM's broader energy price formation proposal, including both enhancements to the manner in which Locational Marginal Prices (LMPs) are calculated and enhancements to the mechanism by which energy and reserve prices are formed under reserve shortage conditions); *see also* Letter from Andrew L. Ott, President and CEO, PJM, to PJM Stakeholders, at 1 (Apr. 11, 2018), https://www.pjm.com/-/media/committees-groups/task-forces/epfstf/postings/20180412-pjm-board-letter-regarding-energy-market-price-formation.ashx?la=en.  The PJM Board of Directors (Board) asked stakeholders to work to develop reserve procurement and pricing market rule changes in time for the Board to direct an FPA section 205 filing to implement changes in time for the winter of 2018/19, with further details to be implemented by summer 2019.  *Id*. at 2.

[22] Letter from Ake Almgren, Chair, PJM Board, to PJM Stakeholders (Dec. 5, 2018), https://www.pjm.com/-/media/committees-groups/task-forces/epfstf/20181214/20181214-item-03-pjm-board-letter-12-5-2018-price-formation-letter.ashx.

[23] The PJM Energy Price Formation Senior Task Force voted on four proposals in January 2019, but none secured the 2/3 supermajority required to pass (although the Independent Market Monitor for PJM's (IMM) proposal received the most support of the four, with a 2.60 sector-weighted vote in favor).  *See* PJM Markets and Reliability Committee, Summarized Voting Report (Jan. 26, 2019), https://www.pjm.com/-/media/committees-groups/committees/mrc/20190124/20190124-summarized-voting-report.ashx.  Following a February 2019 vote on a compromise proposal that also failed to secure the requisite support, in March 2019, PJM posted its proposed revisions and reviewed them with stakeholders prior to making the filings on March 29, 2019.  *See* PJM Transmittal at 44 n.84; *see also* PJM Load/Customer Coalition May 15, 2019

Document Accession #: 20220728-3092   Filed Date: 07/28/2022

section 206.  Accordingly, in this proceeding PJM has the burden of proving that the existing rate is unjust and unreasonable before the Commission can consider whether PJM's proposed replacement rate is just and reasonable.[24]

10.    In its filing, PJM explained that its reserve requirements, and the procedures and products used to meet those requirements, had evolved over time and that purported flaws had developed, which PJM asserted were leading to unjust and unreasonable, and unduly discriminatory and preferential rates.[25]  In particular, PJM contended that:  (1) its currently effective ORDCs fail to address uncertainties around load, wind generation, and solar generation forecasts, and unanticipated supply resource outages, which require PJM operators to frequently bias the load forecasts used to schedule resources and make out-of-market generator commitments not reflected in market prices to preserve reliability; (2) reserve market clearing prices do not reflect the operational value of flexibility; (3) Reserve Penalty Factors of $850/MWh are below the legitimate opportunity cost some resources could face in shortage or near-shortage conditions, as a result of the $2,000/MWh energy offer price cap; (4) the subdivision of its Synchronized Reserve product definition into Tier 1 and Tier 2 reserve products with disparate rules for commitment, compensation, and non-performance has led to under-compensation and poor resource performance; and (5) its reserve products are misaligned between the day-ahead and real-time markets, leading to inadequate procurement of forward reserves and inefficient commitment and pricing outcomes.[26]

11.    In support of its first contention, that its currently effective ORDCs unreasonably fail to account for the uncertainties that PJM operators address, PJM explained that it must conduct prospective forecasting and planning on an ongoing basis to ensure that

---

Protest at 6-15 (detailing stakeholder process and lack of stakeholder support for PJM's proposal) (PJM Load Coalition Protest); IMM May 15, 2019 Protest at 7 (IMM Protest) (asserting that PJM's proposed market design could not be submitted under FPA section 205 because the stakeholders rejected it).

[24] *Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017) ("The proponent of a rate change under section 206 … bears 'the burden of proving that the existing rate is unlawful. …'  Therefore, unlike section 205, section 206 mandates a two-step procedure that requires FERC to make an explicit finding that the existing rate is unlawful before setting a new rate." (internal citations omitted)).

[25] PJM Transmittal at 2-3.

[26] May 2020 Order, 171 FERC ¶ 61,153 at P 8; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 4.

Document Accession #: 20220728-3092 Filed Date: 07/28/2022

reserve requirements are maintained throughout the operating day.[27]  PJM stated that some level of error is always present with forecasts, including factors such as actual load, actual interchange, and the actual performance and availability of generation resources. PJM stated that, to account for these operational uncertainties, its operators will often bias the load forecast input to the intermediate term security constrained economic dispatch (IT SCED) engine to ensure that adequate generation is online and available for the real-time SCED (RT SCED) engine to meet PJM's reserve requirements.[28]  In certain instances, PJM explained that operators will also take out-of-market actions to manually commit additional generating resources, which may occur when longer-lead-time resources must be committed prior to the two-hour IT SCED window or if there is a locational need for reserves due to major transmission constraints.[29]  PJM explained that

---

[27] PJM Transmittal at 34-35 (citing *id*. at attach. E, Affidavit of Christopher Pilong on Behalf of PJM Interconnection, L.L.C.) ¶¶ 5-7 (Pilong Aff.)).

[28] *Id.* at 35 (citing Pilong Aff. ¶¶ 6-9).  As explained by PJM, its "dispatchers regularly bias (i.e., effectively adding (or reducing) demand that must be balanced with additional (or less) supply) their scheduling of supply resources in an attempt to manage the uncertainty inherent in near-term forecasts of load, wind generation, and solar generation (or for unexpected plant outages), and [take] other out-of-market actions to preserve reliability."  *Id*. at 6.  For ease of discussion below, we refer to "positive" biasing as operator actions to add forecasted demand to meet actual demand in real time (and compensate for unexpected supply shortfalls or demand increases) and "negative" biasing as operator actions to reduce forecasted demand to meet actual demand (and compensate for unexpected supply increases or demand decreases).

[29] *Id.* at 36 (citing Pilong Aff. ¶¶ 18-20).

both biasing and out-of-market commitments can result in uplift[30] if a resource needed to provide reserves is scheduled outside of the market clearing engine.[31]

12.    Given the issues identified, PJM proposed a replacement rate design that would: (1) establish Reserve Penalty Factors of $2,000/MWh to align with the maximum price-setting energy offer cap of $2,000/MWh; (2) revise the shape of the ORDCs to be based on a probabilistic calculation of the risk of a reserve shortage due to operational uncertainties (i.e., replacing the stepped shape of the ORDCs with a downward-sloping curve); (3) consolidate the Tier 1 and Tier 2 reserve products into one Synchronized Reserve product with uniform commitment, compensation, and non-performance penalty structures; and (4) align reserve procurement in the day-ahead and real-time markets by establishing two 10-minute reserve requirements (Synchronized Reserve Requirement and Primary Reserve Requirement) and one 30-minute reserve requirement (30-minute Reserve Requirement) in each market.[32]    PJM submitted testimony from its Executive Director of Market Operations, Mr. Adam Keech, that, based on simulations, the annual increase in energy and reserve market billing from its proposal would be approximately $556 million.[33]

13.    In the May 2020 Order, the Commission found that PJM had demonstrated its existing reserve market design is no longer just and reasonable and largely adopted PJM's proposed replacement rate, subject to a compliance filing.[34]    The Commission also

---

[30] "Uplift" generally refers to out-of-market payments (i.e., transactions outside of the usual PJM market policies) to ensure that resources are appropriately compensated when following PJM's instructions to produce or reduce power.  *See* PJM, Understanding Uplift and Out-of-Market Payments, https://learn.pjm.com/three-priorities/buying-and-selling-energy/understanding-uplift-and-out-of-market-payments.aspx.  The Energy Uplift (Operating Reserves) component of PJM's wholesale power price is the average price per MWh of day-ahead and balancing operating reserves and synchronous condensing charges.  *See* IMM, 2018 State of the Market Report for PJM, Vol. 1, at 14, https://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2018/2018-som-pjm-volume1.pdf (citing PJM Operating Agreement, Schedule 1 §§ 3.2.3 & 3.3.3) (2018 State of the Market Report)).

[31] PJM Transmittal at 37-38.

[32] May 2020 Order, 171 FERC ¶ 61,153 at P 9; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 5.

[33] PJM Transmittal at 114 (citing *id*. at attach. D, Affidavit of Adam Keech on Behalf of PJM ¶ 44 (Keech Aff.)).

[34] May 2020 Order, 171 FERC ¶ 61,153 at PP 2, 22, 24, 74.

found that the adoption of the proposed revisions rendered the backward-looking energy and ancillary services offset (E&AS Offset) aspect of PJM's Reliability Pricing Model capacity market unjust and unreasonable and established a forward-looking E&AS Offset as the just and reasonable replacement rate.[35]

14.    The November 2020 Rehearing Order sustained the findings of the May 2020 Order.  In the November 2020 Compliance Order, the Commission accepted PJM's Tariff and Operating Agreement revisions regarding the reserve market reforms, effective May 1, 2022, and the revisions to incorporate a forward-looking E&AS Offset, effective November 12, 2020.[36]  Several parties filed petitions for review of the Commission's orders in the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit).

## B.    Motion for Voluntary Remand and the Remand Order

15.    On August 13, 2021, the Commission submitted an unopposed motion for voluntary remand of the agency record in the consolidated appeals of the Commission's 2020 Orders to permit the Commission to further consider, and to issue a further order on, the matters set for judicial review.[37]  On August 23, 2021, the D.C. Circuit issued an order granting the Commission's unopposed motion.[38]

16.    In the Remand Order, the Commission affirmed in part and reversed in part its earlier orders, finding that PJM had met its burden of proof under FPA section 206 to show that certain aspects of its Tariff had become unjust and unreasonable, but failed to meet that burden with respect to other aspects of its Tariff.[39]  In particular, the Commission held that PJM had proved (1) that the bifurcation of Tier 1 and Tier 2 Synchronized Reserve products; (2) the misalignment of the day-ahead and real-time reserve markets; and (3) the provisions regarding resources' reserve capability and offer rules had become unjust and unreasonable.[40]

---

[35] *Id.* PP 2, 308, 310.

[36] November 2020 Compliance Order, 173 FERC ¶ 61,134 at P 3.

[37] *Am. Mun. Power, Inc. v. FERC*, Motion for Voluntary Remand, No. 20-1372 (filed D.C. Cir. Aug. 13, 2021) (Remand Motion).

[38] *Am. Mun. Power, Inc. v. FERC*, No. 20-1372 (D.C. Cir. Aug. 23, 2021) (order granting unopposed motion for voluntary remand).

[39] Remand Order, 177 FERC ¶ 61,209 at P 2.

[40] *Id.* PP 2, 24.

17.    However, the Commission reversed its prior determination in part and found that PJM failed to meet its FPA section 206 burden with respect to certain aspects of its existing Tariff.  In particular, it concluded that PJM had not shown that the currently effective Reserve Penalty Factors and stepped ORDCs are unjust and unreasonable.  The Commission therefore denied PJM's complaint regarding these two aspects of its reserve market and accordingly directed PJM to submit a compliance filing to revise its Tariff and Operating Agreement records previously accepted in this proceeding (to become effective May 1, 2022) to reflect the currently effective Reserve Penalty Factors and ORDCs.[41]  As a result, the Commission also reversed its determination that the prior backward-looking E&AS Offset is unjust and unreasonable.  The Commission explained that its findings regarding the E&AS Offset were grounded in its determination that the Reserve Penalty Factors and ORDCs were unjust and unreasonable and, without those findings, it lacked a basis under the FPA to require PJM to adopt a forward-looking E&AS Offset.[42]  Given the need to delay the base residual auction (BRA) for the 2023/2024 delivery year to incorporate the revised E&AS Offset into the BRA for the 2023/2024 delivery year, the Commission directed PJM to submit a compliance filing proposing a new schedule for that BRA and subsequent BRAs.[43]

---

[41] *Id.* PP 2, 25-26.

[42] *Id.* P 25.  *See, e.g.*, *Emera Me.,* 854 F.3d at 25 (discussing the Commission's dual burden under section 206 to (1) show the existing rate is unlawful before (2) imposing a just and reasonable replacement rate); *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 353 (D.C. Cir. 2014) (*FirstEnergy*) (same); *see also* Remand Order, 177 FERC ¶ 61,209 at P 46 ("[W]e are not finding that a forward-looking E&AS offset is unjust and unreasonable or that PJM cannot propose forward-looking E&AS offset").

[43] The Commission accepted PJM's compliance filing on February 22, 2022.  *See* February 2022 Compliance Order, 178 FERC ¶ 61,122.  We note that the Public Utilities Commission of Ohio (PUCO) filed comments responding to PJM's January 21, 2022 compliance filing in Docket Nos. EL19-58-010, ER19-1486-001, -002, -003, and -004.  The Commission addressed PUCO's comments in the February 2022 Compliance Order.  *See* February 2022 Compliance Order, 178 FERC ¶ 61,122 at P 12.  In an order dated February 11, 2022, the Commission granted PJM's request for clarification related to how PJM should reflect the reserve price caps in its February 22, 2022 filing to comply with the Remand Order.  *See PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,085 (2022).  On February 18, 2022, and February 22, 2022, PJM filed additional compliance filings in Docket Nos. EL19-58-011 and EL19-58-012.  On May 13, 2022, the Commission accepted the compliance filing in Docket No. EL19-58-011, subject to PJM submitting a further compliance filing.  *PJM Interconnection, L.L.C.*, 179 FERC ¶ 61,104 (2022).  PJM submitted this further compliance filing on May 20, 2022, and it was accepted on June 1, 2022.  *PJM Interconnection, L.L.C.*, Docket No. EL19-58-013 (Jun. 1, 2022)

### C.    Requests for Rehearing

18.    Petitioners' requests for relief center on the assertion that the Commission's determination to reverse the 2020 Orders was not supported by substantial evidence.  In particular, Petitioners contend that rehearing of the Remand Order's findings with respect to the shape of PJM's ORDCs and level of the Reserve Penalty Factors is required because those findings are not supported by substantial evidence and fail to consider contrary evidence and expert testimony provided by PJM and other parties.[44]  Petitioners further contend that the Remand Order does not constitute reasoned decisionmaking because it fails to adequately address record evidence:  showing the effect of forecast uncertainties on the need for reserves;[45] demonstrating the frequency, extent, and impact of operator biasing;[46] indicating that the $850/MWh Reserve Penalty Factors are too low, particularly given that other Commission rules permit the energy component of energy

---

(delegated order).  The compliance filing in Docket No. EL19-58-012 remains pending before the Commission.

[44] *See* PJM Request for Rehearing at 1, 3, 26, 30 (citing 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*); *PPL Wallingford Energy, LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005); *Office of Consumers Counsel v. FERC*, 783 F.2d 206, 227 (D.C. Cir. 1986))); Exelon Request for Rehearing at 2 (arguing that in reversing its previous conclusions regarding the ORDCs and $850/MWh Reserve Penalty Factor, the Commission "misinterpreted and overlooked extensive date in the record"); EPSA/P3 Request for Rehearing at 3-4 (contending that the Remand Order's findings are not supported by substantial evidence and improperly ignore contrary evidence, including expert testimony (citing 5 U.S.C. § 706(2)(E); 16 U.S.C. § 825*l*(b); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018); *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009); *Tenneco Gas v. FERC,* 969 F2d 1187, 1214 (D.C. Cir. 1992); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 802 F.2d 969, 975 (7th Cir. 1986)); *id.* at 19-20 (asserting that the Commission failed to support its decisions with substantial evidence by ignoring expert testimony regarding the Reserve Penalty Factors and ignoring evidence that would require a difference outcome (citing Remand Order, 177 FERC ¶ 61,209 (Danly, Comm'r, dissenting at P 12))); *id.* at 22-23 (arguing that the Remand Order failed to grapple with the "mountain of evidence" demonstrating that the stepped ORDCs are unjust and unreasonable).

[45] PJM Request for Rehearing at 10-11.

[46] *Id.* at 11-12; EPSA/P3 Request for Rehearing at 23-27.

market prices to rise to $2,000/MWh;[47] demonstrating that the current structure of PJM's ORDCs causes PJM to rely on uncompensated "pseudo reserves;"[48] and providing competing analysis of the costs and benefits of the proposal.[49]

19.     PJM further argues that the Remand Order fell short of reasoned decisionmaking by finding that there is not substantial evidence that the current ORDCs and Reserve Penalty Factors are unjust and unreasonable based on the same record underlying the 2020 Orders, without taking additional evidence.[50]  In addition, EPSA/P3 argue that the Commission failed to meet the higher burden of proof for reversing prior factual findings by failing to address evidence that the existing stepped ORDCs are unjust and unreasonable or prior findings regarding PJM's proposed Reserve Penalty Factors.[51] Further, they argue that the Commission erred by ignoring precedent regarding the benefits of downward sloping demand curves and failing to acknowledge precedent finding price caps to be unjust and unreasonable because of circumstances that occurred only infrequently.[52]

20.     Although Petitioners request that the Commission reinstate the determinations in the 2020 Orders with respect to the shape of the ORDCs and level of Reserve Penalty Factors,[53] PJM and EPSA/P3 assert that the Commission should, at a minimum, have found sufficient record evidence to find that PJM's current reserve pricing may be unjust

---

[47] PJM Request for Rehearing at 4-5; Exelon Request for Rehearing at 3, 11-15; *see* EPSA/P3 Request for Rehearing at 12-20.

[48] Exelon Request for Rehearing at 3-11.

[49] *Id*. at 15-17.

[50] PJM Request for Rehearing at 1, 3, 30; *see id.* at 4 (asserting that the May 2020 Order reasonably found that evidence had shown that its current reserve market was unjust and unreasonable and the November 2020 Rehearing Order affirmed that finding, rebutting "the very same intervenor showings and arguments that the Remand Order would later rely upon to reach the opposite conclusion").

[51] EPSA/P3 Request for Rehearing at 20, 22-23 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (*Fox*); Remand Order, 177 FERC ¶ 61,209 at P 36).

[52] *Id*. at 15 (citing *Fox*, 556 at 515; *Panhandle E. Pipe Line Co. v. FERC*, 196 F.3d 1273, 1275 (D.C. Cir. 1999)); *id*. at 28.

[53] *See* PJM Request for Rehearing at 2; Exelon Request for Rehearing at 2, 17; *see* EPSA/P3 Request for Rehearing at 10, 33.

and unreasonable and set this matter for hearing and settlement or other further proceedings.[54]  In addition, PJM urges the Commission to acknowledge the unresolved issues in this proceeding and encourage PJM and stakeholders to work to address these issues (as the Commission did with the forward-looking E&AS Offset) to avoid discouraging other reserve market improvements "based upon the premise that the market has not proven itself unworkable."[55]

21.    In this order, we also address:  (1) PJM's argument that the Remand Order erred in reversing the forward-looking E&AS Offset without considering the impact on ancillary services revenues from the reserve market reforms accepted in the 2020 Orders (section II.B); (2) PICOs' request for clarification, or in the alternative rehearing, regarding their October 8, 2021 motion requesting that the Commission direct PJM to remove the 10% adder from the going-forward calculation of the E&AS Offset in the Net Cost of New Entry (Net CONE) calculation (section II.C); and (3) EPSA/P3's assertion that the Chairman's directive to move for voluntary remand was unlawful (section II.E).

## II.    <u>Discussion</u>

22.    In 2012, the Commission approved PJM's existing reserve market rules, finding that the proposal satisfied the criteria in Order No. 719 and "ensures that the market price for energy reflects the value of energy during an operating reserve shortage."[56]  The Commission determined that the resulting "prices should encourage market participants to make available and maintain existing generation or demand resources, or bring new generation or demand resources to the PJM markets to enhance short-term reliability during operating reserve shortage conditions."[57]  Under this construct, during a reserve shortage in PJM, the energy price is increased by the administratively determined cost of falling below the reserve requirement—i.e., the Reserve Penalty Factors.  That upward adjustment sends a strong price signal to both load and supply to respond to the shortage condition, helping to restore normal reserve levels.

23.    In this proceeding, PJM sought to revise its reserve market structure and chose to proceed under FPA section 206, thus requiring it to first demonstrate that its existing reserve construct has become unjust and unreasonable before the Commission, under the

---

[54] PJM Request for Rehearing at 2, 10; EPSA/P3 Request for Rehearing at 30-31.

[55] EPSA/P3 Request for Rehearing at 6.

[56] 2012 Compliance Order, 139 FERC ¶ 61,057 at P 31.

[57] *Id.*

strictures of section 206, could be allowed to impose revisions.[58] In the stakeholder proceedings leading to PJM's filing at issue here, PJM was unable to achieve the necessary support to submit its proposal under FPA section 205 and opted, after some time, to proceed under FPA section 206. The FPA thus requires that PJM bear the consequence,[59] the burden of proof, in the context of the stringent procedural requirements of FPA section 206.[60] Most particularly, recognizing that there can be more than one just and reasonable rate, FPA section 206 does not permit the Commission to revise an existing tariff simply where a new proposal might reflect an improvement over the status quo.[61]

---

[58] *See New England Power Generators Ass'n v. FERC*, 879 F.3d 1192, 1200 (D.C. Cir. 2018) ("In a proceeding under FPA § 206, . . . the challenging party, whether the Commission or the complainant, carries the burden of proving a rate is unjust and unreasonable."); *FirstEnergy*, 758 F.3d at 353 (complainant in FPA section 206 proceeding bears burden to demonstrate existing rate is unjust and unreasonable); *see also Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 663-65 (D.C. Cir. 2017) (recognizing PJM carries higher FPA section 206 burden to propose changes to Operating Agreement).

[59] In *FirstEnergy*, 758 F.3d at 354, the D.C. Circuit addressed a similar situation, explaining the result of the petitioner's choice as follows:

> In any event, petitioner did have the opportunity to negotiate with PJM . . . and could have at that point submitted a section 205 filing with new terms alongside PJM. Such an approach would have allowed FirstEnergy to avoid its burden as to the existing tariff. *See* 16 U.S.C. § 824d. Instead, it made the choice to join PJM without such a negotiated agreement, and is unable to demonstrate the requisite "unjust and unreasonable" showing that it must establish under section 206.

*See also id.* at 357 ("This was not a case where an RTO itself submitted a 205 filing to change its own tariff, obviating the need for an "unjust and unreasonable" showing.").

[60] *City of Anaheim v. FERC*, 558 F.3d 521, 525 (D.C. Cir. 2009) (explaining that FPA section 206 "involves an entirely different-and stricter-set of procedures" than FPA section 205).

[61] *Emera Me.*, 854 F.3d at 21 ("Only *after* having made the determination that the utility's existing rate fails that test may FERC exercise its section 206 authority to impose a new rate."); *see, e.g., PJM Interconnection, L.L.C.*, 158 FERC ¶ 61,093, at PP 31, 50 (2017), *affirmed sub. nom. N.J. Bd. of Pub. Utils. v. FERC*, 728 Fed.Appx. 14 (D.C. Cir. 2018) (per curiam) (denying rehearing of PJM's proposal to eliminate netting, where PJM and intervenors had argued that eliminating netting would be an improvement to the

24.     Further, PJM's burden is not any lighter because the Commission previously reached a different result, in part, in the 2020 Orders.  To be sure, when the Commission departs from its prior rulings, it must "'provid[e] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'"[62]  But Petitioners err in claiming[63] that a heightened standard applies here.[64]  As always, the Commission "must show that there are good reasons for the new policy.  But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."[65]  In addition, where the Commission's determination "rests upon factual findings that contradict those which underlay its prior policy," we must provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy,[66] but we are "not required to refute the factual underpinnings of [our] prior policy with new factual data."[67]

---

current rate, because PJM had not shown that the existing rate was unjust and unreasonable in its complaint).

[62] *ESI Energy, LLC v. FERC*, 892 F.3d 321, 329 (D.C. Cir. 2018) (quoting *Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009) (citation omitted)).

[63] EPSA/P3 Request for Rehearing at 22 (citing *Fox*, 556 U.S. at 515-16); *see id.* at 2-3, 15, 20, 28.

[64] *Westar Energy, Inc. v. FERC*, 568 F.3d 985, 989 (D.C. Cir. 2009) ("The fact that FERC changed its approach required no additional or special explanation.") (citing *Fox*, 556 U.S. at 514 ("We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review.  The Act mentions no such heightened standard.")).  While an agency must always "examine the relevant data and articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Assn. of U. S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983), the APA "makes no distinction, however, between initial agency action and subsequent agency action undoing or revising that action."  *Fox*, 556 U.S. at 515.

[65] *Fox*, 556 U.S. at 515.

[66] *Id*.

[67] *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 626 (D.C. Cir. 2016) ("The Agency only needed to provide a reasoned explanation for discounting the importance of the facts that it had previously relied upon.").  *See also Masias v. EPA*, 906 F.3d 1069, 1074 (D.C. Cir. 2018), *order clarified*, No. 16-1314, 2019 WL 1096761 (D.C. Cir. Feb. 22, 2019)

25.    In the Remand Order, the Commission appropriately applied Commission precedent in the context of the record here, thus calling into question whether the Commission is changing policy in the manner addressed in *Fox* and *U.S. Sugar*, or merely correcting course, within the context of the same proceeding, from the 2020 Orders.  Nonetheless, in the Remand Order and this order, the Commission satisfies *Fox* by reasonably explaining the decision to reverse in part the 2020 Orders.  Much of that decision rests on the competing evidence and arguments presented by PJM and the IMM.  In the 2020 Orders, the Commission sided with PJM; on reconsidering the evidence, the Remand Order and this order explain that, in the Commission's judgment, the IMM's evidence is more persuasive.  The Commission's statutory role is to make and explain this judgment and the decision to reverse in part the 2020 Orders does not diminish that role.[68]

26.    The Commission appropriately applied these standards in the Remand Order and this order.  As an initial matter, we clarify that the issue before us is not whether PJM is failing to meet its reserve requirements or otherwise maintain electric reliability:  PJM's own calculations demonstrate that PJM is procuring reserves under the existing reserve pricing construct that are well in excess of the minimum levels that are needed to maintain electric reliability.[69]  However, PJM and Petitioners argue that PJM is only able to attract these reserves through out-of-market actions that manually supplement the demand for reserves driven by PJM's ORDCs and Reserve Penalty Factors and which are compensated through uplift rather than market prices.[70]  Therefore, the question before us

---

("even without new information, EPA can change course with nothing more than a 'reasoned explanation'") (citing *U.S. Sugar Corp. v. EPA*, 830 F.3d at 626; *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037–38 (D.C. Cir. 2012); *Arkema, Inc. v. EPA*, 618 F.3d 1, 6 (D.C. Cir. 2010)).

[68] *Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 746-47 (D.C. Cir. 2001) ("the presence of disputing expert witnesses" is "'a factual dispute the resolution of which implicates substantial agency expertise,'" where the court "must defer to 'the informed discretion of the responsible federal agencies'") (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989)).

[69] PJM Load Coalition Protest at 23-25 (citing *id.* at attach. A, Affidavit of Ali Al-Jabir on Behalf of the PJM Load/Customer Coalition ¶ 8 (Al-Jabir Aff.)) ("PJM Load/Customer Coalition Affiant Ali Al-Jabir includes in his affidavit a graph of 2018 data that demonstrates that PJM is carrying Synchronized Reserves that are approximately 34% higher than the system requirement and Primary Reserves that are 43% higher than the system requirement.").

[70] *See, e.g.*, PJM Transmittal at 33-39; Keech Aff. ¶ 51; EPSA/P3 Request for Rehearing at 25 ("the fundamental problem is the need for operator biasing that produces

is whether the shortcomings of PJM's ORDCs and Reserve Penalty Factors result in market prices that fail to reflect the value of energy during an operating reserve shortage, such that the Tariff no longer meets the criteria established in Order No. 719.

27.     PJM has not demonstrated that the existing Tariff no longer meets this standard. First, as discussed in section II.A.1, PJM has not met its burden to demonstrate that PJM's existing reserve market provisions *prevent* prices from reflecting actual marginal costs and opportunity costs, notwithstanding the recent increase in the energy market offer cap.  And the availability of significant reserves at $0/MWh is a reflection of market conditions and resource parameters, which is not, here where uplift levels remain low, a sign that reserves are under-compensated in a manner that is unjust and unreasonable.[71] Simply put, oftentimes, the marginal cost for reserves in PJM is, in fact, $0/MWh. Moreover, as discussed in section II.A.2, neither PJM nor Petitioners provide evidence directly linking operator actions or the stepped shape of the ORDCs to actual uplift data; but evidence in this proceeding does demonstrate that uplift in PJM is low.[72]  Having weighed the evidence presented by both PJM and the IMM, as well as other parties, we continue to find that PJM did not meet its burden under FPA section 206 to demonstrate that its existing ORDCs or Reserve Penalty Factors are unjust and unreasonable.

28.     Furthermore, we continue to find that the Remand Order's findings with respect to PJM's ORDCs and Reserve Penalty Factors removed the basis for the Commission's finding that PJM's backward-looking E&AS Offset was unjust and unreasonable.  As discussed in section II.B, PJM has not shown that its backward-looking E&AS Offset is rendered unjust and unreasonable by the reforms maintained in the Remand Order.

29.     Although PJM did not meet its burden under FPA section 206 to demonstrate that the existing Reserve Penalty Factors and ORDCs have become unjust and unreasonable, we clarify that nothing in the Remand Order precludes PJM or other RTOs/ISOs from pursuing improvements to their ORDCs, Reserve Penalty Factors, or E&AS Offset.  We encourage PJM and its stakeholders to continue to work together to achieve a consensus

---

the uplift"); Exelon Request for Rehearing at 3-15 (arguing that the deficiencies of PJM's reserve market cause PJM to engage in out-of-market actions).

[71] *See infra* PP 76-78.

[72] *See* IMM Protest at 17-18 ("PJM uplift is low, accounting for $0.23 per MWh of energy or 0.4 percent of LMP.  The bulk of uplift is driven by specific issues with units or specific local transmission system conditions, such as local reliability issues, extremely inflexible parameters, or failure to follow dispatch instructions . . . .  The lack of evidence directly linking operator actions, reserve market outcomes, or the ORDC shape to quantifiable levels of uplift invalidate PJM's arguments that the energy and reserve markets are unjust and unreasonable due to uplift effects.").

approach allowing additional reserve market enhancements to be presented under FPA section 205.

## A.    Stepped ORDCs and $850/MWh Reserve Penalty Factor

30.    On rehearing, we continue to find that PJM has failed to meet its FPA section 206 burden to show that the currently effective Reserve Penalty Factors and stepped ORDCs have become unjust and unreasonable.  As discussed below, we continue to find that: (1) PJM did not meet its burden to demonstrate that its existing Tariff is no longer just and reasonable because the stepped ORDCs and $850/MWh Reserve Penalty Factors fail to appropriately capture the value of resources that provide reserves (section II.A.1); (2) PJM failed to demonstrate that uncertainties around load, wind, and solar forecasts, and unanticipated supply resource outages and the use of operator biasing to address those uncertainties demonstrate that the requirements in PJM's Tariff regarding ORDCs are unjust and unreasonable or unduly discriminatory or preferential (section II.A.2); and (3) the precedent cited by Petitioners regarding price transparency, uplift, and the use of vertical demand curves does not compel us to find PJM's Tariff unjust and unreasonable (section II.A.3).

### 1.    Valuation of Reserves and Reserve Penalty Factors

31.    In the Remand Order, the Commission found, upon reconsideration, that the May 2020 Order erroneously relied on the increase in the cost-based incremental energy market offer cap to $2,000/MWh as a basis for finding that PJM's Reserve Penalty Factors were no longer just and reasonable.[73]  In particular, the Remand Order found insufficient record support for the conclusion in the 2020 Orders that the Reserve Penalty Factors must be set at the energy market offer cap to maintain sufficient reserves.  The Commission explained that costs of a resource providing reserves are mainly based on that resource's lost opportunity costs:  the difference between the prevailing LMP and its energy offer, i.e., its foregone net energy market revenues.  Thus, the Commission reasoned that even when LMPs in the PJM region exceed $1,000/MWh, there is usually reserve capacity available at a lost opportunity cost of much less than $1,000/MWh.[74] The Remand Order further found that PJM failed to show that a hypothetical situation it described—in which the system goes into shortage pricing or operators schedule reserves out of market because the opportunity costs of a resource physically available to meet the

---

[73] Remand Order, 177 FERC ¶ 61,209 at P 28 (citing May 2020 Order, 171 FERC ¶ 61,153 at P 82).

[74] *Id*. P 29 (citing *Offer Caps in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 831, 157 FERC ¶ 61,115 (2016), *order on reh'g & clarification*, Order No. 831-A, 161 FERC ¶ 61,156 (2017), *amended by* 165 FERC ¶ 61,136 (2018); PJM Transmittal at 33).

reserve requirement exceed the $850/MWh Reserve Penalty Factors—"has or is likely to occur with sufficient frequency that it renders PJM's currently effective rules unjust and unreasonable."[75]  In particular, the Remand Order cited to the IMM's and Maryland Public Service Commission's observations that short-run marginal costs rarely have exceeded $850/MWh and that PJM previously has declined to propose changes to the Reserve Penalty Factors given the infrequency of prices above $1,000 during shortage events.[76]

32.    In addition, the Remand Order explained that the fact that PJM operators take pre-emergency and emergency actions to maintain reserves that have costs greater than $850/MWh does not show that PJM's existing Tariff is unjust and unreasonable because PJM sets the price of these demand response and energy purchases higher than the Reserve Penalty Factors by design.[77]  Finally, the Remand Order disagreed with PJM's claim that the $850/MWh Reserve Penalty Factors were unjust and unreasonable because the highest lost opportunity costs used in forming the Synchronized Reserve supply stack exceeded $1,000/MWh on 3.6% of the days (70 of 1,947) from January 1, 2014-April 30, 2019.  The Remand Order found that this percentage (1) did not demonstrate how often PJM actually went economically short of reserves with the $850/MWh Reserve Penalty Factors when it would have been able to procure sufficient reserves if the Reserve Penalty Factors were raised to $2,000/MWh; and (2) overstated the problem by failing to account for the number of intra-day pricing intervals in which the offers exceeded $1,000.[78]

### a.    Requests for Rehearing

33.    On rehearing, Petitioners renew assertions that the stepped ORDCs and $850/MWh Reserve Penalty Factors fail to reflect the value reserves provide to the

---

[75] *Id*. P 30 (citing PJM Transmittal at 29-30; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 65 (D.C. Cir. 2014)).

[76] *Id*. (citing IMM Protest at 32-33; Maryland Public Service Commission May 15, 2019 Protest at 7 (Maryland Commission Protest) (citing PJM, PJM Market Participants' Response to Prices Exceeding $1,000/MWh (2019), https://www.pjm.com/-/media/committees-groups/committees/mc/20190422-webinar/20190422-item-07b-ferc-required-reserve-shortage-report.ashx) (PJM Price Report)).

[77] *Id*. P 31 (citing PJM Transmittal at 48-49, 93, 103).  The Remand Order also found that PJM did not provide a factual record demonstrating that PJM operators routinely incur costs greater than $850/MWh by dispatching emergency resources to maintain reserves.  *Id*. P 32.

[78] *Id*. PP 33-35 (citing PJM June 21, 2019 Answer at 51 (PJM Answer)).

market and, in particular, that record evidence establishes that the current ORDCs do not reasonably reflect the reliability value of procuring reserves above the minimum reserve requirement.[79]

34.    PJM and Exelon assert that the Remand Order failed to address record evidence that the level of the $850/MWh Reserve Penalty Factors is too low because the Reserve Penalty Factors should be aligned with the marginal cost of providing reserves necessary to meet applicable reserve requirements.[80]  PJM states that the Reserve Penalty Factors

---

[79] PJM Request for Rehearing at 7-8 (citing evidence that: the current ORDCs are not designed to address uncertainties from wind, solar, load, and interchange forecasts and thermal plant outages or the probability that they will cause reserves to fall below the minimum reserve requirement; the current ORDC design includes a contingent step for procuring reserves above the minimum reserve requirement triggered only during conservative operations that fails to price reserves needed on an ongoing basis to meet documented uncertainties; PJM operators regularly take out-of-market action to bias dispatch schedules to mitigate load and resource forecast uncertainties without being reflected in market prices; and a large share of the revenue for Synchronized Reserves comes from out-of-market uplift (citing PJM Transmittal at 25, 35-37, 56, 104; *id.* at attach. F, Affidavit of Dr. Patricio Rocha Garrido on Behalf of PJM ¶¶ 8-11 (Garrido Aff.); PJM Answer at 14, attach. D Reply Affidavit of Dr. Patricio Rocha Garrido on Behalf of PJM ¶ 27, Table 2 (Garrido Reply Aff.))); Exelon Request for Rehearing at 3 (arguing that the Remand Order ignored extensive record evidence confirming that the $850/MWh Reserve Penalty Factors are inadequate).

[80] *See* PJM Request for Rehearing at 15-17 (citing *Petro Star Inc. v. FERC*, 835 F.3d 97, 102-103 (D.C. Cir. 2016) (*Petro Star*); *PPL Wallingford Energy, LLC*, 419 F.3d at 1198; *Process Gas Consumers Grp. v. FERC*, 866 F.2d 470, 474 (D.C. Cir. 1989)); *id.* at 17 (arguing that the Commission was correct in agreeing with PJM in the May 2020 Order that the Reserve Penalty Factors should be aligned with the energy offer cap to improve the likelihood that market prices reflect the marginal cost of providing reserves and send appropriate price signals (citing November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 81; *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (*West Deptford*); *Wis. Valley Improvement Co.*, 236 F.3d at 748; *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970; May 2020 Order, 171 FERC ¶ 61,153 at P 155)); *id.* at 28 (Remand Order erred in maintaining a reserve market design that prevents clearing prices from reflecting the marginal cost of reserves required to meet applicable minimum reserve requirements); Exelon Request for Rehearing at 11-12 (arguing that the weight of record evidence indicates that the $850/MWh Reserve Penalty Factor is insufficient and capable of creating an economic shortage, and that the Commission lacked sufficient justification for its determination in the Remand Order that

act as a cap on how much the market is willing to pay for a reserve product to meet a minimum reserve requirement and avoid a reserve shortage and, thus, if the marginal cost of reserves procured to avoid a shortage exceeds the Reserve Penalty Factors the market will not procure sufficient reserves and will allow a shortage to occur absent out-of-market actions.[81]

35.     Petitioners continue to point to PJM's current $2,000/MWh energy offer cap as the appropriate measure of opportunity cost for resources providing reserves.[82]  EPSA/P3 agree with PJM that resources can face opportunity costs up to $2,000/MWh or higher, requiring system operators to take actions in that price range to maintain reserves, and maintain that the Commission failed to provide a meaningful explanation as to why clearing prices should not be allowed to reflect actual marginal costs, including opportunity costs.[83]  EPSA/P3 assert that the Commission failed to grapple with expert testimony and evidence, as well as with its own prior findings in this proceeding, that resources could face legitimate opportunity costs above $850/MWh.[84]  With respect to

---

PJM had not shown it to be unjust and unreasonable (citing Remand Order, 177 FERC ¶ 61,209 at PP 30-31)).

[81] PJM Request for Rehearing at 16.

[82] *Id.* (citing PJM Transmittal at 31; Keech Aff. ¶ 11; Order No. 831, 157 FERC ¶ 61,115); Exelon Request for Rehearing at 11 (arguing that, in order to send price signals to avoid reserve shortages, the Reserve Penalty Factors should "equal or exceed the highest market-based marginal cost of providing reserves, which is the opportunity cost of resources of participating in the energy market, *i.e.*, the [LMP] the resource can attain minus the cost of providing the energy" (citing PJM Transmittal at 8, 27-29; Keech Aff. ¶¶ 10-11)); EPSA/P3 Request for Rehearing at 18 (citing PJM Answer at 32; Remand Order, 177 FERC ¶ 61,209 at P 29; Order No. 831-A, 161 FERC ¶ 61,156 at P 38; *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,157, at P 185 (2017), *order on reh'g*, 162 FERC ¶ 61,047 (2018); *Frequency Regul. Comp. in the Org. Wholesale Power Mkts.*, Order No. 755, 137 FERC ¶ 61,064, at PP 99, 102 (2011), *order on reh'g*, Order No. 755-A, 138 FERC ¶ 61,123 (2012)).

[83] EPSA/P3 Request for Rehearing at 3-4, 18-19 (citing PJM Answer at 50; P3 May 16, 2019 Comments, attach. B, Emma Nicholson Ph.D. Whitepaper on RTO/ISO Market Design Changes to Increase Operational Flexibility at 13, 16; EPSA May 15, 2019 Comments at 16-18, attach. A, Affidavit of Paul M. Sotkiewicz, Ph.D. ¶ 8 (Sotkiewicz Aff.)).

[84] *Id.* at 19-20 (citing Remand Order, 177 FERC ¶ 61,209 (Danly, Comm'r, dissenting at P 12); November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 81 (footnote omitted)).

these prior findings, EPSA/P3 contend that the Commission was obligated to "provide a more detailed justification" when relying "upon factual findings that contradict those which underlay its prior policy."[85]

36.    EPSA/P3 further allege that the Commission erred in its treatment of PJM data showing that lost opportunity costs exceeded $1,000/MWh on 3.6% of the days. EPSA/P3 state that it is "plainly illogical" and fails to consider relevant factors to suggest that PJM would have to show that it was unable to procure sufficient reserves, given that PJM's operators can and do procure reserves above $850/MWh but compensate those suppliers through uplift.[86]  With respect to the finding in the Remand Order that PJM's data overstated the degree of the problem by not providing data for each pricing interval, EPSA/P3 contend that the Commission did not provide any evidence rebutting PJM's data.  Moreover, EPSA/P3 contend that the Remand Order incorrectly assumed that there is a "frequency" threshold, so even if the problem is overstated, the Reserve Penalty Factors are nevertheless unjust and unreasonable.[87]

37.    Specifically, PJM and EPSA/P3 assert that the Remand Order erred by assuming that PJM was required to show that the cost of providing reserves exceeded $850/MWh with "sufficient frequency" to satisfy its burden under FPA section 206.[88]  PJM contends that the Remand Order established a new standard and failed to justify its departure from other decisions finding existing tariff provisions unjust and unreasonable without requiring evidence of flaws occurring "with sufficient frequency."[89]  EPSA/P3 argue that

---

[85] *Id*. at 20 (quoting *Fox*, 556 U.S. at 515).

[86] *Id*. at 3, 16-17 (citing Remand Order, 177 FERC ¶ 61,209 at PP 33-34; May 2020 Order, 171 FERC ¶ 61,153 at P 34); *id.* at 3 (arguing that the Remand Order was arbitrary and capricious in claiming that PJM would have to show that it "actually went economically short of reserves" under the $850/MWh Reserve Penalty Factor even though PJM demonstrated that it procures reserves at a higher cost through out-of-market commitments (citing *Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, 374 (1998) (*Allentown*); *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983)).

[87] *Id*. at 17-18 (citing Remand Order, 177 FERC ¶ 61,209 at P 35).

[88] *Id*. at 2-3, 13-15 (citing *Fox*, 556 U.S. at 515; *West Deptford,* 766 F.3d at 20; Remand Order, 177 FERC ¶ 61,209 at P 30); PJM Request for Rehearing at 5, 18-19, 27 (citing Remand Order, 177 FERC ¶ 61,209 at PP 29, 30, 32; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 81).

[89] PJM Request for Rehearing at 18 (citing *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 531 (D.C. Cir. 2010); *Enable Gas Transmission, LLC*, 152 FERC ¶ 61,052, at P 66 (2015)).

the Remand Order lacked a basis for this threshold and ignored prior orders finding price caps to be unjust and unreasonable even though they would only have prevented market prices from reflecting actual costs on rare occasions.[90]  PJM further asserts that the frequency of an event does not affect whether it is a "reasonable economic proposition" on which an economic theory can be based to support findings (in place of evidence).[91]

38.    Exelon asserts that the Commission erred in relying on observed prices to conclude that the $850/MWh Reserve Penalty Factors are adequate because market design should not be limited to favorable operating conditions that will not prevail indefinitely and should instead account for challenging conditions to ensure reliability and economic efficiency.[92]  As discussed in section II.A.2 below, Exelon further asserts that the routine use of operator biasing is one reason why marginal energy prices in PJM have not often exceeded $850/MWh, but maintains that this out-of-market action is accomplished "through systematic discrimination among resources providing their reserve capacity to PJM" and runs counter to the Commission's preference that resources be procured in the market.[93]

39.    EPSA/P3 also take issue with the statement in the Remand Order that "there is usually reserve capacity available at a cost much less than $1,000/MWh."[94]  EPSA/P3

---

[90] EPSA/P3 Request for Rehearing at 13-15 (citing November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 81; Order No. 831, 157 FERC ¶ 61,115 at PP 34, 36; *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,057, at P 63 (2012 Compliance Order), *order on reh'g*, 141 FERC ¶ 61,096 (2012)).

[91] PJM Request for Rehearing at 18-19 (citing Remand Order, 177 FERC ¶ 61,209 at PP 30, 32 (citing *S.C. Pub. Serv. Auth.*, 762 F.3d at 65).

[92] Exelon Request for Rehearing at 12-13.

[93] *Id*. at 13 (citing *Managing Transmission Line Ratings*, Order No 881, 177 FERC ¶ 61,179, at P 165 (2021); *Midcontinent Indep. Sys. Operator, Inc.*, 170 FERC ¶ 61,075, at P 33 (2020); *Uplift Cost Allocation & Transparency in Mkts Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 844, 163 FERC ¶ 61,041, at PP 2-3 (2018); *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,017, at P 24 (2015)); *see also* PJM Request for Rehearing at 17 (arguing that operators must go out of market to commit resources to provide reserves because the Reserve Penalty Factors limit the ability of PJM's SCED to commit resources when there is reserve capacity available to meet system needs but at costs above $850/MWh (citing PJM Transmittal at 29; Keech Aff. ¶ 11)).

[94] EPSA/P3 Request for Rehearing at 3, 16 (citing Remand Order, 177 FERC ¶ 61,209 at P 29).

assert that this fact is not dispositive in PJM's single-clearing-price markets, in which the clearing price is set at the marginal resource's offer.[95]

40.     PJM and Exelon further reference the cost of other pre-emergency and emergency load management actions in support of their assertions that the $850/MWh Reserve Penalty Factors are too low.  PJM argues that the fact that pre-emergency and emergency load management actions, costing well above $1,000/MWh (plus committing generation in bids up to $2,000/MWh) are available to maintain reserve levels and avoid shortage shows that the Reserve Penalty Factors, which are supposed to represent the maximum price the market is willing to pay for a specific reserve product to meet a minimum reserve requirement and avoid a reserve shortage, is misaligned with PJM's Tariff.[96] PJM argues that the Remand Order erred in failing to correct the misalignment between the level of the Reserve Penalty Factors and the fixed offer prices for the pre-emergency and emergency actions operators may take to maintain minimum reserve requirements.[97] Exelon similarly asserts that the Commission incorrectly dismissed the significance of $1,849/MWh offers for emergency and pre-emergency demand response and emergency energy offers from neighboring areas exceeding $2,000/MWh.  According to Exelon, a demand response or an emergency energy purchase could set energy market clearing prices at close to $2,000/MWh even though offers from other generation remain low, causing opportunity costs to approach $2,000/MWh and lead to an economic shortage.[98]

41.     Finally, Exelon argues that the Remand Order improperly relied on PJM's load payment analysis in finding the ORDCs and $850/MWh Reserve Penalty Factors to be just and reasonable without considering Exelon's more robust cost-benefit analysis.[99] Exelon states that PJM's estimate that its proposed market revisions would cost $556 million annually measured only the impact on market prices and energy and reserves

---

[95] *Id*. at 16 (citing *Commonwealth Edison Co.*, 113 FERC ¶ 61,278, at P 43 (2005); *Remedying Undue Discrimination through Open Access Transmission Serv. & Standard Elec. Mkt. Design*, 100 FERC ¶ 61,138, at P 204 & n.118 (2002)).

[96] PJM Request for Rehearing at 23 (citing PJM Transmittal at 49, Keech Aff. ¶ 12; *Advanced Energy Mgmt. All.*, 860 F.3d at 664).

[97] *Id*. at 22-23, 29 (citing Remand Order, 177 FERC ¶ 61,209 at P 31).

[98] Exelon Request for Rehearing at 14-15.

[99] *Id*. at 3, 15-17 (citing *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)).

procurement volumes.[100]  Exelon asserts that this cost estimate did not identify or
quantify production cost savings and incremental reliability benefits, which would yield
$200 million in annual net benefits, nor consider the change to the forward-looking
E&AS Offset that would lower capacity costs and prices for consumers.[101]

### b.     Commission Determination

42.     We continue to find that PJM has not met its FPA section 206 burden to show that
the existing Tariff has become unjust and unreasonable.  As an initial matter, although
Petitioners maintain that PJM's current $2,000/MWh energy offer cap is the appropriate
benchmark for the Reserve Penalty Factors,[102] the Reserve Penalty Factors serve a
different purpose than price caps such as the $2,000/MWh energy offer cap, and PJM has
not demonstrated that they should be the same.  PJM's Reserve Penalty Factors are an
administratively determined value intended to "represent[ ] the incremental value of
reserves under shortage conditions" in PJM when the market fails to clear based on
supply and demand fundamentals.[103]  In contrast, the energy offer cap limits the
incremental energy offers that may be reflected in LMP based on actual marginal costs up
to $2,000/MWh.[104]  Therefore, Reserve Penalty Factors serve a different purpose as an
administrative construct than the limiting effect of the $2,000/MWh energy offer cap on
energy prices, and it is reasonable for the Commission to allow Reserve Penalty Factors
that are below the $2,000/MWh energy offer cap.[105]  In fact, many RTOs have

---

[100] *Id*. at 15 (citing Exelon May 15, 2019 Comments, Attachment, Affidavit of
Michael Schnitzer ¶¶ 11-13, 38-51 (Schnitzer Aff.)).

[101] *Id*. at 15-17.

[102] PJM Request for Rehearing at 16-17; Exelon Request for Rehearing at 11-12;
EPSA/P3 Request for Rehearing at 18.

[103] Garrido Aff ¶ 6 n.2 (citing Keech Aff. ¶ 11).

[104] *See* Order No. 831, 157 FERC ¶ 61,115 at PP 5, 11, 86.

[105] In addition, the Reserve Penalty Factors can and do significantly increase
reserve prices and LMP during shortage conditions, even when the maximum reserve and
energy offers on the system are far below the level of the Reserve Penalty Factors, while
the $2,000/MWh energy offer cap does not affect LMP unless a resource has an energy
offer exceeding $2,000/MWh.  *See* IMM Protest at 11 ("Shortage pricing results in an
administrative adder to the energy market price during reserve shortages.  The
administrative adder is equal to the shadow price of the reserve requirement constraint in
the market clearing software.  In other words, LMP increases by the administratively
assigned cost of violating the minimum reserve requirement to serve load.").

implemented reserve penalty factors that are below the $2,000/MWh energy offer cap,[106] and PJM's existing $850/MWh Reserve Penalty Factors were below its prior $1,000/MWh energy offer cap when the Commission found them just and reasonable.[107]

43.    Neither are we persuaded by Petitioners' various arguments that the stepped ORDCs and $850/MWh Reserve Penalty Factors do not reflect the value reserves provide to the market.  PJM adopted its current approach to valuing reserves consistent with Order No. 719.  Recognizing that there could be more than one just and reasonable approach to pricing during an operating reserve shortage, Order No. 719 permitted RTOs/ISOs to work with their stakeholders to propose one of four approaches, including establishing an ORDC.[108]  In accepting PJM's proposal, including its use of a stepped ORDC and $850/MWh Reserve Penalty Factors, the Commission found that PJM's mechanism satisfied the criteria set forth in Order No. 719.[109]

44.    In the current proceeding PJM, as the proponent of a rate change under FPA section 206, bore the burden of showing that the existing Tariff is no longer just and reasonable, which requires showing more than that an alternative rate design might also be just and reasonable, or even preferable.[110]  PJM has not demonstrated, or in some cases even alleged, that aspects of its Commission-approved shortage pricing that it now contends are unjust and unreasonable—the $850/MWh Reserve Penalty Factors or the stepped shape of its ORDCs—fail to satisfy the principles articulated in Order No. 719.  That is, PJM has not demonstrated that its approach to valuing reserves is causing

---

[106] *See, e.g.*, *N.Y. Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,241, at PP 7, 38 (2021) (accepting NYISO's proposal to maintain the existing $750/MWh maximum allowable shadow price assigned to the 30-minute reserve requirement); *Midcontinent Indep. Sys. Operator, Inc.*, 170 FERC ¶ 61,075 at PP 9 n.21, 33 (accepting MISO's proposal to implement a $100/MWh penalty price for the market-wide short-term reserve requirement).

[107] *See* 2012 Compliance Order, 139 FERC ¶ 61,057 at P 68 (noting that PJM's proposal retained the existing $1,000/MWh energy offer cap).

[108] Order No. 719, 125 FERC ¶ 61,071 at P 234.

[109] 2012 Compliance Order, 139 FERC ¶ 61,057 at P 6; *see supra* P 6.

[110] *Emera Me.*, 854 F.3d at 25-26 (Commission failed to meet its "dual burden" under FPA section 206 to find the existing rate unlawful before setting a new rate where the Commission relied on analysis regarding the just and reasonable return on equity to meet both burdens of proof); *id.* at 21 ("Only *after* having made the determination that the utility's existing rate fails that test may FERC exercise its section 206 authority to impose a new rate.").

reliability problems; discouraging investment in demand response technologies; discouraging reliance on existing generation and demand resources during operating reserve shortages; discouraging entry of new resources; failing to ensure comparable treatment of resources during operating reserve shortages; or failing to mitigate market power.

45.     Notwithstanding the broad standard articulated in Order No. 719, in this proceeding, PJM's complaint relies on a claim that under-compensation of reserves renders its existing Tariff unjust and unreasonable.  As explained in the Remand Order, and we continue to find here, PJM has not adequately supported its claim that, following the recent increase in the energy market offer cap to $2,000/MWh, the $850/MWh Reserve Penalty Factors must be raised to match the $2,000/MWh energy offer cap in order to appropriately reflect reserve resources' marginal costs and the maximum theoretical opportunity costs for providing reserves.[111]  As an initial matter, we continue to find that the costs of resources providing reserves are appropriately based on lost opportunity costs: the difference between the prevailing LMP and the resource's energy offer.[112]  But the Remand Order did not find that clearing prices should not be allowed to reflect actual marginal costs or opportunity costs.  Rather, the Remand Order found that PJM has not met its burden to demonstrate that the PJM's reserve market provisions *prevent* clearing prices from reflecting actual marginal costs and opportunity costs.[113] We agree with the IMM's analysis of market conditions showing that that PJM's Reserve Penalty Factors are not unjust and unreasonable simply because the energy market offer cap has been raised.  As the IMM explained:

> PJM's arguments do not support its claim that the value must be at least $2,000 per MWh.  The short run marginal cost of generation rarely exceeds the current $850 per MWh penalty factor and cannot exceed $1,000 per MWh without prior PJM approval of cost-based offers.  It is only under rare and foreseeable circumstances that PJM may need to raise the value above $1,000 per MWh.  PJM does not deploy pre-emergency or emergency demand response prior to synchronized or primary reserve shortages.  PJM has not deployed pre-emergency or emergency demand since April

---

[111] EPSA/P3 Request for Rehearing at 18-20 (citing November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 81); PJM Request for Rehearing at 15-17, 28; Exelon Request for Rehearing at 11-12.

[112] Remand Order, 177 FERC ¶ 61,209 at P 29.

[113] *See id.* PP 33-35.

> 22, 2015, but PJM has experienced shortages of reserves in
> the last four years. The maximum offer price, or strike price,
> for load management resources, $1,849 per MWh, is not a
> short run marginal cost. Requiring the reserve penalty factor
> to exceed the strike price is not necessary for efficient
> dispatch.[114]

46.    In other words, the IMM maintains, and we agree, that the two prerequisites PJM
relies on to claim that the Reserve Penalty Factors are unjust and unreasonable are both
unlikely to occur, and therefore changes to the Reserve Penalty Factors are not necessary
for PJM to achieve efficient dispatch and just and reasonable price formation.
Specifically, the IMM maintains that: (1) contrary to PJM's claims, resources' short run
marginal energy costs (and therefore their opportunity costs) rarely exceed $850/MWh,
despite the recent changes to the energy offer cap; and (2) while dispatching load
management resources (e.g., pre-emergency or emergency demand response) may
theoretically increase resources' opportunity costs, PJM does not generally dispatch load
management resources prior to shortage events.

47.    Although it is possible that the maximum theoretical opportunity cost could
exceed the current $850/MWh Reserve Penalty Factors, PJM has not provided evidence
that the Reserve Penalty Factors are no longer meeting the criteria laid out in Order
No. 719 or preventing clearing prices from reflecting actual marginal costs and
opportunity costs. We continue to find that that the Reserve Penalty Factors need not
equal the maximum possible theoretical opportunity cost incurred by a reserve provider.
In Order No. 719, the Commission directed all RTOs/ISOs to provide adequate factual
support to enable the Commission to ensure that any proposed shortage pricing reform
was "necessary and narrowly tailored to address the circumstances in that region" as well
as designed to protect consumers against the exercise of market power.[115]    The
Commission accepted the $850/MWh Reserve Penalty Factors proposed in PJM's Order
No. 719 shortage pricing compliance filing based in part on PJM's evidence that,
although the "the theoretical maximum opportunity cost incurred by a resource that must
reduce its output to provide reserves is the full value of the LMP, or $1,000/MWh"[116] its
proposal was just and reasonable given the actual opportunity costs incurred during
reserve shortages.[117]    PJM explained that "[a]lthough the identified opportunity costs

---

[114] IMM Protest at 32.

[115] Order No. 719, 125 FERC ¶ 61,071 at P 246.

[116] PJM Transmittal, Docket No. ER09-1063-004, at 22 (filed June 18, 2010) (PJM
Shortage Pricing Proposal).

[117] 2012 Compliance Order, 139 FERC ¶ 61,057 at P 19 ("PJM states that, while a
$1,000 per MWh cap would be the theoretical maximum that could be set, PJM's

exceeded $850/MWh on one day, it is not clear that conditions on that day are representative of possible future conditions."[118]  The Commission accepted PJM's proposal, agreeing that "the establishment of an $850 per MWh reserve penalty factor is appropriate given the opportunity costs actually paid by PJM on peak days in recent years."[119]

48.    As this background demonstrates, by accepting PJM's premise in its complaint that Reserve Penalty Factors must be set at maximum theoretical opportunity costs, the 2020 Orders marked a departure from the Commission's basis for accepting PJM's initial Reserve Penalty Factors.  Importantly, however, in the 2020 Orders, the Commission only endorsed PJM's assertion that the Reserve Penalty Factors must be set at the maximum theoretical opportunity cost in establishing the replacement rate at $2,000/MWh in the second step of the Commission's FPA section 206 analysis.[120]  The 2020 Orders did not ground the finding that the existing Reserve Penalty Factors were unjust and unreasonable, the first step of FPA section 206 and the only step at issue here, in a conclusion that the Reserve Penalty Factors must be set at the maximum theoretical opportunity cost.  Accordingly, in finding in the Remand Order that PJM has not carried its burden to demonstrate that the existing reserve pricing approach has become unjust and unreasonable, the Commission was not required to refute these findings made in the 2020 Orders.[121]

---

proposed cap is reasonable given the opportunity costs actually paid on peak days from January 1, 2006 to November 1, 2009."); PJM Shortage Pricing Proposal at 22-23 (explaining that actual opportunity cost payments to reserve providers exceeded $850/MWh during only three hours on one day during the period of January 1, 2006 to November 1, 2009).

[118] PJM Shortage Pricing Proposal at 23.

[119] 2012 Compliance Order, 139 FERC ¶ 61,057 at P 69.

[120] See May 2020 Order, 171 FERC ¶ 61,153 at P 153 ("We agree with PJM and commenters that because generation resources can submit verified cost-based incremental energy offers up to $2,000/MWh, resources capable of providing reserves will more frequently face opportunity costs as high as $2,000/MWh."); November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 81 ("The market price needs to capture these opportunity costs, even if relatively rare, and it will allow emergency and pre-emergency demand response (which may submit offers up to $1,849/MWh to reduce demand with a 30-minute lead time) to set the clearing price for any reserve product.").

[121] Nonetheless, we address below Petitioners' claims on rehearing regarding the Remand Order's treatment of arguments and record evidence regarding lost opportunity

49.     In the Remand Order, the Commission corrected course to track the reasoning in
the 2012 Compliance Order, explaining as it did in 2012 that the mere theoretical
possibility that opportunity costs could exceed the Reserve Penalty Factors is not
sufficient to render them unjust and unreasonable.[122]   In particular, the Remand Order
found that PJM had not presented the requisite "reasonable economic propositions" to
support a finding that the Reserve Penalty Factors are unjust and unreasonable based on
economic theory.  In contrast, the Commission explained that there is usually reserve
capacity available at an opportunity cost of less than $1,000/MWh even when LMPs in
the PJM region exceed $1,000/MWh.[123]   The Remand Order also pointed to record
evidence from the IMM and the Maryland Public Service Commission (Maryland
Commission) that actual observed short-run marginal costs in PJM have rarely exceeded
$850/MWh, and noted that PJM itself previously declined to propose changes to the
Reserve Penalty Factors in light of the small number of busses that experienced prices
over $1,000 in only one five-minute interval during two reserve shortage events that
occurred in 2018.[124]   On the current record, we continue to find PJM has not
demonstrated that the Commission-accepted Reserve Penalty Factors are no longer just
and reasonable.[125]

---

costs, the role of frequency, and emergency and pre-emergency demand response in our
finding that PJM has not carried its FPA section 206 burden.

[122] Remand Order, 177 FERC ¶ 61,209 at P 30.

[123] *Id.* P 29; *see infra* P 54.

[124] Remand Order, 177 FERC ¶ 61,209 at P 30 (citing IMM Protest at 32-33;
Maryland Commission Protest at 7 (citing PJM Price Report)).

[125] Moreover, the Commission did not require maximum theoretical costs to be
used in setting the demand curves used by New York Independent System Operator, Inc.
*See N.Y. Indep. Sys. Operator, Inc.*, 106 FERC ¶ 61,111, at P 45, *order on reh'g*, 107
FERC ¶ 61,134, *order on reh'g, clarification, and compliance*, 108 FERC ¶ 61,188
(2004), *order on reh'g*, 111 FERC ¶ 61,488, *order on reh'g*, 112 FERC ¶ 61,264 (2005);
*id.* P 43 ("NYISO states that they anticipate adjusting the relevant demand curve when it
is warranted in the future, but . . . wants to avoid adjusting the demand curve for an
unforeseen type of contingency that created system stresses but was deemed extremely
unlikely to happen again."); *N.Y. Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,241 at P 7
("NYISO proposes to revise the current MW quantity assigned the highest pricing value
in the [New York Control Area] 30-minute reserve demand curve to 1,965 MW, which is
1.5 times the single largest contingency of 1,310 MW.  NYISO proposes to maintain the
existing $750/MWh maximum allowable Shadow Price assigned to the 1,965 MW of 30-

50.     In addition, the Commission's precedent on Reserve Penalty Factors further establishes that the Reserve Penalty Factors need not equal the maximum possible theoretical opportunity cost a reserve provider could incur or even the maximum observed opportunity cost.[126]   In directing PJM and other RTOs/ISOs to increase the maximum allowable cost-based energy offer to $2,000/MWh, Order No. 831 provided that RTOs/ISOs "may" propose modifications under FPA section 205 to shortage prices or other market elements in light of the offer cap reforms.[127]   However, the Commission expressly declined to require such changes, "find[ing] that it is not appropriate to determine in this Final Rule the changes that individual RTOs/ISOs should make to market elements that are not the subject of these reforms."[128]   Here, PJM submitted its proposed modifications pursuant to FPA section 206 and thus must first demonstrate that its existing Tariff is unjust and unreasonable.  PJM has failed to show that changes to the maximum theoretical opportunity cost directed by Order No. 831 are alone sufficient to demonstrate PJM's Reserve Penalty Factors are unjust and unreasonable.

51.     In light of the competing evidence and precedent discussed above, we continue to find inadequate the data PJM submitted to support its claim that the $850/MWh Reserve Penalty Factors have become unjust and unreasonable.[129]   PJM provided data showing

---

minute reserves.  NYISO states that this shortage pricing value remains consistent with resource operating costs observed on peak load days." (footnote omitted)).

[126] 2012 Compliance Order, 139 FERC ¶ 61,057 at P 63 (accepting PJM's $850/MWh Reserve Penalty Factors while acknowledging that PJM had made resource-specific opportunity cost payments as high as $923/MWh).

[127] Order No. 831, 157 FERC ¶ 61,115 at P 213.

[128] *Id.* ("An RTO/ISO may file, pursuant to section 205 of the [FPA], to propose modifications to shortage prices or other market elements that require revision in light of the offer cap reforms adopted in this Final Rule.  However, we do not require such modifications to comply with this Final Rule.").

[129] Remand Order, 177 FERC ¶ 61,209 at PP 33-35.  As explained above, the Commission's statutory role is to resolve disputes among competing experts and here we find the IMM's explanation, by reference to significant data and sound theory, more persuasive that PJM's more limited presentations.  *See Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 702 (D.C. Cir. 2007) ("where expert witnesses dispute a factual issue 'the resolution of which implicates substantial agency expertise,' [the court's] is only to verify that the agency has "relied upon sufficient expert evidence to establish a rational connection between the facts and the choice made.") (quoting *Wis. Valley Improvement Co.,* 236 F.3d at 746, 747 (internal quotation marks omitted) (quoting *Marsh v. Or. Nat. Res. Council,* 490 U.S. at 376).

that lost opportunity costs, which constitute the bulk of offers used in forming the
Synchronized Reserve supply stack, exceeded $1,000/MWh on 3.6% of days from
January 1, 2014 through April 30, 2019.[130]  EPSA/P3 argue that the Commission ignored
PJM's evidence that "operators can and do procure reserves at prices above $850/MWh,
but compensate suppliers for those costs through uplift."[131]  Contrary to EPSA/P3's
claim, PJM's complaint failed to document any instances where operators have procured
reserves from a resource with opportunity costs greater than $850/MWh through uplift.
Instead, PJM relied on the fact that such an opportunity cost is theoretically possible.
Accordingly, we disagree that the Remand Order failed to consider relevant factors,[132]
and continue to find that the data PJM provided say nothing about how often those
resources with lost opportunity cost offers exceeding $850/MWh would have been
selected to provide Synchronized Reserve, even if the Reserve Penalty Factor were set at
$2,000/MWh (i.e., how often PJM actually went economically short of reserves at a
$850/MWh Reserve Penalty Factor when it would have been able to procure sufficient
reserves if the Reserve Penalty Factor were set at $2,000/MWh).[133]  Moreover, EPSA/P3
assert that the Remand Order erred in concluding that PJM "overstates the degree of the
problem" because the Commission did not provide evidence rebutting PJM's data.[134]
EPSA/P3 misapprehend PJM's burden of proof under FPA section 206.  The
Commission was not required to provide in-kind evidence to rebut PJM's data; instead, it
showed that PJM's data is not probative of its claim because reserves are settled on an
interval basis rather than a daily basis and PJM's data does not reflect the number of

---

[130] *See* EPSA/P3 Request for Rehearing at 16-17.

[131] *Id.* at 17 (citing PJM Transmittal at 33; May 2020 Order, 171 FERC ¶ 61,153 at
P 34).

[132] *Id.* (citing *Allentown*, 522 U.S. at 374; *Balt. Gas & Elec. Co.*, 462 U.S. at 105).

[133] *See* Remand Order, 177 FERC ¶ 61,209 at P 34.  Moreover, PJM raised the
need to adjust the Reserve Penalty Factors in the Order No. 831 proceeding, arguing that
the factors were derived by looking at average out-of-market lost opportunity costs and
directly linked to offers and the offer cap itself, and thus should be set based on the
highest offer submitted for each day.  *See* PJM and Southwest Power Pool, Inc., Joint
Comments, Docket No. RM16-5-00, at 28-29 (filed Apr. 4, 2016).  The fact that the
Commission expressly declined to do so in Order No. 831 suggests that the Commission
at least implicitly considered and rejected the idea that the theoretical possibility was
sufficient to render the Reserve Penalty Factors unjust and unreasonable.  Order No. 831,
157 FERC ¶ 61,115 at P 213; *supra* P 50.

[134] EPSA/P3 Request for Rehearing at 17-18 (quoting Remand Order, 177 FERC
¶ 61,209 at P 35).

pricing intervals in which the offers exceeded $1,000/MWh.[135]  As the party with the
burden of proof, PJM had the burden of presenting "credible and credited" evidence to
establish a *prima facie* case—only then would the burden shift.[136]  Here, PJM did not
provide such evidence or meet its burden.[137]

52.     Nor did the Commission apply a new or inappropriate "frequency" standard, either
with respect to the number of intervals to be considered for PJM's lost opportunity cost
data or in determining that PJM failed to provide support "that its hypothetical situation
[of costs exceeding $850/MWh and causing false shortage conditions] has or is likely to
occur with sufficient frequency that it renders PJM's currently effective rules unjust and
unreasonable."[138]  Petitioners mistake the Commission's determination that PJM did not
meet its burden of proof under FPA section 206 with the Commission establishing a new
or different showing.  EPSA/P3 point to the Commission's reasoning in the November
2020 Rehearing Order that it "did not accept the $2,000/MWh Reserve Penalty Factors
on the basis of past frequency of a resource's opportunity costs reaching $2,000/MWh"
and that the market needs to capture these costs "even if relatively rare," asserting that
this conclusion was in "perfect accord" with other precedent.[139]  The Commission made
these statements in the context of choosing PJM's proposed $2,000/MWh Reserve
Penalty Factors as the just and reasonable replacement rate after finding the existing
Reserve Penalty Factors unjust and unreasonable, a determination which the Commission
explained did not require determining the "best or perfect rate," but rather balancing the
price of reserves and quantity of reserves procured to avoid setting too low or high of a
price.[140]  This is a different showing than the demonstration required under the first step
of FPA section 206 to establish that PJM's $850/MWh Reserve Penalty Factors are no

---

[135] Remand Order, 177 FERC ¶ 61,209 at P 35.

[136] *See San Diego Gas & Elec. Co. v. Sellers of Ancillary Servs.*, 149 FERC
¶ 61,116, at P 45 & n.101 (2014) (citing *Dir., Off. of Workers' Comp. Programs v.
Greenwich Collieries*, 512 U.S. 267, 279 (1994)).

[137] Remand Order, 177 FERC ¶ 61,209 at P 35.

[138] *See* EPSA/P3 Request for Rehearing at 2-3, 12-15, 17-18; PJM Request for
Rehearing at 18-19; Remand Order, 177 FERC ¶ 61,209 at P 30.

[139] EPSA/P3 Request for Rehearing at 13-15 (citing November 2020 Rehearing
Order, 173 FERC ¶ 61,123 at P 81; Order No. 831, 157 FERC ¶ 61,115 at PP 34, 36;
2012 Compliance Order, 139 FERC ¶ 61,057 at P 63).

[140] November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 81.

longer just and reasonable.[141]  Having determined, upon reconsideration, that there is
insufficient evidence to find PJM's Reserve Penalty Factors unjust and unreasonable, the
Remand Order's statements did not need to be reconciled with these prior statements
regarding frequency from the November 2020 Rehearing Order.

53.    In any event, the precedent to which EPSA/P3 cite for the proposition that the
Commission previously has declined to consider frequency is likewise inapposite.[142]  In
the 2012 Compliance Order, the Commission already had directed RTOs/ISOs in Order
No. 719 to reform their existing market rules (or otherwise demonstrate their ability to
ensure that energy prices will appropriately reflect the value of energy during an
operating reserve shortage).[143]  Under these circumstances, the Commission's reference
to PJM's description of seven shortage conditions experienced during 28 hours over the
years prior to PJM implementing its current shortage pricing provisions does not, as
EPSA/P3 suggest, establish precedent from which the Commission has departed.[144]
Similarly, the Commission's statements in Order No. 831 regarding the frequency of
energy offer caps binding in connection with its determination of a just and reasonable
electric market design for RTOs/ISOs[145] are not relevant to whether PJM has met its
burden of proof in this FPA section 206 proceeding regarding its reserve market.  As
discussed above, the Commission in Order No. 831 explicitly declined to require
revisions to Reserve Penalty Factors to reflect the new $2,000/MWh offer cap.[146]  Indeed,
the record in this proceeding shows that LMPs in PJM have rarely exceeded

---

[141] *Emera Me.*, 854 F.3d at 24, 25 (the Commission must "make an explicit finding
that the existing rate is unlawful before setting a new rate" and "has no authority to
impose a new rate" absent "a showing that the existing rate is unlawful").

[142] EPSA/P3 Request for Rehearing at 13-15 (citing November 2020 Rehearing
Order, 173 FERC ¶ 61,123 at P 81; Order No. 831, 157 FERC ¶ 61,115 at PP 34, 36;
2012 Compliance Order, 139 FERC ¶ 61,057 at P 63).

[143] *See* PJM Shortage Pricing Proposal at 4 (acknowledging that "[t]he
Commission already has made the crucial determination in Order No. 719 that RTO
market rules that do not allow prices to rise sufficiently during an operating reserve
shortage are unjust and unreasonable" (citing Order No. 719, 125 FERC ¶ 61,071 at
P 192)).

[144] EPSA/P3 Request for Rehearing at 15 (citing *Fox*, 556 U.S. at 515; *West
Deptford*, 766 F.3d at 20; *Panhandle E. Pipe Line Co.*, 196 F.3d at 1275).

[145] *See* Order No. 831, 157 FERC ¶ 61,115 at P 36.

[146] *Id*. P 213.

$1,000/MWh,[147] which in turn demonstrates that the theoretical concern of economic reserve shortages is, in fact, unlikely to occur. Although PJM's hypothetical may be possible, it is not the type of reasonable economic proposition that is sufficient to demonstrate that the existing reserve market is unjust and unreasonable based on record evidence suggesting that it is unlikely to occur with any frequency.[148] PJM itself chose to support its complaint based upon evidence showing that opportunity costs might rarely exceed $850/MWh,[149] but now argues that the frequency of an event is irrelevant to the economic theory.[150] Likewise, Exelon objects to the Commission "point[ing] to observed prices to conclude that the $850/MWh penalty factor is adequate,"[151] but as explained above, PJM cited observed prices in first proposing the $850/MWh Reserve Penalty Factor, and the record does not support Exelon's claim that the Reserve Penalty Factors should be based on inflated theoretical costs.[152] We find it appropriate to consider the evidence of frequency PJM provided, but ultimately find that evidence unpersuasive to support a fundamental change in PJM's reserve market, particularly where that change would also be contrary to the precedent established in the proceedings regarding opportunity costs, including the 2012 Compliance Order, discussed above.[153] Accordingly, we find that, based on the record, the Commission in the Remand Order reasonably reconsidered its earlier determinations in the 2020 Orders and found that PJM

---

[147] *See* PJM Load/Customer Coalition Protest at 50-51 ("[F]rom 2014-2018, LMPs in the day-ahead and real-time PJM energy markets never reached $2,000/MWh and never exceeded $1,850/MWh. Importantly, from 2015-2018, LMPs never exceeded $1,000/MWh. Even when LMPs exceeded $1,000/MWh in 2014, such price escalations were anomalies, constituting less than 0.1% of the pricing intervals for any giving pricing point in 2014." (citing Al-Jabir Aff. ¶ 15, Table 1)); *see also* Remand Order, 177 FERC ¶ 61,209 at P 30 (noting that "PJM itself previously declined to suggest changes to the Reserve Penalty Factors after finding that 'so few busses experienced >$1,000 prices in only one five-minute interval' during two reserve shortage events that occurred in 2018").

[148] PJM Request for Rehearing at 19 (citing PJM Transmittal at 8, 28-34, attach. C, exh. 1 (Hogan/Pope Report) at 3; Keech Aff.¶ 31, PJM Answer at 31-33).

[149] PJM Transmittal at 29-30 (citing Hogan/Pope Report at 3).

[150] PJM Request for Rehearing at 19.

[151] Exelon Request for Rehearing at 12-13.

[152] *See supra* P 47.

[153] *See supra* PP 49-50.

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

Docket Nos. EL19-58-007 and ER19-1486-004                                      - 37 -

failed to meet its burden to show that resources may face costs above $850/MWh with sufficient frequency to render PJM's Tariff unjust and unreasonable.[154]

54.     We similarly disagree with EPSA/P3's assertion that it was irrelevant for the Commission to "breezily" find that there is often available reserve capacity at a cost much less than $1,000/MWh.[155]  The Remand Order concluded that "even when LMPs in the PJM region exceed $1,000/MWh, there is usually reserve capacity available at a cost much less than $1,000/MWh" based on the explanation that "[t]he costs of a resource providing reserves are mainly based on that resource's lost opportunity costs:  the difference between the prevailing [LMP] and its energy offer, i.e., its foregone net energy market revenues."[156]  EPSA/P3's contention that this explanation did not explain "why this is a relevant factor in a single-clearing price market where clearing prices are set at the price of the marginal resource"[157] fails to address the Commission's point.  The Remand Order did not suggest that the reserve market price should be set on a pay-as-bid basis rather than the marginal cost of providing reserves, but rather explained that the marginal reserve resource is likely to have opportunity costs below $1,000/MWh even when the LMP exceeds that amount—a fact that is borne out in the record by the relative infrequency of prices exceeding the $850/MWh Reserve Penalty Factors.

55.     We also disagree with PJM's and Exelon's assertions that the $850/MWh Reserve Penalty Factors are unjust and unreasonable because emergency and pre-emergency demand response offers can reach $1,849/MWh and emergency energy costs can exceed $2,000/MWh.[158]  In the Remand Order, the Commission refuted PJM's claim that the $850/MWh Reserve Penalty Factors are too low due to the possibility that it might need to deploy emergency and pre-emergency demand response and emergency energy

---

[154] Remand Order, 177 FERC ¶ 61,209 at P 30.  Further, although EPSA/P3 allege that the Commission failed to explain its departure from precedent, EPSA/P3 Request for Rehearing at 3, we confirm that the Commission appropriately assessed the evidence in the existing record and explained its basis for reaching a different conclusion.  *See supra* P 46.

[155] EPSA/P3 Request for Rehearing at 16 (citing Remand Order, 177 FERC ¶ 61,209 at P 29).

[156] Remand Order, 177 FERC ¶ 61,209 at P 29.

[157] EPSA/P3 Request for Rehearing at 3; *see id*. at 16.

[158] PJM Request for Rehearing at 22-23, 29; Exelon Request for Rehearing at 14-15.

purchases at amounts that exceed the Reserve Penalty Factors.[159]  As PJM acknowledged, this difference is by PJM's own intentional design.[160]  In 2014, the Commission accepted as just and reasonable PJM's proposal to define the demand response offer caps and the emergency energy price-setting offer cap as formulaically greater than the Reserve Penalty Factors.[161]  The Commission was aware when it accepted PJM's proposal to determine the demand response offers caps and emergency energy offer cap based on the Reserve Penalty Factors fact that these aspects of PJM's market design may increase LMPs and theoretically could cause reserve providers to incur opportunity costs greater than the Reserve Penalty Factors.[162]  The Commission found PJM's proposal to be "an improvement over the [then-]current pricing for demand resources" and just and reasonable in response to arguments that the existing offer cap incorrectly valued demand response at shortage pricing levels during times when PJM has adequate reserves.[163]  Furthermore, as the IMM explains, PJM has not historically deployed pre-emergency or emergency demand response during reserve shortage events, and therefore requiring the Reserve Penalty Factors to exceed the $1,849/MWh demand response strike price is not necessary for efficient dispatch.[164]  Accordingly, Petitioners provide no basis to conclude

---

[159] Remand Order, 177 FERC ¶ 61,209 at P 31.

[160] *Id.*

[161] *PJM Interconnection, L.L.C.,* 147 FERC ¶ 61,103, at PP 94-95, 112 (2014), *order on reh'g and compliance*, 155 FERC ¶ 61,061 (2016) (accepting PJM's proposal to establish:  (1) a cap on the required offer price pre-emergency load response and emergency load response resources that are subject to a 30-minute notice period, and for economic load response, equal to $1,000 per MWh, plus the applicable primary reserve penalty factor, minus $1.00; (2) a cap for resources subject to a 60-minute notice period of $1,000 per MWh, plus the applicable primary reserve penalty factor divided by two; and (2) a cap for resources subject to 120-minute notice period of $1,100 per MWh).

[162] *See id.* P 94 ("PJM states that because a Pre-Emergency Load Response resource will be deployed by PJM as one of the last steps taken prior to the occurrence of a shortage event, such a resource should be eligible to set price at a level that is just below the price that would be set under PJM's shortage pricing rules.").

[163] *See id.* P 118 (finding "PJM's pricing stratification proposal is an improvement over the [then-]current pricing for demand resources" and just and reasonable in response to arguments that the existing offer cap incorrectly valued demand response at shortage pricing levels during times when PJM has adequate reserves).

[164] IMM Protest at 32.

that the fact that pre-emergency and emergency market actions are priced higher than reserves renders PJM's reserve market unjust and unreasonable.

56.     Finally, we are not persuaded by Exelon's argument that the Commission erred by relying on PJM's statement that the replacement rate would increase payments to load by more than $556 million annually while ignoring Exelon's statement that the replacement rate would yield at least $200 million in consumer surplus.[165]  The Commission did not rely on PJM's analysis of the costs of its replacement rate to find that PJM failed to demonstrate that its current Reserve Penalty Factors and ORDCs are unjust and unreasonable.  In support of this premise, Exelon cites a single explanatory footnote in the Remand Order, appended to the finding that PJM failed to demonstrate that the currently effective Reserve Penalty Factors and stepped ORDCs are unjust and unreasonable, in which the Commission noted PJM's estimate while acknowledging that the Commission need not address PJM's proposed replacement rate.[166]  We do not construe that footnote as relying on the costs of PJM's replacement rate to justify reversing certain aspects of the 2020 Orders; as explained above and in the footnote at issue, the Remand Order did not make any findings on the replacement rate because the Commission did not reach the second prong of the section 206 inquiry.  Accordingly, the Commission need not address Exelon's witness's claims about the benefits of PJM's replacement rate.

57.     For the above reasons, we continue to find that PJM did not meet its FPA section 206 burden to demonstrate that its existing Tariff is no longer just and reasonable because the stepped ORDCs and $850/MWh Reserve Penalty Factors fail to appropriately capture the value of resources that provide reserves.  Indeed, it could be just and reasonable to have higher Reserve Penalty Factors, but PJM has not made the threshold showing required for the Commission to consider that question.  Although PJM may in the future be able either to secure the requisite stakeholder support to submit such a proposal under FPA section 205 or to make the demonstration needed under FPA section 206 to implement Tariff changes absent stakeholder support, PJM has not shown on this record that its Tariff is no longer just and reasonable.

---

[165] Exelon Request for Rehearing at 15-17 (citing Remand Order, 177 FERC ¶ 61,209 at P 25 n.62).

[166] *See* Remand Order, 177 FERC ¶ 61,209 at P 25 n.62 ("While we need not address PJM's proposed replacement rate with respect to Reserve Penalty Factors and the ORDCs, we note that PJM states that, based on simulations, it estimates the annual increase in energy and reserve market billing from its proposal to be approximately $556 million." (citing PJM Transmittal at 14)).

## 2.     Forecast Uncertainties and Operator Biasing

58.     Upon reconsideration, the Remand Order found that the "broad statements regarding the amount of operational uncertainty PJM faces, PJM operators' practice of load forecast biasing, and the prevalence of reserve market uplift" on which the Commission relied in the May 2020 Order did not demonstrate that PJM's reserve market, including the stepped shape of the ORDCs, was unjust and unreasonable.[167]  The Remand Order determined that PJM failed to carry its burden of demonstrating that the current stepped ORDCs caused its operators to routinely bias the forecasts input to its IT SCED software to maintain reliability or to demonstrate the impacts of biasing on PJM's market or reserve levels.[168]  Specifically, the Remand Order agreed with the IMM that PJM's analysis of operator biasing focused unreasonably on positive forecast bias, despite the fact that PJM operators bias the IT SCED forecast downwards approximately half of the time.[169]  The Commission further found that PJM's claim that it would have been short reserves in 29.1% of all real-time pricing intervals in 2018 if not for IT SCED bias incorrectly assumed a one-to-one causal relationship between the positive bias applied to IT SCED and the amount of additional reserves committed.[170]  Contrary to PJM's claims that operator actions and the deficiencies of its reserve markets caused unreasonably low reserve prices, the Remand Order relied on the IMM's explanation that $0/MWh reserve prices occur when PJM commits resources with a large dispatchable range but inflexibility in starting up and shutting down (such as coal or combined-cycle natural gas) before the peak hour to meet energy demand and the portion of the dispatchable range that is not in economic merit for energy is available to provide reserves at a cost of $0/MWh until the peak of the day and often in other hours with lower energy demand.[171]  In response to concerns regarding reserve market uplift, the Remand Order pointed to data from the IMM that the uplift payments largely arise from incorrect settlement calculations and the mismatch between dispatch and pricing intervals, which PJM recently corrected.  Thus, the Remand Order also agreed with the

---

[167] Remand Order, 177 FERC ¶ 61,209 at P 36 (citing May 2020 Order, 171 FERC ¶ 61,153 at PP 77-81).

[168] *Id*. PP 36, 39.

[169] *Id*. P 38 (citing IMM May 31, 2019 Answer at 6-8 (IMM Answer); IMM Protest at 46, Table 2).

[170] *Id*. P 39 (citing PJM Transmittal at 54-55; Pilong Aff. ¶ 16).

[171] *Id*. P 41 (citing IMM Protest at 13-14; IMM June 19, 2020 Rehearing Request at 15 (IMM Rehearing Request); PJM Transmittal at 26).

IMM that PJM had not demonstrated that uplift in the reserve market arises from any deficiency of the ORDCs.[172]

### a.    Requests for Rehearing

59.    PJM asserts that the Remand Order did not address PJM's evidence of the forecast uncertainties driving the need for reserves and, in particular, the fact that those uncertainties can substantially exceed the reserve requirements reflected in the current ORDCs.[173]  By not addressing the role of forecast uncertainty, PJM alleges that the Remand Order misjudged the relevance of evidence in the record that operators increase the demand component of their scheduling actions as an out-of-market means to mitigate forecast uncertainties beyond the mitigation the reserve market provides (operator biasing).[174]

60.    Petitioners claim that the Remand Order erred by dismissing evidence regarding forecast biasing that operators in PJM use to mitigate uncertainties based largely on the reasoning that the evidence focuses on positive bias—i.e., when dispatchers bias demand

---

[172] *Id*. P 42 (citing IMM July 16, 2019 Answer (IMM Second Answer) at 8-9, attach. A; IMM Rehearing Request at 16-17; *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,104 (2021)).

[173] PJM Request for Rehearing at 4, 10-11, 26 (citing May 2020 Order, 171 FERC ¶ 61,153 at P 79; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 39; PJM Transmittal at 6-7, 25-26, 33-39; Garrido Aff. ¶¶ 8-16; Pilong Aff. ¶¶ 8-20; Hogan/Pope Report at 13; PJM Answer at 8-16; PJM Answer, attach. A, Reply Affidavit of Drs. William W. Hogan and Susan L. Pope on Behalf of PJM Interconnection, L.L.C. ¶¶ 3-4 (Hogan and Pope Aff.); Garrido Reply Aff. ¶¶ 2-13); *see also* Exelon Request for Rehearing at 4 (arguing that the Remand Order did not address undisputed record evidence that PJM operators believe that additional resources are needed in excess of what is procured under the ORDCs, which are affected by the balance of supply and demand, including load level, interchange, thermal resource outages, and intermittent resource output levels).

[174] *See* PJM Request for Rehearing at 11 (citing Garrido Aff. ¶¶ 8-16; Pilong Aff. ¶¶ 8-12); *see id*. at 4, 11-12, 27; *see also* Exelon Request for Rehearing at 9 (citing testimony from PJM to support its claim that PJM does not properly value generation in its reserve market because PJM does not account for uncertainty in its requirements and instead uses market-distorting out-of-market biasing (*Energy & Ancillary Servs. in the Evolving Electricity Sector*, Docket No. AD21-10-000, Technical Conf. Tr. at 82:12-18 (Sept. 14, 2021); Remand Order, 177 FERC ¶ 61,209 at P 39)).

Document Accession #: 20220728-3092   Filed Date: 07/28/2022

level up—without also considering that demand may be biased down.[175]  According to
PJM, this reasoning misses the point of the evidence, as PJM contends that the issue in
this case is not whether over-forecasting can also occur, but what happens when operators
under-forecast system needs.[176]  Petitioners cite to the testimony of PJM witness Mr.
Christopher Pilong, who explained that operators' upward biasing acts as a functional
alternative to reserves, addressing the same forecast uncertainties, and that such bias can
be frequent and extensive.[177]  PJM asserts that the May 2020 Order correctly found that
when PJM needs reserves it is relying on out-of-market supplements to the ORDCs.[178]
According to PJM, the November 2020 Rehearing Order appropriately held that instances
of downward biasing did not mean that the ORDCs are not unjust and unreasonable
because the downward and upward biasing occurred during different intervals and
"during many other intervals, PJM's operators must bias demand upward to prepare for
numerous, sizable operational uncertainties not reflected in PJM's current contingency-
based ORDCs."[179]

61.     Exelon asserts that, contrary to the Commission's conclusion in the Remand
Order, positive biasing by operators has a larger impact on the operating reserves

---

[175] PJM Request for Rehearing at 11-12 (citing Remand Order, 177 FERC
¶ 61,209 at P 38); Exelon Request for Rehearing at 4-6; EPSA/P3 Request for Rehearing
at 4, 23-24.

[176] PJM Request for Rehearing at 11.

[177] *Id*. (citing Pilong Aff. ¶¶ 8-20); *see also* EPSA/P3 Request for Rehearing at 4,
23-24 (claiming that PJM witness Mr. Christopher Pilong explained that positive and
negative biasing serve different purposes—i.e., "that the purpose of positive biasing is to
maintain reserves and reliability during periods of increasing load," while "the purpose of
negative biasing is to remove generation that is not economically needed" after PJM
exceeds the peak load for the period—but that the Commission failed to respond to this
explanation (citing PJM June 21, 2019 Answer, attach. C, Reply Affidavit of Christopher
Pilong on Behalf of PJM Interconnection, L.L.C. ¶ 14 (Pilong Reply Aff.); Remand
Order, 177 FERC ¶ 61,209 at PP 38-39)); Exelon Request for Rehearing at 5-6 (arguing
that PJM commits additional units out of market when operators bias upwards but does
not usually decommit units when operators bias the forecast downwards (citing Pilong
Reply Aff. ¶¶ 14-15)).

[178] PJM Request for Rehearing at 11-12 (citing May 2020 Order, 171 FERC
¶ 61,153 at P 81).

[179] *Id*. at 12 (quoting November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P
39).

Docket Nos. EL19-58-007 and ER19-1486-004                                   - 43 -

available to the system than negative biasing.[180]   Exelon states that when an operator
biases upward, "PJM commits additional units out of market, creating additional
uncompensated 'pseudo-reserves,'" but when an operator biases downward "PJM does
not normally decommit units on an out of market basis," meaning that downward biasing
will not have much impact on the amount of reserves available.[181]   Exelon also claims
that, contrary to the Commission's description of operators adjusting load forecasts based
on their real-time expectations of what load will actually be, operators in PJM
"systematically engage in biasing to add load that they *do not* expect to materialize"
because the market is not designed properly and, absent such intervention, would not
procure sufficient reserves.[182]   Exelon further contends that the Commission's reference
to instances of negative biasing is irrelevant because the Commission has not grappled
with either the May 2020 Order's conclusion that PJM's practice of upward biasing
renders the market design unjust and unreasonable and unduly discriminatory, or with
evidence that PJM's operators believe that PJM's ORDCs procure insufficient reserves to
maintain reliability and are therefore procuring reserves based on out-of-market upward
biasing that does not compensate resources for the service they provide.[183]

62.     PJM argues that the Remand Order unduly dismissed PJM's showing that in
29.1% of all five-minute intervals in 2018, PJM would have been short reserves absent
the positive bias applied in the scheduling engine (for an average amount of increased
demand applied of 1,471 MW).[184]   Although acknowledging that this is a "worst-case
scenario level of reserves because the original positive bias would have had to result in
additional commitment recommendations from the [IT SCED] that the operator took
action on," PJM nevertheless asserts that the fact that the system could have been short
reserves in this many intervals demonstrates that positive bias appears to be needed to

---

[180] Exelon Request for Rehearing at 4-6.

[181] *Id*. at 5-6; *see id.* at 7-8 (providing an example of how Exelon asserts that
"pseudo reserves" are created from upward biasing).

[182] *Id*. at 6.

[183] *Id*. at 10 (citing *State Farm*, 463 U.S. at 43; *Carlson v. Postal Regul. Comm'n*,
938 F.3d 337, 344 (D.C. Cir. 2019); May 2020 Order, 171 FERC ¶ 61,153 at PP 58, 220;
November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 13).  Exelon submits there
may also be a problem with negative operator biasing, "but that is not the record before
the Commission."  *Id*.

[184] PJM Request for Rehearing at 12 (citing Pilong Aff. ¶¶ 12-17); *see also* Exelon
Request for Rehearing at 5 (citing this figure to emphasize the importance of biasing to
reliability (citing Pilong Aff. ¶ 16)).

avoid reserve shortages.[185] PJM objects to the reasoning in the Remand Order that PJM has not shown that the identified intervals led to an actual avoided reserve shortage, arguing that this logic would require the reserve market to fail before it can be improved.[186]

63.    Further, PJM argues that the Remand Order erred in ignoring PJM's contention that the ORDCs should recognize the value of reserves to the system instead of just focusing on the cost of supply.[187] In particular, PJM asserts that the Remand Order is mistaken in finding that PJM's reserve prices for on-line units with unloaded capability should be almost zero, as PJM asserts that the question is not what the supplier's incremental cost is for reserves but what is a reasonable value to the system for those reserves.[188] PJM asserts that this position conflicts with the Commission's orders endorsing single-clearing price markets and the 2012 Compliance Order accepting PJM's current ORDCs, and PJM argues that the Remand Order presented no reason to focus on whether individual market participants might experience revenues above their low marginal costs in lieu of defining a sound market design consistent with prior guidance on price formation.[189] PJM asserts that the Remand Order relied on the "unsteady footing" of the IMM's belief that reserves above the minimum reserve requirement have zero value, but contends that this view is belied by the current ORDC, which procures reserves above the minimum reserve requirement.[190] EPSA/P3 also contend that the Remand Order failed to reconcile its reliance on the IMM's claims that $0/MWh reserve prices are due to inflexible operating parameters with the fact that operators are engaging

---

[185] PJM Request for Rehearing at 12-13 (quoting Pilong Aff. ¶ 16).

[186] *Id*. at 13 (citing *Petro Star*, 835 F.3d at 102-03).

[187] *Id*. at 27-28.

[188] *Id*. at 13 (citing5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43; *Petro Star*, 835 F.3d at 102-03; *PPL Wallingford Energy, LLC*, 419 F.3d at 1198).

[189] *Id*. at 14 (citing 2012 Compliance Order, 139 FERC ¶ 61,057; *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,318, at P 195 (2007); *Cal. Indep. Sys. Operator Corp.*, 112 FERC ¶ 61,013, at PP 34, 36 (2005); *Midwest Indep. Transmission Sys. Operator, Inc.*, 108 FERC ¶ 61,163, at PP 221-24, *order on reh'g*, 109 FERC ¶ 61,157, at PP 204-06 (2004); *New England Power Pool*, 100 FERC ¶ 61,287, at P 71 (2002); *Cent. Hudson Gas & Elec. Corp.*, 86 FERC ¶ 61,062, at 61,223-24, *order on reh'g*, 88 FERC ¶ 61,138 (1999)).

[190] *Id*. at 14 (citing Remand Order, 177 FERC ¶ 61,209 at P 41 (citing IMM Protest at 13-14)); *id*. at 27.

in positive biasing, which EPSA/P3 claim shows that additional reserves are needed but not reflected in the market clearing prices.[191]

64.     EPSA/P3 assert that, even if the Remand Order were correct in suggesting that uplift resulting from operator biasing is less of an issue than PJM claimed, the Remand Order did not address arguments demonstrating that the fundamental problem is not uplift, as such, but the need for operator biasing that produces the uplift.  According to EPSA/P3, PJM's filings demonstrated that the ORDCs fail to recognize the true value of reserves, leaving market participants exposed to out-of-market actions that are not reflected in price signals.[192]

65.     Exelon argues that the Remand Order erred in concluding that PJM's ORDCs are just and reasonable without addressing Exelon's argument that the current structure is unjust, unreasonable, and unduly discriminatory because it relies on "pseudo reserves" provided without compensation by flexible resources.[193]  Because biasing is an out-of-market solution, Exelon states that it entails unintended and discriminatory consequences resulting from the fact that "PJM's intermediate-term software seeks out resources that can start within 120 minutes and have a minimum run time of 120 minutes or less," and thus often selects block-loaded combustion turbines that cannot be dispatched below their economic maximum.[194]  According to Exelon, when the entire output of these resources is not needed and the load forecast has been biased above its expected level, "PJM must reduce the output of a dispatchable unit to make room for the combustion turbine," creating "pseudo reserves" provided by the dispatchable unit, i.e., capacity that is available to PJM as reserves if needed, but that is not compensated as reserves.[195]

---

[191] EPSA/P3 Request for Rehearing at 4, 26-27 (citing Remand Order, 177 FERC ¶ 61,209 at P 41); *id.* at 26 (arguing that the Commission correctly found in the 2020 Orders that the frequent need for operator actions shows that the markets are not functioning properly and the fact that those actions are not incorporated into market prices shows that reserve prices do not reflect the true marginal price of providing reserves (citing May 2020 Order, 171 FERC ¶ 61,153 at P 91; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 41)).

[192] *Id.* at 25 (citing PJM Transmittal at 49-50; Hogan/Pope Report at 4; Sotkiewicz Aff. ¶ 22; EPSA May 15, 2019 Comments at 8-9 (EPSA Comments)).

[193] Exelon Request for Rehearing at 3, 5-11 (citing *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011)).

[194] *Id.* at 6.

[195] *Id.* at 6-8 (citing Schnitzer Aff. ¶ 20).

66.     Exelon alleges that these uncompensated pseudo reserves distort prices such that
load pays less than the full cost for required reserves, and dispatchable units receive less
than the full value of what they provide, which Exelon states is "*per se*
discrimination."[196]  Exelon further argues that, in contending that "the price for these
reserves is low because the cost of providing them is free or close to it," the Remand
Order ignored the distortions caused by backing down dispatchable resources in favor of
combustion turbines instead of allowing the market to identify more efficient solutions.[197]
Exelon also states that these alleged uncompensated reserves raise overall production
costs, pointing to the approximately $70 million in production cost savings PJM claimed
would result from its proposal, and can create inefficiencies and reliability risks due to
the use of operator judgment instead of a systematic framework.[198]  Exelon asserts that
PJM's proposed replacement rate would provide a non-discriminatory framework to
replace these "pseudo reserves" and would ensure that each additional megawatt of
reserves was compensated based on its marginal benefit to customers.[199]

67.     EPSA/P3 contend that the Remand Order acknowledged that the ORDCs do not
procure reserves beyond the minimum reserve requirements but failed to explain how
biasing is consistent with "the limitations on additional procurement under the filed
rate."[200]  Exelon also raises filed rate doctrine concerns, arguing that because PJM uses
biasing in most intervals during the year PJM must include this practice in its Tariff
because it significantly affects rates, terms, and conditions in the reserve market.[201]

---

[196] *Id*. at 8 (citing 16 U.S.C. § 824d(b)).

[197] *Id*. at 8 (citing Remand Order, 177 FERC ¶ 61,209 at P 41).

[198] *Id*. at 8-9 (citing Schnitzer Aff. ¶¶ 26, 44-49).

[199] *Id*. at 9.

[200] EPSA/P3 Request for Rehearing at 4, 26 (citing Remand Order, 177 FERC
¶ 61,209 at P 37).

[201] Exelon Request for Rehearing at 14 (discussing biasing in the context of the
$850/MWh Reserve Penalty Factors (citing EPSA Comments at 9-10)).  EPSA/P3
similarly assert that the Commission failed to address EPSA's argument that systematic
reliance on operator biasing raises a filed rate doctrine concern and conflicts with "the
spirit, if not the letter" of FPA section 205(c), 16 U.S.C. § 824d(c).  EPSA/P3 Request for
Rehearing at 4, 26 (citing EPSA Comments at 9); *see* EPSA Comments at 9-10 (arguing
that operators' unfiled biasing practices raise filed rate doctrine concerns as they
significantly affect rates).

## b.    **Commission Determination**

68.    We continue to find that PJM failed to demonstrate that uncertainties around load, wind, and solar forecasts, and unanticipated supply resource outages and the use of operator biasing to address those uncertainties demonstrate that the requirements in PJM's Tariff regarding ORDCs are unjust and unreasonable or unduly discriminatory or preferential.[202]    Although Petitioners reiterate concerns that the stepped ORDCs do not account for forecast uncertainties and lead to out-of-market actions that do not appropriately reflect the demand for, or value of, reserves, the record in this proceeding does not show that PJM's existing Tariff is unjust and unreasonable under FPA section 206.    The Commission did not, as EPSA/P3 allege, "toss[ ] aside its prior findings regarding the shape of the ORDCs" and ignore contrary evidence.[203]    Rather, the Commission examined the record in this proceeding and, based on the totality of the evidence, reconsidered its determinations in the 2020 Orders that PJM had demonstrated that its Tariff is unjust and unreasonable based in large part on PJM's concerns of forecast uncertainties and operator biasing.[204]    In particular, the Commission weighed the record evidence and reasonably determined in the Remand Order, that uplift observed in the reserve market was not caused by deficiencies in the ORDCs[205] and that the use of operator biasing does not create impacts on PJM's markets or reserve levels that render the ORDCs unjust and unreasonable.[206]    Under these circumstances, Petitioners'

---

[202] *See* Remand Order, 177 FERC ¶ 61,209 at PP 36-42.

[203] EPSA/P3 Request for Rehearing at 22-23 (citing *Fox*, 556 U.S. at 515-16).

[204] *See* May 2020 Order, 171 FERC ¶ 61,153 at PP 77-81.

[205] Remand Order, 177 FERC ¶ 61,209 at PP 40, 42; IMM Second Answer at 8-9 (asserting that uplift in PJM is "not new," and is caused by multiple factors such as: incorrect settlements calculations and a mismatch between the dispatch interval and the pricing interval for Synchronized Reserve uplift; using IT SCED prices instead of RT SCED prices to clear reserves; exclusion of start and no load costs from the lost opportunity cost calculation; the use of a five minute payment; and special arrangements between PJM and market sellers regarding Non-Synchronized Reserve eligibility); *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,104 (correcting the dispatch and pricing interval issue identified by the IMM as causing Synchronized Reserve uplift); IMM Rehearing Request at 16-18.

[206] *See* Remand Order, 177 FERC ¶ 61,209 at P 39 (finding PJM "failed to demonstrate the actual impacts that IT SCED bias has on PJM's market or its reserve levels" and that "the evidence PJM provides regarding IT SCED bias fails to demonstrate that the currently effective ORDCs are unjust and unreasonable"); IMM Protest at 44 (explaining that PJM rarely enters shortage conditions and had zero five minute market

arguments that PJM's proposed replacement rate could potentially provide a more optimal solution to the need for reserves in its market do not demonstrate that PJM has met its burden in this FPA section 206 proceeding to show that the ORDCs under PJM's Tariff are unjust and unreasonable.  Neither has PJM shown that the use of out-of-market actions, in itself, is unjust and unreasonable.[207]  There can be more than one just and reasonable rate,[208] but here PJM had the burden of demonstrating that PJM's existing Tariff is no longer just and reasonable under FPA section 206 before reaching the question of whether its rate proposal is just and reasonable.[209]  Accordingly, Petitioners' assertions regarding the benefits of PJM's proposal fail to show that PJM's Tariff is no longer just and reasonable.

69.     As an initial matter, we continue to find that PJM has failed to carry its burden of demonstrating that the operator bias it cited is caused by the currently effective

---

intervals of primary reserve shortage in 2018); *id.* at attach. A ,Winter Peak Price and Uplift Analysis:  January 2019 (IMM Uplift Analysis).  As explained above, and contrary to EPSA/P3's assertions, these conclusions in the Remand Order satisfy, to the extent necessary, the "more detailed justification" required by *Fox* for determinations that rest upon factual findings that contradict those underpinning a prior policy.  *See Fox*, 556 U.S. at 515.

[207] Indeed, the Commission has recognized that market operators should have the ability to make such adjustments to, for example, maintain reliability.  *See, e.g., Cal. Indep. Sys. Operator Corp.*, 166 FERC ¶ 61,138, at P 24 (2019), *order on reh'g*, 170 FERC ¶ 61,131 (2020) ("We find that operators in the CAISO and [Energy Imbalance Market] entity balancing authority areas should have the ability to manually adjust load forecasts in the real-time market when necessary to maintain system reliability and keep the system in balance.").

[208] *See Sw. Power Pool, Inc.*, 158 FERC ¶ 61,063, at P 13 (2017) (acknowledging that "there can be more than one just and reasonable rate"); *Int'l Transmission Co.*, 123 FERC ¶ 61,065, at P 20 (2008) ("The Commission has consistently found that different rate proposals can be just and reasonable, and that more than one method can be correct for calculating rates."); *Louisville Gas & Elec. Co.*, 114 FERC ¶ 61,282, at P 29 (2006) (the just and reasonable standard under the FPA is not so rigid as to limit rates to a "best rate" or "most efficient rate" standard, but rather a range of different approaches often may be just and reasonable).  Further, "[s]tatutory reasonableness is an abstract quality" that "allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high."  *FPC v. Conway Corp.*, 426 U.S. 271, 278 (1976) (quoting *Mont.-Dakota Util. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951)).

[209] *Emera Me.*, 854 F.3d at 21.

ORDCs.[210]  PJM continues to assert that the magnitude of forecast uncertainties (relative to its reserve requirements) renders the stepped ORDCs unjust and unreasonable.  Specifically, PJM claims that managing these uncertainties requires additional reserves above PJM's minimum reserve requirements, causing unjust and unreasonable price suppression.[211]  However, in claiming that various forecast uncertainties can exceed the maximum level of reserves it procures, PJM fails to demonstrate that its cited forecast uncertainties and the actions taken in response to those uncertainties render PJM's ORDCs unjust and unreasonable.  In particular, PJM has not demonstrated that forecast uncertainties occur over timeframes that can only be addressed by 10-minute and 30-minute reserves.  PJM and Petitioners largely rely on the frequency and extent of IT SCED operator bias to argue that PJM's forecast uncertainties render its ORDCs unjust and unreasonable.  However, PJM's expert testimony is clear that IT SCED considers an operational timeframe of 30 minutes to 2 hours ahead, longer than the 10-minute and 30-minute timeframes considered by its ORDCs and reserve requirements.[212]  Therefore, many of the resources that PJM operators schedule based on the advice of IT SCED may not even be eligible to provide 10-minute or 30-minute reserves; IT SCED considers all resources that can start within two hours, while PJM's reserve requirements exclusively consider resources that can start within 10 to 30 minutes.[213]  Accordingly, we continue to find that IT SCED bias alone is not sufficient to demonstrate that PJM's forecast uncertainties render its reserve requirements insufficient.

---

[210] Remand Order, 177 FERC ¶ 61,209 at PP 36-39.

[211] PJM Request for Rehearing at 8, 10-12 (citing May 2020 Order, 171 FERC ¶ 61,153 at P 79; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 39; Garrido Aff. ¶¶ 8-16; Pilong Aff. ¶¶ 8-12); *see also* Exelon Request for Rehearing at 4 (arguing that the Commission failed to address evidence documenting that PJM's operators believe that additional resources are needed above what is procured under the ORDCs as a result of forecast uncertainties and resources not performing when called upon).

[212] As PJM's witness Mr. Christopher Pilong explains, "[t]he [IT SCED] engine looks at multiple time intervals beginning between 30-minutes and 2-hours ahead," and "recommend[s] resources that can start within 2-hours and have a Minimum Run Time of 2 hours or less for the PJM dispatcher to commit."  Pilong Aff. ¶ 8.

[213] *See* IMM Answer at 11 (citing PJM Manual 11 to explain that IT SCED functions on a one- to two-hour timeframe); *see also* PJM, Manual 11:  Energy & Ancillary Services Market Operations, Revision: 121, at 54 (Jul. 7, 2022), https://www.pjm.com/~/media/documents/manuals/m11.ashx (explaining that PJM uses the SCED to perform various functions over a one to two-hour look-ahead period, including commitment for energy and reserves and economic demand resources).

70.    Beyond the issue of operator bias, PJM's witness Dr. Patricio Rocha Garrido analyzes PJM's historic 30-minute forecast uncertainty to argue that PJM faces greater operational uncertainty in proportion to its 10-minute reserve requirements than other RTOs/ISOs, asserting that 30-minute forecast uncertainty is the relevant timeframe for 10-minute reserves.[214]  However, the IMM contends that PJM overstates its forecast uncertainty and in particular disputes PJM's underlying assertion that the relevant forecast timeframe for 10-minute reserves is 30 minutes.  Rather, the IMM explains that the relevant forecast timeframe for 10-minute reserves is no greater than 15 minutes because PJM schedules generation in real-time using forecasts that look 10 to 14 minutes ahead, meaning that all of the uncertainty reflected in the forecasts will be resolved within 15 minutes.[215]  On balance, we find the IMM's explanation persuasive because we agree that PJM has not demonstrated a need to use 30-minute forecast error to quantify the uncertainty for this period, nor to use the resulting uncertainty to procure additional reserves.  Therefore, we find that the record evidence regarding forecast uncertainty does not demonstrate that PJM's reserve requirements are unjust and unreasonable, because the cited forecast uncertainties occur over different timeframes than PJM's reserve requirements.

71.    Given this finding, we remain unpersuaded by Exelon's assertion that the use of operator biasing has rendered PJM's reserve market unjust and unreasonable.  Exelon suggests that the Commission should direct PJM to raise the Reserve Penalty Factors to avoid the potential use of out-of-market actions, and implies that doing so would have little or no negative impacts on rates.[216]  However, in carrying out the Commission's statutory obligation under FPA section 206 to determine whether PJM has shown that its existing Tariff is unjust and unreasonable, we must also balance our responsibility to

---

[214] *See* Garrido Aff. ¶¶ 8-14; Garrido Reply Aff. ¶ 27, Table 2; *see* PJM Request for Rehearing at 7, 10-11.

[215] IMM Protest at 33-35; *id*. at 35 ("PJM has to operate to account for the load forecast, and any generator forced outages that may occur within the 10 to 14 minute period between the target interval and the time that an RT SCED case is executed.  It is appropriate to use a 15 minute forecast error, and 15 minute forced outage rate to quantify this uncertainty.  Using a 30 minute forecast error inflates the amount of relevant uncertainty."); *see also* IMM Rehearing Request at 13 (pointing out that forecast data are inputs to PJM tools and asserting that PJM has not demonstrated that forecast error data are relevant to operator actions).

[216] *See* Exelon Request for Rehearing at 13 (arguing that PJM's marginal energy prices have not often exceeded the $850/MWh Reserve Penalty Factors only due to the use of pervasive out-of-market biasing "that has a distortive effect on reserve prices and discriminatory effect on suppliers").

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

protect consumers from excessive rates.[217]  PJM would have us prioritize the concern that $850/MWh Reserve Penalty Factors have or may lead to out-of-market operator actions as the only concern.  This is not required, and PJM has not shown that the possibility that the $850/MWh Reserve Penalty Factors may lead to out-of-market operator actions renders its Tariff unjust and unreasonable.  Here, the Commission reasonably balanced this concern against evidence that setting the Reserve Penalty Factors at or above the maximum theoretical opportunity cost significantly increases reserve prices and LMP during shortage events, and thereby increases costs to consumers in a manner that is not warranted by a corresponding change in benefits.[218]  In particular, PJM has failed to identify any instance where the $850/MWh Reserve Penalty Factors were insufficient to procure needed reserves within PJM's market engines.  The Commission therefore appropriately determined in the Remand Order that PJM did not meet its FPA section 206 burden to demonstrate that the $850/MWh Reserve Penalty Factors are unjust and unreasonable.

72.    Next, we disagree with Petitioners' claims that the Commission did not acknowledge the potential harms of applying positive bias to the load forecasts entered into PJM's IT SCED engine.[219]  Rather, based on evidence that PJM operators bias the IT SCED forecast upwards approximately one third of the time, downwards approximately

---

[217] *See Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952-53 (D.C. Cir. 2016) ("It is long-established that the 'primary aim [of the FPA] is the protection of consumers from excessive rates and charges.'" (quoting *Mun. Light Bds. of Reading & Wakefield Mass. v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971)).

[218] *See* IMM Protest at 11 (explaining the function of shortage pricing as an administrative adder to the energy market prices during reserve shortages); *id*. at 32-33 (arguing that the proposed $2,000/MWh Reserve Penalty Factors overstate marginal costs and would lead to unreasonable costs to consumers).

[219] Exelon Request for Rehearing at 10 (asserting that the Remand Order did not grapple with evidence that upward biasing produces both discrimination and inefficiency, despite the Commission's finding in the May 2020 Order that PJM's existing market design is unjust, unreasonable, and unduly discriminatory in part on that basis, and that pointing to instances in which PJM's operators bias forecasts down is irrelevant); EPSA/P3 Request for Rehearing at 22 (arguing that the Commission dismissed the findings in the 2020 Orders as having "relied on broad statements regarding the amount of operational uncertainty PJM faces, PJM operators' practice of load forecast biasing and the prevalence of reserve market uplift" (citing Remand Order, 177 FERC ¶ 61,209 at P 36)); PJM Request for Rehearing at 11 ("[B]y not addressing the critical role of forecast uncertainty, the Remand Order incorrectly evaluates the relevance of the operator dispatch bias that PJM documented in the record.").

half of the time, and apply no bias for the balance of time, the Remand Order concluded that "[a] pattern of operators reflecting their expert judgment in imperfect computer-generated forecasts is not sufficient to demonstrate that PJM's ORDCs are unjust and unreasonable."[220]  Petitioners cite to the testimony of PJM witness Mr. Christopher Pilong to suggest that the Remand Order improperly relied on instances of negative biasing to find that PJM failed to meet its burden "because the purpose of positive biasing is to maintain reserves and reliability during periods of increasing load (managing risk), and the purpose of negative biasing is to remove generation that is not economically needed after PJM has past the peak load for the period (managing uplift)."[221]  Petitioners' arguments assume, however, a one-for-one causal relationship between positive biasing and commitment of units.[222]  As the Remand Order explained, the biasing pattern does not indicate that PJM operators "systematically 'put their thumb[s] on the scale' to compensate for a deficiency in PJM's ORDCs," but simply shows that IT SCED, by its nature, regularly requires adjustments based on operator judgment as part of the progression from longer-term to near-term forecasts.[223]

73.     Referencing PJM's own statements, the Remand Order explained that forecast biasing is part of the sequence of actions that operators take that may or may not lead to commitment decisions:

> . . . in PJM there are no "automated" commitments either real-time or day-ahead.  Instead, several applications, including PJM's [IT SCED] software, provide commitment suggestions to PJM operators while considering maintaining power balance and controlling transmission constraints.  PJM operators perform additional analyses once these suggestions are received, including running transmission studies to ensure

---

[220] Remand Order, 177 FERC ¶ 61,209 at P 38.

[221] EPSA/P3 Request for Rehearing at 24 (quoting Pilong Reply Aff. ¶ 14); *see* Exelon Request for Rehearing at 5-6 (citing Pilong Reply Aff. ¶¶ 14-15).

[222] *See also* Exelon Request for Rehearing at 5-6 (asserting that PJM typically commits additional units out of market when operators bias the forecast upwards, but does not decommit units for downward bias).

[223] Remand Order, 177 FERC ¶ 61,209 at P 38 ("This biasing pattern does not indicate that PJM operators systematically 'put their thumb on the scale' to compensate for a deficiency in PJM's ORDCs, but rather indicates that IT SCED bias is part of a continuum that starts with longer-term forecasts, transitions to near-term forecasts, and then ultimately relies on operators' independent judgment to reliably operate the PJM system." (citing IMM Answer at 6-7)).

Document Accession #: 20220728-3092   Filed Date: 07/28/2022

> committing the resource will not result in overloads prior to
> finally committing a unit.  Both these analyses and the
> operators' decisions all occur after the clearing of the Day-
> ahead Energy Market, which occurs by 1:30 PM on the day
> prior to the Operating Day.[224]

74.     As the Remand Order explained, IT SCED is an advisory tool, and not all recommendations will lead to commitment decisions.[225]  To that end, the fact that the Commission found in the November 2020 Rehearing Order that upward and downward biasing occur in different intervals does not prevent the Commission from determining that the use of IT SCED as an advisory tool does not render PJM's Tariff unjust and unreasonable.[226]  We find that the Remand Order adequately considered the potential effects of positive and negative bias in light of the record evidence, and reasonably concluded that PJM's analysis of positive bias is not sufficient to demonstrate that its current ORDCs are unjust and unreasonable.

75.     For this reason, we likewise find unpersuasive PJM's continued assertion that it is possible that in 29.1% of all five-minute intervals in 2018, PJM would have been short reserves absent the positive bias applied in the scheduling engines for those intervals.[227]  PJM acknowledges that this constitutes a "worst-case scenario level of reserves" that would require the positive bias to result in additional commitments.[228]  Indeed, PJM does not deny, as the Commission explained, that this scenario in fact rests on the unsupported assumption of a "one-for-one causal relationship between the positive MW bias applied to IT SCED and the amount of additional reserves committed."[229]  Thus, we disagree that, in finding that this evidence fails to meet PJM's FPA section 206 burden to demonstrate

---

[224] *Id.* P 39 (quoting PJM, Comments, Docket No. RM17-2-000, at 13 (filed Apr. 10, 2017)).

[225] *Id.* (citing IMM Answer at 10; IMM Second Answer at 6-7; IMM Rehearing Request at 13-14).

[226] November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 39; PJM Request for Rehearing at 12 (citing November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 39).

[227] PJM Request for Rehearing at 12 (citing Pilong Aff. ¶¶ 12-17).

[228] *Id.* (citing Pilong Aff. ¶¶ 12-17).

[229] Remand Order, 177 FERC ¶ 61,209 at P 39.

that PJM's existing reserve market is unjust and unreasonable, the Remand Order unduly dismissed this showing.

76.    Contrary to PJM's claim, this does not mean that PJM's reserve market must "fail" before it may be improved.[230]  Rather, consistent with FPA section 206, PJM must carry its burden to show that the existing rate is unjust and unreasonable before we may impose a replacement rate.[231]  Under these circumstances, this does not require showing that the market would have failed absent these actions, but does require more than a showing that PJM could have been short under a hypothetical worst-case scenario which, as explained above, is based on the unsupported assumption that every megawatt of positive biasing leads to a megawatt of unit commitment.  Moreover, this argument fails to acknowledge that nothing precludes PJM, or any other RTO, from working with its stakeholders to propose improvements to its reserve market under FPA section 205, which would not require demonstrating that the existing Tariff is unjust and unreasonable.[232]

77.    We disagree with EPSA/P3's and PJM's assertions that the Remand Order's conclusions regarding $0/MWh reserve prices fail to recognize the true value of reserves to the system.[233]  The Remand Order found that the large amount of $0/MWh reserves available and corresponding prevalence of $0/MWh reserve prices is a natural byproduct of PJM committing units to meet energy demand.[234]  If a unit is economically dispatched

---

[230] *See* PJM Request for Rehearing at 13.

[231] *See FirstEnergy*, 758 F.3d at 353 (complainant in FPA section 206 proceeding bears burden to demonstrate existing rate is unjust and unreasonable).

[232] *See supra* PP 29, 57.

[233] EPSA/P3 Request for Rehearing at 26 (arguing that the Remand Order's conclusion that $0/MWh reserve prices are caused by inflexible operating parameters is irreconcilable with the fact that operators are engaging in positive biasing that reveals a need for reserves not reflected in clearing prices) (citing Remand Order, 177 FERC ¶ 61,209 at P 41)); PJM Request for Rehearing at 13-14 (arguing that the conclusion that reserve prices should be almost zero because substantial reserves are provided by on-line units with unloaded capability ignores the demand for reserves and their value to the system).

[234] Remand Order, 177 FERC ¶ 61,209 at P 41 ("Given the fact that many of the resources in PJM have inflexibility in starting up and shutting down that necessitates committing them hours ahead of time and have a large dispatchable range that allows them to offer a large amount of reserves, we find that the observed reserve prices are a reflection of supply and demand conditions in the PJM market, and not a demonstration that PJM's reserve markets are unjust and unreasonable.").

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

below the amount of energy the resource is willing and capable of supplying, the resource has uncommitted capacity that could be deployed if called upon.[235]  Under these conditions, the resource is not incurring any opportunity costs and the fact that a significant amount of headroom is available at a marginal cost of $0/MWh is a reflection of supply and demand conditions in the PJM market and not an indication that PJM's markets are unjust and unreasonable.[236]  Although reserve prices would be different under alternative ORDCs, such as PJM's proposed replacement ORDCs, the fact that alternative ORDCs might produce different pricing outcomes does not demonstrate that PJM's current ORDCs are unjust and unreasonable.[237]  Moreover, if the $0/MWh prices were not consistent with supply and demand conditions on the system (i.e., if the units

---

[235] *See* IMM Protest at 13 ("PJM's reserve markets do not produce prices equal to zero unless the quantity of zero cost reserves exceeds the reserve requirement.  Zero cost reserves often exceed the reserve requirement because some generating units are inflexible and must be scheduled for hours ahead of and beyond the time at which they are needed to produce energy.").

[236] *See id.* at 14 & fig. 2 (explaining that 60% of PJM's energy is provided by resources that create large quantities of zero cost reserves—coal and combined cycle units that that have inflexibility in starting up and shutting down but can offer roughly half of their capacity as dispatchable once online (citing 2018 State of the Market Report, Vol. 2, Section 3:  Energy Market at Tables 3-11 and 3-12)); IMM Uplift Analysis at 1 (explaining that reserve prices at or near zero on January 31, 2019 were consistent with supply and demand conditions, including self-scheduling by steam generators during the early morning ramping period or producing several hours prior to their day-ahead commitments); *id.* at 12-13 (providing additional information on the market participant decisions leading to the large amount of $0/MWh reserves on January 31, 2019); *id.* at 16 ("Low reserve prices on January 31, 2019, were consistent with supply and demand fundamentals," including an adequate reserve supply); PJM Load Coalition Protest at 20 (asserting that Synchronized Reserve surplus during cold weather and high load periods of January 30-31, 2019 was similar to the surplus PJM reported for 2018 and that it is logical that reserve prices would fall during particular intervals, but this evidence does not indicate a market design flaw (citing Al-Jabir Aff. ¶ 10)).

[237] Neither does this conclusion indicate an improper reliance on the "unsteady footing" of the IMM's explanation that reserves above the minimum reserve requirement should have zero value.  PJM Request for Rehearing at 14.  The Commission may decide between evidence and testimony provided by experts in reaching its conclusions and, here, the fact that adopting a differently shaped ORDC would produce different results does not render the Commission's conclusion unreasonable.  *See Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003); *Wis. Valley Improvement Co.*, 236 F.3d at 746-47.

with inflexible commitment parameters contributing to these prices were not economic), this would tend to lead to higher amounts of uplift. However, this is not the case.

78.     We agree with the IMM that the record evidence does not demonstrate a link between operator actions or the shape of the ORDCs and actual uplift payments.[238] As explained above, IT SCED is an advisory tool that does not involve automated commitments,[239] and there is not a one-to-one relationship between operator biasing actions and commitment decisions. Uplift represented only 0.4% of wholesale power prices in 2018, the year PJM developed its proposal submitted in 2019.[240] Neither are we persuaded by EPSA/P3's contention that, no matter the extent of uplift, "the fundamental problem is the need for operator biasing that produces the uplift."[241] Although PJM continues to assert that operator biasing resulting from the shape of the ORDCs causes uplift, PJM has not provided evidence demonstrating increases in uplift tied to the existing ORDCs. And this argument fails to acknowledge that most uplift is driven by issues with individual units or local transmission conditions, such as local reliability issues, inflexible parameters, or failing to follow dispatch instructions.[242] The fact that the Commission accepted PJM's representations regarding uplift in the 2020 Orders as evidence that PJM's Tariff, and specifically the stepped shape of the ORDCs, was not just and reasonable did not foreclose the determination in the Remand Order, which we

---

[238] *See* IMM Protest at 17-18 ("PJM provides no evidence directly linking operator actions or the shape of the ORDC to actual uplift data. … The lack of evidence directly linking operator actions, reserve market outcomes, or the ORDC shape to quantifiable levels of uplift invalidate PJM's arguments that the energy and reserve markets are unjust and unreasonable due to uplift effects."); *id.* at 47 ("The market requires that operators make decisions in response to real-time market conditions. PJM's proposal would not eliminate the need for operators to make decisions . . . . The proposed ORDCs may be formulaic, but they do not formulaically match actual minute by minute market conditions.").

[239] *See supra* PP 73-74.

[240] 2018 State of the Market Report, Vol 1., at 16, Table 8; *see also* IMM Protest at 17 (citing 2018 State of the Market Report for the same); IMM Uplift Analysis at 1 (noting that uplift payments during a winter peak in January 2019 "were moderate and revealed no underlying problems with price formation").

[241] EPSA/P3 Request for Rehearing at 25.

[242] *See* IMM Protest at 17-18.

continue to find to be supported under the circumstances.[243]  For example, in 2020 the Commission pointed to evidence regarding the volume of Synchronized Reserve revenues paid in the form of uplift.[244]  However, the IMM explains that Synchronized Reserve uplift payments primarily arise from incorrect settlement calculations and a mismatch between the dispatch interval and the pricing interval,[245] an issue PJM recently corrected,[246] and not from the shape of the ORDCs.  Moreover, the presence of uplift does not, in itself, render PJM's existing Tariff unjust and unreasonable.  RTO/ISO operators regularly take out-of-market actions to maintain reliable operations, and the fact that those actions could result in uplift does not automatically render the RTO/ISO tariff unjust and unreasonable.  Making such a finding here could have sweeping consequences given the many actions operators take that may reasonably result in uplift, and potentially could tie the hands of the operators making key decisions to maintain reliability.[247]

79.    We also disagree with Exelon's claim that the positive biasing performed by PJM operators in IT SCED serves to procure uncompensated and unduly discriminatory "pseudo reserves" from dispatchable units.[248]  Exelon asserts that this constitutes *per se* discrimination and distorts price signals because PJM secures reserves from the dispatchable unit by committing a block-loaded combustion turbine via biasing without

---

[243] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 93; November 2020 Rehearing Order, 173 FERC ¶ 61,123 at PP 42, 45.

[244] November 2020 Rehearing Order, 173 FERC ¶ 61,123 at P 45.

[245] IMM Second Answer at 8-9, attach. A; IMM Rehearing Request at 16-17; *see* Remand Order, 177 FERC ¶ 61,209 at P 42.

[246] *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,104.

[247] *See* Order No. 844, 163 FERC ¶ 61,041 at P 2 ("RTO/ISO markets can be affected by a number of operational challenges such as unplanned transmission and generation outages and the need to maintain adequate voltage throughout the system."); *see also id.* P 105 (discussing variety of reasons RTOs/ISOs make operator-initiated commitments).

[248] Exelon Request for Rehearing at 3-8; *id.* at 7-8 (providing a hypothetical example showing how PJM could procure uncompensated "pseudo reserves" if PJM: (1) manually adds "phantom load" in the form of positive load forecast biasing performed by PJM operators in the IT SCED; (2) commits a block-loaded combustion turbine based on the recommendation of IT SCED; and (3) backs down a dispatchable unit to "make room" for the block-loaded combustion turbine).

compensating the dispatchable unit.[249]  Exelon is mistaken.  Under the circumstance
Exelon describes:  (1) the Commission's fast-start pricing reforms ensure that the block-
loaded combustion turbine's marginal costs are reflected in LMP;[250] and (2) the directive
in the Remand Order to consolidate Tier 1 and Tier 2 Synchronized Reserve means that
the dispatchable resource will receive the Synchronized Reserve clearing price for its
reserve capability, including any increase to the Synchronized Reserve clearing price
caused by the higher LMP.[251]  Therefore, Exelon has failed to demonstrate that the use of
biasing is discriminatory because resources receive compensation for the services they
provide, and similarly situated energy and reserve providers are compensated at the same
market clearing prices.

80.    We further disagree with Exelon's assertion that the record demonstrates that
operator biasing causes an unjust and unreasonable increase in production costs.[252]
Exelon estimates the production cost impact of IT SCED load forecast biasing performed
by PJM operators as equal to the sum of *all* real-time balancing uplift paid to combustion
turbine resources in 2018.  It is unreasonable, however, to assume that *all* of the
production costs associated with uplift would be avoided if not for load forecast biasing
performed by PJM operators in IT SCED.  As the IMM explained, and Exelon does not
contest, uplift is largely driven by factors unrelated to IT SCED bias or PJM's ORDCs.[253]
Furthermore, although Exelon assumes that the excess commitment of combustion
turbines is exactly equal to the average amount of positive bias reported by PJM, there is
not a one-for-one relationship between positive load forecast biasing performed by PJM
operators in the IT SCED and the amount of additional reserves committed.[254]  As such,

---

[249] *Id*. at 8-9.

[250] *See* PJM, Intra-PJM Tariffs, Operating Agreement, OA Schedule 1 §. 2.4-
(Determination of Energy Offers Used in Calculating Real-time Prices) (7.0.0), § 2.4(b)
(effective Nov. 1, 2021).

[251] *See* Remand Order, 177 FERC ¶ 61,209 at PP 7, 24.

[252] Exelon Request for Rehearing at 8 (arguing that the Remand Order failed to
address evidence demonstrating that PJM's proposed reserve market design would reduce
production costs by approximately $70 million per year).

[253] Remand Order, 177 FERC ¶ 61,209 at P 42 ("The IMM also explains that
reserve market uplift is caused by PJM's practice of co-optimizing Non-Synchronized
Reserve using the IT SCED run rather than the [RT SCED] run and simplifying lost-
opportunity cost calculations." (citing IMM Second Answer at 8-9, attach. A; IMM
Rehearing Request at 17)).

[254] *Id*. P 39 ("PJM's claim that it would have been short reserves in 29.1% of all
real-time pricing intervals in 2018 if not for IT SCED bias incorrectly assumes a one-for-

we disagree that the $70 million figure accurately depicts the amount of uplift potentially attributable to operator biasing or that Exelon's arguments regarding this figure show that the existing Tariff is unjust and unreasonable or unduly discriminatory or preferential.

81.    Additionally, although Exelon argues that applying operator judgment instead of a systematic framework may result in less accurate load forecasts being used in IT SCED, which could create inefficiencies (if the operator biases upward too much) and risk reliability (if the operator does not bias upward enough),[255] the record does not support this conclusion.  PJM has not demonstrated that it is unjust and unreasonable or unduly discriminatory for operators to reflect their expert judgment in adjusting PJM's computer-generated forecasts through positive and negative bias.[256]

82.    Finally, EPSA/P3's and Exelon's arguments that operator biasing raises filed rate doctrine concerns are beyond the scope of PJM's complaint regarding its reserve markets.[257]  PJM's complaint argued that its ORDCs were unjust and unreasonable because they did not address uncertainties driving the need for out-of-market operator actions,[258] but did not assert that this biasing should be prohibited or included in its Tariff.[259]  In any event, we disagree with EPSA/P3's suggestion that operator biasing

---

one causal relationship between the positive MW bias applied to IT SCED and the amount of additional reserves committed." (citing PJM Transmittal at 54-55, Pilong Aff. ¶ 16)).

[255] Exelon Request for Rehearing at 8-9.

[256] *See* Remand Order, 177 FERC ¶ 61,209 at P 38 ("A pattern of operators reflecting their expert judgment in imperfect computer-generated forecasts is not sufficient to demonstrate that PJM's ORDCs are unjust and unreasonable."); *see also Cal. Indep. Sys. Operator Corp.*, 166 FERC ¶ 61,138 at P 24.

[257] *See Encana Mktg. (USA) Inc. v. Rockies Express Pipeline LLC,* 146 FERC ¶ 61,161, at P 34 (2014) ("The Commission will not address Indicated Shippers' remaining arguments because these issues are beyond the scope of Encana's complaint.").

[258] *See* PJM Transmittal at 6-7.

[259] Further, load forecast biasing and operator-initiated commitments implicate additional aspects of PJM's Tariff outside of the reserves market, which are likewise not addressed in PJM's complaint.

violates limitations on additional procurement under the filed rate.[260] As explained above, IT SCED is an advisory tool used by PJM operators, and PJM operators do not always follow IT SCED recommendations or commit additional units based on IT SCED.[261] Thus, load forecast biasing by PJM operators in IT SCED does not constitute "additional procurement" of reserves beyond the reserve requirements or ORDCs specified in PJM's Tariff, as EPSA/P3 assert.[262] Nor do operator actions to increase or decrease forecasted demand (i.e., operator biasing) otherwise conflict with existing provisions in PJM's Tariff.[263] We likewise disagree that operator biasing must be

---

[260] EPSA/P3 Request for Rehearing at 26 (arguing that the Remand Order failed to explain how biasing is consistent with the limitations on additional procurement under the filed rate).

[261] *See* Remand Order, 177 FERC ¶ 61,209 at P 39; IMM Answer at 10 ("IT SCED is an advisory tool. PJM operators may or may not follow IT SCED recommendations."); IMM Second Answer at 6 ("IT SCED bias is a tool used by dispatchers to provide information to the dispatchers. It is a form of sensitivity analysis. PJM has not claimed and could not support the claim that IT SCED bias is used to create reserves.").

[262] EPSA/P3 Request for Rehearing at 26; *see* IMM Rehearing Request at 14 (explaining that the fact that the advisory IT SCED tool can result in commitment does not support the conclusion that operators regularly procure thousands of megawatts of additional reserves through operator biasing); *id.* at 14-15 (asserting that the example of increased reserves from January 2019 cited in the May 2020 Order was not the result of IT SCED load bias, but rather resulted from generators self-scheduling energy or coming online to produce energy earlier than scheduled by PJM); IMM Uplift Analysis at 1 (making the same point and asserting that operator actions had limited effects on pricing).

[263] PJM, Intra-PJM Tariffs, Operating Agreement, OA Schedule 1 § 1.10 – Scheduling (37.0.0), § 1.10.8(a) ("the Office of the Interconnection shall take into account: (i) the Office of the Interconnection's forecasts of PJM Interchange Energy Market and PJM Region energy requirements, giving due consideration to the energy requirement forecasts and purchase requests submitted by Market Buyers . . ."); *id.* § 1.10.1(d) ("Scheduling encompasses the day-ahead and hourly scheduling process, through which the Office of the Interconnection determines the Day-ahead Energy Market and determines, based on changing forecasts of conditions and actions by Market Participants and system constraints, a plan to serve the hourly energy and reserve requirements of the Internal Market Buyers and the purchase requests of the External Market Buyers in the least costly manner, subject to maintaining the reliability of the PJM Region.").

incorporated into PJM's Tariff to avoid running afoul of the filed rate doctrine.[264] The Commission's rule of reason requires that public utilities file practices "that affect rates and service *significantly*, that are realistically *susceptible* of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous."[265] For example, the Commission previously declined to require PJM to include in its Tariff language defining its authority to determine a resource is ineligible to provide Tier 1 Synchronized Reserves, reasoning that the "innumerable, reliability-related reasons to deselect a generating resource for any given hour" are not realistically susceptible of specification in a tariff and that "it may be appropriate to provide operational and reliability-related discretion to [ISOs], and to not second-guess their decisions in that regard."[266] Similarly, the load forecast biasing performed by PJM operators in IT SCED involves operator discretion and the use of expert judgment that will necessarily vary between operators and is not reasonably susceptible of specification.[267] In addition, requiring PJM to specify the criteria operators must use for biasing in its Tariff could restrict operators' ability to apply their expert judgment to actual conditions on the system in making decisions to maintain reliable operations.

---

[264] Exelon Request for Rehearing at 14 (citing EPSA Comments at 9-10); EPSA/P3 Request for Rehearing at 26 (citing EPSA Comments at 9).

[265] *City of Cleveland, Ohio v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985).

[266] *Big Sandy Peaker Plant, LLC*, 154 FERC ¶ 61,216, at P 50 (2016) (footnote omitted) (*Big Sandy Peaker*); *id.* ("In addition, requiring PJM to set forth in the PJM Tariff an exclusive list of all specific, reliability-related reasons that could result in the deselection of a generating resource from Tier 1 Synchronized Reserve would necessarily limit PJM to those tariff criteria, and could compromise PJM's ability to respond to changes in operations or characteristics of the PJM system, a class of generating resources, or individual generating resources.").

[267] *See* Pilong Aff ¶ 9 ("Use of a bias, and the amount of the bias, are based on the dispatcher's training, experience, and judgement. However, it is important to note that this bias is not developed formulaically or in a manner that is 100 percent consistent from dispatcher to dispatcher."). Although EPSA's comments, cited by Exelon and EPSA/P3, raised concerns that operator biasing significantly affected rates without being included in the Tariff, EPSA nevertheless acknowledged that "it is hard to see how these [operator biasing] practices could be specified in a meaningful way" given the variation among operators based on training, experience, and judgment, and conceded that biasing may not be realistically susceptible of specification. EPSA Comments at 10-11 (citing Pilong Aff ¶ 9; Sotkiewicz Affidavit ¶ 16).

Accordingly, tariff language defining the allowable circumstances for the operators to
engage in biasing is not required by the rule of reason.[268]

### 3.     **Consistency with Precedent**

83.    In the Remand Order, the Commission found nothing in its price formation
policies that supported finding the currently effective ORDCs unjust and unreasonable.
The Remand Order explained that the Commission "did not establish an across-the-board
policy that market rules will be deemed unjust and unreasonable if they permit uplift—
i.e., if operator actions are not unfailingly reflected in market prices."[269]  Although PJM
argued that the Commission had established in a prior order that a downward-sloping
capacity market demand curve "provides a better indication of the incremental value of
different capacity levels than the current vertical demand curve," the Remand Order
explained that the Commission found PJM's prior capacity construct to be unjust and
unreasonable based on multiple factors and did not categorically find vertical or stepped
demand curves unjust and unreasonable.[270]

### a.     **Requests for Rehearing**

84.    On rehearing, Petitioners contend that the Remand Order departed without
adequate explanation from Commission precedent involving price formation.
Specifically, Petitioners maintain that the Remand Order failed to reconcile precedent

---

[268] *See, e.g.*, *Cube Yadkin Generation, L.L.C. v. PJM Interconnection, L.L.C.*, 171
FERC ¶ 61,152, at P 49 (2020) (finding that "not all rules or guidance governing a
generating resource's participation in PJM's markets must be included in PJM's [T]ariff,"
as "[i]ncluding all such rules and guidance in the Tariff could limit PJM's ability to
respond to changes in operational characteristics" (citing *Big Sandy Peaker*, 154 FERC
¶ 61,216 at P 50)); *Energy Storage Ass'n v. PJM Interconnection, L.L.C.*, 162 FERC
¶ 61,296, at PP 105, 108 (2018) (holding that although the methodology for calculating
the benefits factor and other parameters governing PJM's RegD signal must be included
in its Tariff, PJM must retain operational flexibility to control area control error without
delay and certain details were not reasonably susceptible to specification).

[269] Remand Order, 177 FERC ¶ 61,209 at P 43; *see id.* (explaining that Order
No. 844 only required RTOs/ISOs to post information about all operator-initiated
commitments on their websites (citing Order No. 844, 163 FERC ¶ 61,041 at P 99)).

[270] *Id.* P 44 (citing PJM Transmittal at 37-38 (quoting *PJM Interconnection,
L.L.C.*, 117 FERC ¶ 61,331, at P 76 (2006)).

recognizing that the costs of resources procured to alleviate shortages should be reflected in prices whenever possible, and reflecting a preference for minimizing uplift costs.[271]

85.    PJM argues that the Remand Order left the Commission's price formation policy unsettled and raised barriers to future pricing reforms because it departed without adequate explanation from the Commission's prior holdings, including that the costs of resources procured to alleviate shortages should be reflected in transparent market prices when it makes sense to do so and that payments to individual resources recovered in uplift do not send clear market signals.[272]  With respect to transparency, PJM asserts that the Reserve Penalty Factors are set too low to allow for transparent market prices or to allow the market to procure reserves necessary to meet minimum requirements, contrary to precedent establishing that the costs of resources procured to alleviate shortage should be reflected in market prices when possible and the determination in Order No. 719 that rules that do not allow prices to rise to allow supply to meet demand during shortages are unjust and unreasonable, and may be unduly discriminatory.[273]  PJM further contends that, although true that "[t]he Commission did not establish an across-the-board policy

---

[271] EPSA/P3 Request for Rehearing at 4, 27 (arguing that the Commission departed from this precedent in finding the ORDCs just and reasonable (citing Remand Order, 177 FERC ¶ 61,209 at P 43; *Uplift Cost Allocation & Transparency in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, 158 FERC ¶ 61,047, at P 2 (2017); 2012 Compliance Order, 139 FERC ¶ 61,057 at P 63)); PJM Request for Rehearing at 1, 5-6, 20-22, 28-29 (asserting that, by acknowledging that PJM's reserve market prices will not reflect the marginal value of reserves when the opportunity cost of the next increment of reserve exceeds the $850/MWh Reserve Penalty Factor, the Remand Order departed without explanation from policy and precedent favoring transparent market prices and preferring price formation as a way to reduce uplift costs); Exelon Request for Rehearing at 13 (maintaining that operator bias to avoid shortfalls is a contributing factor to marginal energy prices in PJM not often exceeding $850/MWh, but is accomplished "through systematic discrimination among resources providing their reserve capacity to PJM" that runs counter to the Commission's preference that resources be procured in the market (citing Order No. 881, 177 FERC ¶ 61,179 at P 165; *Midcontinent Indep. Sys. Operator, Inc.*, 170 FERC ¶ 61,075 at P 33; Order No. 844, 163 FERC ¶ 61,041 at PP 2-3; *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,017 at P 24)).

[272] PJM Request for Rehearing at 1.

[273] *Id*. at 20-21 (citing PJM Transmittal at 31; Keech Aff. ¶ 11; Order No. 719, 125 FERC ¶ 61,071 at P 192; 2012 Compliance Order, 139 FERC ¶ 61,057 at P 63).

that market rules will be deemed unjust and unreasonable if they permit uplift,"[274] the Remand Order fails to reconcile the inconsistency between PJM's reserve market shortcomings and the Commission's previously stated preference for market designs that minimize uplift costs.[275]

86.     In addition, EPSA/P3 claim that the Remand Order did not adequately explain its departure from precedent concerning the benefits of downward-sloping demand curves and finding PJM's prior capacity market demand curves unjust and unreasonable.[276]

## b.     Commission Determination

87.     We continue to find that the Commission's price formation policies do not require us to grant PJM's complaint and find the currently effective ORDCs unjust and unreasonable.[277]  We disagree with PJM's and EPSA/P3's arguments that the Remand Order is inconsistent with Commission price formation policies providing that the cost of resources procured to alleviate shortages be reflected in transparent market prices whenever possible and favoring market designs that minimize uplift.[278]  In the 2012 Compliance Order cited by EPSA/P3, the Commission accepted PJM's $850/MWh Reserve Penalty Factors on the basis that $850/MWh was greater than the vast majority—but not all—of the opportunity costs historically incurred by reserve resources during shortage events.[279]  Indeed, the paragraph EPSA/P3 cites acknowledges that resource-specific opportunity cost payments escalated "as high as $923 per MWh during

---

[274] *Id.* at 21 (quoting Remand Order, 177 FERC ¶ 61,209 at P 43 (citing Order No. 844, 163 FERC ¶ 61,041 at P 99)).

[275] *Id.* at 21-22 (citing 2012 Compliance Order, 139 FERC ¶ 61,057 at P 63; *Price Formation in Energy & Ancillary Servs. Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Staff Analysis of Uplift in RTO and ISO Markets, Docket No. AD14-14-000, at 21 (filed Aug. 21, 2014)).

[276] EPSA/P3 Request for Rehearing at 4, 28 (claiming that "waving its hand vaguely" at the myriad factors on which the Commission based its earlier findings that the demand curve under PJM's prior capacity construct was unjust and unreasonable does not satisfy reasoned decision-making (citing Remand Order, 177 FERC ¶ 61,209 at P 44 (discussing *PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 (2006)))).

[277] Remand Order, 177 FERC ¶ 61,209 at P 43.

[278] PJM Request for Rehearing at 20-22; EPSA/P3 Request for Rehearing at 27.

[279] *See* 2012 Compliance Order, 139 FERC ¶ 61,057 at P 63.

the August 8, 2007 event."[280]  PJM has not provided adequate record evidence here to demonstrate that $850/MWh is no longer greater than the opportunity costs incurred by reserve resources during the vast majority of shortage event intervals, and the Commission has never (with the exception of the 2020 Orders) found that a Reserve Penalty Factor must be greater than the maximum theoretical opportunity cost that could be incurred by a reserve resource.  Consistent with the Commission's shortage pricing goals, PJM's current construct sends strong price signals during reserve shortages—price signals that no party has demonstrated are insufficient to procure reserve resources during shortage events.  In addition, although the Commission has not established an across-the-board policy that market rules will be deemed unjust and unreasonable if they permit uplift, as discussed in section II.A.2 above, we emphasize that PJM has not demonstrated that out-of-market actions causally related to forecast uncertainty or PJM's ORDCs caused all or even the majority of the uplift payments, nor that the presence of uplift alone renders a market unjust and unreasonable.

88.     We further disagree with EPSA/P3's argument that the Commission failed to justify its decision to decline to direct a sloped demand curve in the Remand Order even though the Commission has previously directed PJM to adopt a sloped demand curve in its capacity market and has elsewhere found vertical demand curves unjust and unreasonable.[281]  More than just "waving its hand vaguely,"[282] the Commission reasonably pointed to a number of factors on which those orders relied that are not present here, and reasonably determined that the absence of those facts justified not extending the precedent to these circumstances.[283]  In particular, although the Commission found in the order addressing PJM's Reliability Pricing Model settlement that a downward sloping demand curve provided a better indication of the incremental value of capacity at different levels than a vertical curve based on its then-existing capacity market,[284] it did not purport to make findings beyond that market.  The Commission previously had found PJM's existing capacity construct unjust and unreasonable based on factors not present here—in particular PJM's demonstration that

---

[280] *Id.*

[281] EPSA/P3 Request for Rehearing at 28 (citing Remand Order, 177 FERC ¶ 61,209 at P 44).

[282] *Id.*

[283] Remand Order, 177 FERC ¶ 61,209 at P 44 (citing *PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 at P 29).

[284] *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331 at P 76.

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

the existing construct was failing to achieve its reliability objectives,[285] a demonstration that PJM has not made in this proceeding.  Moreover, the Commission has recognized that capacity markets and energy and ancillary services markets are distinct markets,[286] and the Commission's findings of volatility in the capacity market context in PJM or elsewhere[287] thus do not automatically suggest that the stepped shape of the ORDCs is not just and reasonable in the context of the energy and ancillary services market.

---

[285] The Commission explained:

> PJM has shown that the existing construct will, in the future, fail to achieve the intended goal of ensuring reliable service. It does not enable market participants to see the reliability problems in particular locations, does not provide price signals that would elicit solutions to reliability problems in enough time before the problems occur, and does not allow transmission and demand response to compete on a level playing field with generation to solve reliability problems. These factors, in conjunction with other factors (such as load growth in particular locations, and the lack of price signals sent by the energy markets) render PJM's current construct unreasonable on a long-term basis.

*PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 at P 29.

[286] *See* Order No. 719, 125 FERC ¶ 61,071 at P 204 (explaining that although adding elements to the capacity markets can have effects on the energy markets or *vice versa*, "[s]hortage pricing in an emergency and capacity markets for long-term resource adequacy assurance serve largely distinct purposes"); *see also Refinements to Horizontal Mkt. Power Analysis for Sellers in Certain Reg'l Transmission Org. & Indep. Sys. Operator Mkts.*, 165 FERC ¶ 61,268, at P 50 (2018) (explaining that monitoring and mitigation of energy prices do not ensure that capacity prices will be just and reasonable because "[c]apacity markets are distinct from energy markets (unlike several ancillary services, capacity is not co-optimized with energy").

[287] *See* EPSA/P3 Request for Rehearing at 28 (arguing that the Remand Order failed to account for other Commission precedent finding vertical demand curves to be unjust and unreasonable, and citing generally to the order finding ISO New England, Inc.'s Forward Capacity Market unjust, unreasonable, unduly discriminatory or preferential because it applies vertical demand curves within constrained zones (citing *ISO New England, Inc.*, 153 FERC ¶ 61,338 (2015)).

## B.    Backward-Looking E&AS Offset

89.    Based on the finding that PJM did not demonstrate that its Reserve Penalty Factors and ORDCs are unjust and unreasonable, the Commission found that it lacked sufficient evidence in the record to find that E&AS revenues will increase to such an extent that the backward-looking E&AS Offset does not reasonably reflect future E&AS revenues and is therefore unjust and unreasonable.[288]

### 1.    Request for Rehearing

90.    PJM argues that the Remand Order also erred in reversing its prior requirement for a forward-looking E&AS Offset without considering the impact on ancillary services revenues from the reserve market reforms that the 2020 Orders accepted, and the Remand Order re-affirmed.[289]   In particular, PJM asserts that the changes to PJM's reserve market affirmed in the Remand Order will result in increased reserve revenues that both support the imposition of a forward looking E&AS Offset and mean that continuing to use a historical E&AS Offset could yield an inaccurate Net CONE and Avoidable Cost Rate in the Reliability Pricing Model Auctions in the long run.[290]

91.    Should the Commission grant rehearing and allow application of a forward-looking E&AS Offset, PJM requests that the Commission direct it to apply starting with the 2024/2025 BRA, as it would not be realistic to reinstate in time for the 2023/2024 BRA proposed to be held on June 8, 2022.[291]

---

[288] Remand Order, 177 FERC ¶ 61,209 at P 46.

[289] PJM Request for Rehearing at 6, 23-25, 29.

[290] PJM Request for Rehearing at 24.  PJM points to changes that will result in increased revenues:  (1) for Synchronized Reserve, with the elimination of the uncompensated Tier 1 product; (2) for the new day-ahead Synchronized Reserve product; (3) for the new real-time Secondary Reserve product; and (4) from removing price capping provisions when system conditions are tight.  *Id*.

[291] *Id*. at 24-25.  PJM requests an order by June 24, 2024, two weeks before the proposed deadline to post preliminary EAS offsets associated with the 2024/2025 Delivery Year, granting this request. PJM notes that there likely will not be a difference between the historical and forward-looking E&AS Offsets for the 2023/2024 delivery year, as the forward markets have not an opportunity to fully price in the changes reaffirmed in the Remand Order.  *Id*. at 25.

### 2. **Commission Determination**

92.    We continue to find it was appropriate for the Commission to direct PJM to remove the forward-looking E&AS Offset and return to the prior backward-looking E&AS Offset.  While PJM asserts that significant changes to PJM's reserve market that were reaffirmed in the Remand Order will increase reserve revenues sufficient to support the imposition of a forward-looking E&AS Offset, PJM provides no support for such arguments in its rehearing request.[292]  Accordingly, we continue to find there to be "insufficient evidence in the record to find that E&AS revenues will increase to such an extent that the backward-looking offset does not reasonably reflect future E&AS revenues and is therefore unjust and unreasonable."[293]  However, we emphasize that in the Remand Order, the Commission did not indicate that a forward-looking E&AS Offset is unjust and unreasonable or that PJM cannot propose a forward-looking E&AS Offset.[294]  Rather, the Commission found, and we continue to agree, that we simply lack a basis to impose such an offset under FPA section 206 on the present record.[295]

### C. **10% Adder**

93.    On October 9, 2021, PICOs filed a motion for expedited order on remand requesting that the Commission issue an order:  (1) resolving in its entirety the proceeding in Docket No. ER19-105-000 pertaining to PJM's quadrennial review of and associated proposed Tariff revisions to the Variable Resource Requirement Curve used in PJM capacity auctions pursuant to *Delaware Division of Public Advocate*;[296] and (2) removing the 10% adder from the going-forward calculation of the E&AS Offset in the Net CONE calculation.[297]  In *Delaware Division of the Public Advocate*, the D.C. Circuit remanded the Commission's application of a 10% adder to estimates of hypothetical combustion turbine resources' energy offers in PJM in orders in Docket No. ER19-105.

---

[292] *Id*. at 24.

[293] Remand Order, 177 FERC ¶ 61,209 at P 46.

[294] *Id.*

[295] *Id.*

[296] *Del. Div. of the Pub. Advoc. v. FERC*, 3 F.4th 461 (D.C. Cir. 2021) (*Delaware Division of the Public Advocate*).

[297] PICOs Motion at 1-2.  PICOs submitted their motion in Docket No. ER19-105-006 in addition to the dockets of the instant proceeding.

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

### 1.    Request for Clarification/Rehearing

94.    PICOs state that the Remand Order did not address their October 8, 2021 motion, pursuant to the D.C. Circuit's remand in *Delaware Division of the Public Advocate*. PICOs urge the Commission to clarify that the Remand Order did not resolve their motion regarding the 10% adder, that this motion remains pending, and that the Commission will address PICOs' motion in this proceeding or in the *Delaware Division of the Public Advocate* remand proceeding concerning PJM's Reliability Pricing Model Variable Resource Requirement demand curve.  PICOs assert that resolution of their motion is necessary for PJM to reflect exclusion of the 10% adder in its compliance filing to restore the backward-looking E&AS Offset for future BRAs.[298]

95.    To the extent the Commission clarifies that the Remand Order rejected PICOs' motion regarding the 10% adder, PICOs alternatively request rehearing and argue that the Commission erred because retaining the 10% adder is contrary to *Delaware Division of the Public Advocate* and unsupported by record evidence.[299]

### 2.    Commission Determination

96.    On January 20, 2022, the Commission directed PJM to remove the 10% adder from the E&AS Offset used to determine the Variable Resource Requirement demand curve for the BRA for the 2023/2024 Delivery Year and subsequent auctions.[300] Accordingly, we dismiss as moot PICOs' request for clarification and request for rehearing.

---

[298] PICOs Request for Clarification and Rehearing at 1-2, 5-6.

[299] *Id.* at 6-11 (citing 16 U.S.C. § 825*l*(b); *S.C. Pub. Serv. Auth.*, 762 F.3d at 54).

[300] *See PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,020, at PP 1, 20 (2022).  The Commission explained that the Remand Order in this docket required PJM to submit a compliance filing proposing a new schedule for the 2023/2024 BRA and subsequent BRAs and that it expected PJM to propose a schedule that would provide adequate time to implement the removal of the 10% adder as directed.  *Id.* P 9 n.18.  On February 18, 2022, PJM submitted:  (1) its compliance filing reverting to the backward-looking E&AS Offset, *see* PJM Transmittal, Docket No. EL19-58-011 (filed Feb. 18, 2022), and (2) its compliance filing removing the 10% adder, *see* PJM Transmittal, Docket No. ER19-105-007 (filed Feb. 18, 2022).

## D.   **Request for Further Proceedings**

### 1.   **Requests for Rehearing**

97.     PJM and EPSA/P3 contend that the Commission should, at a minimum, have found sufficient record evidence to find that PJM's current reserve pricing may be unjust and unreasonable and set this matter for hearing and settlement or other further proceedings.[301]  PJM asserts that because the Commission in the Remand Order reversed its previous position that PJM's existing ORDCs and Reserve Penalty Factors were unjust and unreasonable without taking additional evidence or conducting additional proceedings, the Commission failed to reconcile its new position with its earlier position.[302]

98.     EPSA/P3 maintain that PJM established a *prima facie* case on the shape of the ORDCs and level of Reserve Penalty Factors that required further proceedings before the Commission could reject these aspects of PJM's filings.[303]  Relatedly, EPSA/P3 assert

---

[301] PJM Request for Rehearing at 2 (citing *PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079); *id*. at 10 (likewise requesting settlement and hearing procedures based on a threshold finding that the current ORDCs and Reserve Penalty Factors may be producing unjust and unreasonable results); EPSA/P3 Request for Rehearing at 30-31 (citing *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1293 (D.C. Cir. 2000); *City of Willcox v. FPC*, 567 F.2d 394, 410-11 (D.C. Cir. 1977); Remand Order, 177 FERC ¶ 61,209 (Danly, Comm'r, dissenting at PP 14-17); *Okla. Mun. Power Auth. v. Okla. Gas & Elec. Co.*, 163 FERC ¶ 61,114, at P 34 (2018); *Cal. Pub. Utils. Comm'n v. Pac. Gas & Elec. Co.*, 163 FERC ¶ 61,113, at P 21 (2018); *Ass'n of Businesses Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 149 FERC ¶ 61,049, at P 184 (2014), *reh'g*, 156 FERC ¶ 61,060 (2016); *Pub. Serv. Co. of Ind., Inc.*, 51 FPC 1720, 1721 (1974)).

[302] PJM Request for Rehearing at 3.

[303] EPSA/P3 Request for Rehearing at 4, 28-30 (citing 18 C.F.R. § 385.206(b) (2021); *Petro Star*, 835 F.3d at 103; *Tesoro Alaska Petroleum Co.*, 234 F.3d at 1293; *Colo. Interstate Gas Co. v. FERC*, 904 F.2d 1456, 1459 (10th Cir. 1990); Remand Order, 177 FERC ¶ 61,209 at P 25; *Panda Stonewall LLC*, Opinion No. 574, 174 FERC ¶ 61,266, at P 30 (2021); *City of Oakland v. Pac. Gas & Elec. Co.*, 165 FERC ¶ 61,249, at P 24 (2018) (footnotes omitted), *order on reh'g*, 167 FERC ¶ 61,097 (2019); *Sage Grouse Energy Project, LLC v. PacifiCorp*, 154 FERC ¶ 61,223, at P 25 n.73 (2016); *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs.*, 149 FERC ¶ 61,116 at P 45, *order on reh'g*, 153 FERC ¶ 61,144 (2015), *aff'd sub nom. MPS Merch. Servs., Inc. v. FERC*, 836 F.3d 1155 (9th Cir. 2016); *Alterna Springerville LLC v. Tucson Elec. Power Co.*, 153 FERC ¶ 61,125, at n.35 (2015); *Nantahala Power & Light Co.*, 19 FERC

that the Commission must, at a minimum, acknowledge and consider the serious objections of a dissenting Commissioner, and that the issuance of the Remand Order prior to Commissioner Danly's dissenting statement thus renders it arbitrary and capricious.[304]

## 2.    Commission Determination

99.    We disagree with EPSA/P3 and PJM that the Commission erred in not setting this remand proceeding for hearing, ordering other additional procedures, or establishing a new FPA section 206 proceeding.[305]  As explained above, PJM had the burden in this FPA section 206 proceeding to demonstrate that its existing Reserve Penalty Factors and ORDCs were unjust and unreasonable, and nothing compels the Commission to provide PJM the opportunity to adduce further evidence after the Commission concludes that PJM failed to meet that burden.  Once the D.C. Circuit granted the Commission's request for voluntary remand, jurisdiction returned to the Commission and the Commission was able *sua sponte* to correct errors in its decisions in the 2020 Orders.[306]  In correcting these errors, the Commission reasonably exercised its discretion regarding whether to set the matter for hearing here, because the parties have not identified any disputed issues of material fact.[307]  Although EPSA/P3 and PJM may disagree with the Commission's

---

¶ 61,152, at 61,276 (1982), *aff'd sub nom. Nantahala Power & Light Co. v. FERC*, 727 F.2d 1342 (4th Cir. 1984)).

[304] EPSA/P3 Request for Rehearing at 4, 31-32 (citing *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19-21 (D.C. Cir. 2010); *Kamargo Corp. v. FERC*, 852 F.2d 1392, 1398 (D.C. Cir. 1988)).  EPSA/P3 posit that, to the extent the Commission may have intended to issue the Remand Order to ensure that the BRA for the 2023/2024 delivery year was delayed so that it could be conducted using a backward-looing E&AS Offset, the Commission could have issued a standalone order delaying the auction in light of the voluntary remand.  *Id*. at 31 (citing *PJM Interconnection, L.L.C.*, 164 FERC ¶ 61,153 (2018); *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,067 (2015)).

[305] PJM Request for Rehearing at 2-3, 10; EPSA/P3 Request for Rehearing at 4, 28-31.

[306] *See United Gas Improvement Co. v. Callery Props., Inc.*, 382 U.S. 223, 229 (1965) ("An agency, like a court, can undo what is wrongfully done by virtue of its order.").

[307] *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524-25 (1978) (agencies have broad discretion over the formulation of their procedures); *Blumenthal v. FERC*, 613 F.3d 1142, 1144-45 (D.C. Cir. 2010) (choice to hold an evidentiary hearing is generally discretionary).

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

Docket Nos. EL19-58-007 and ER19-1486-004                                    - 72 -

findings based on the record, they had a full opportunity to develop the record and support PJM's proposals in these proceedings.

100.    Moreover, as discussed above, we disagree with PJM and EPSA/P3 that the Commission disregarded evidence regarding the need to revise the Reserve Penalty Factors and ORDCs.[308]  Given that PJM and EPSA/P3 point to no new facts that have arisen since this proceeding was initially on appeal and most of the new rates established by the 2020 Orders, effective May 1, 2022, had not even gone into effect at the time of the Remand Order,[309] once the Commission "reacquired jurisdiction, it had the discretion to reconsider the whole of its original decision,"[310] and was not required to set this matter for hearing to obtain additional evidence.[311]

101.    Despite EPSA/P3's assertion that the Commission "put itself in a position where it could not respond to the objections of dissenting Commissioner Danly, whose dissenting statement was not issued until January 20, 2022,"[312] the Commission has, in the Remand Order and this order, adequately responded to the issues raised.[313]  Moreover, the fact that

---

[308] *See, e.g.*, *supra* PP 24-26, 75, 78.

[309] Although the changes to the E&AS Offset became effective November 12, 2020, the Remand Order did not require PJM to re-run auctions that utilized the forward-looking offset "as doing so would undermine the expectations of the parties who are making commitments for the 2022/2023 delivery year."  *See* Remand Order, 177 FERC ¶ 61,209 at PP 47-48.

[310] *Se. Mich. Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C. Cir. 1998).

[311] *See Fla. Power & Light Co. v. FERC*, 88 F.3d 1239, 1243 (D.C. Cir. 1996) (Commission not required to set matter for hearing on remand and Commission permitted to decide whether to set matter for hearing where "facts are sufficiently established so as to permit resolution of this case through [Commission's] summary procedures").

[312] EPSA/P3 Request for Rehearing at 31.

[313] *See, e.g.*, *Save Our Sebasticook v. FERC*, 431 F.3d 379, 381 (D.C. Cir. 2005) (rehearing "enables the Commission to correct its own errors, which might obviate judicial review, or to explain why in its expert judgment the party's objection is not well taken, which facilitates judicial review"); *Nw. Pipeline Corp. v. FERC*, 863 F.2d 73, 77-78 (D.C. Cir. 1988) (rehearing "afford[s] the Commission an opportunity to bring its knowledge and expertise to bear on an issue before it is presented to a generalist court").  The Commission's practice is to permit the Commissioners to vote on orders with separate statements to follow.  Whether to issue such a statement, and the exact timing thereof, is a decision made by the individual Commissioners.  Although the Remand Order did not directly address Commissioner Danly's dissenting statement, providing a

an individual Commissioner elects to issue a dissenting statement after a majority Commission order issues does not, in and of itself, render a Commission decision arbitrary and capricious.

### E.    Authority to Seek Voluntary Remand

### 1.    Request for Rehearing

102.    EPSA/P3 acknowledge that the Chairman is generally responsible for the executive and administrative operation of the Commission, but assert that this authority does not extend to substantive policy and regulatory determinations and that the Chairman's executive and administrative powers should be exercised on behalf of the Commission.[314]  EPSA/P3 contend that the Remand Order is unlawful, because the Commission acts as a body by majority vote and the motion for voluntary remand was not filed pursuant to the Commission's longstanding tradition of polling the Commissioners for major litigation decisions.[315]

103.    EPSA/P3 assert that in seeking voluntary remand of the 2020 Orders, the Commission failed to account for the importance of regulatory stability in a "broadly supported and badly needed package of reforms" previously approved by the Commission.[316]  According to EPSA/P3, the destabilizing effect of this action is

---

meaningful response does not require this level of granularity as long as "the agency's path may reasonably be discerned." *Aera Energy, LLC v. FERC*, 789 F.3d 184, 192-93 (D.C. Cir. 2015) (the Commission did not fail to respond meaningfully to an argument, where the Commission's basis for refusing to consider the argument could reasonably be discerned from the record (citing *State Farm*, 463 U.S. at 43)); *New Fortress Energy Inc. v. FERC*, 36 F.4th 1172, 1177-78 (D.C. Cir. 2022) (finding that the Commission reasonably rejected dissenting Commissioner's proposal regarding jurisdictional threshold for certain liquified natural gas facilities (citing *New Fortress Energy LLC*, 176 FERC ¶ 61,031, at P 10 (2021)).

[314] EPSA/P3 Request for Rehearing at 4-5, 32-33 (citing 42 U.S.C. § 7171(c); Remand Order, 177 FERC ¶ 61,209 (Danly, Comm'r, dissenting at PP 1, 4 n.5)).

[315] *Id*. at 32-33 (citing 42 U.S.C. § 7171(e); Remand Order, 177 FERC ¶ 61,209 (Danly, Comm'r, dissenting at P 3)).

[316] *Id*. at 2, 10-12 (citing *Nat'l Ass'n for the Advancement of Colored People v. FPC*, 425 U.S. 662, 670 (1972); *Indep. Market Monitor for PJM v. PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,022 (2022) (Danly Comm'r, concurring at PP 1, 4-6); *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 173 FERC ¶ 61,159 (2020) (Glick, Comm'r, dissenting in part and concurring in part, at P 10); *Rail Splitter Wind Farm, LLC v. Ameren Servs. Co.*, 142 FERC ¶ 61,047, at P 13 (2013),

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

exacerbated by the fact that it was undertaken by a voluntary remand rather than a new FPA section 206 proceeding, "even assuming the current Commission's policy is superior to that of the prior Commission."[317]

## 2.    Commission Determination

104.    At the outset, we note that EPSA/P3 do not dispute the D.C. Circuit's authority to remand the record to the Commission for further consideration here and, in fact, did not oppose the Commission's voluntary remand before the D.C. Circuit.[318]  Upon the Commission's filing of the administrative record with D.C. Circuit on June 22, 2021, the court had exclusive jurisdiction, under FPA section 313(b), to review the Commission's orders in this proceeding.  Subsequently, the Commission filed its unopposed motion for voluntary remand of the record to allow further consideration,[319] and the court granted that motion,[320] thus returning jurisdiction to the Commission.[321]  EPSA/P3 identify no

---

*reh'g*, 146 FERC ¶ 61,017 (2014); *Nev. Power Co. v. Duke Energy Trading & Mktg., L.L.C.*, 99 FERC ¶ 61,047, at 61,190, *clarifying on reh'g*, 100 FERC ¶ 61,273 (2002)).

[317] *Id*. at 11-12.

[318] *See* D.C. Circuit Handbook of Prac. and Internal Proc. § VIII.E ("Parties may file a motion to remand either the case or the record for a number of reasons, including to have the district court or agency reconsider a matter, to adduce additional evidence, to clarify a ruling, or to obtain a statement of reasons.  The Court also may remand a case or the record on its own motion.").

[319] The motion for voluntary remand was unopposed by parties to the appeal of the 2020 Orders, including P3.  *See* Remand Order, 177 FERC ¶ 61,209 at P 12 n.25 ("In the Remand Motion, the Commission stated that it contacted all parties to the proceeding and that petitioner IMM consents to the motion; all other petitioners, *as well as intervenor-respondent P3 do not oppose the motion . . . .*" (emphasis added)).  Any opposition to the Commission's motion for voluntary remand could and should have been brought before the D.C. Circuit in response to the motion or in a request for rehearing of the court's order granting the motion.

[320] *See supra* note 38.  The court retained jurisdiction over the case on appeal, *see supra* P 100, and thus continues to have judicial superintendence.  At the court's direction, the Commission has filed periodic status reports, including notifying the court of the Remand Order.  *See* Status Report, *Am. Mun. Power, Inc. v. FERC*, D.C. Cir. Case No. 20-1372 et al. (filed Feb. 22, 2022).

[321] *See* 16 U.S.C. § 825*l*(a) (providing that the Commission retains authority to act while it retains the record).

Docket Nos. EL19-58-007 and ER19-1486-004                                    - 75 -

limit, in either the FPA or the court's directive, on the Commission's authority to further consider this matter on remand and to act accordingly, and we are aware of none.[322] Following the court's remand, the Remand Order was the subject of standard Commission voting procedures and supported by a majority of Commissioners.[323]

105.    In any event, we clarify here that, when judicial review of a Commission order is sought, the Chairman is responsible for the direction of litigation on behalf of the Commission, as confirmed by both historical tradition and the Department of Energy Organization Act (DOE Act), which replaced the Federal Power Commission with the Federal Energy Regulatory Commission and vests the Chairman with the authority to oversee "the executive and administrative operation of the Commission."[324]  That includes designating the attorneys who "may appear for, and represent the Commission in, any civil action brought in connection with any function carried out by the Commission."[325]

106.    As we have stated before, "[t]he Commission speaks through its orders,"[326] which reflect a majority vote of a quorum of the Commission.[327]  The Chairman's

---

[322] *See, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947) ("After the remand was made, therefore, the Commission was bound to deal with the problem afresh, performing the function delegated to it by Congress."); *Cal. Pub. Utils. Comm'n v. FERC*, 29 F.4th 454, 462 (9th Cir. 2022) ("agency may consider on remand any issue not expressly or impliedly disposed of by the court" (internal quotations omitted)); *Se. Mich. Gas Co. v. FERC*, 133 F.3d at 38 (once Commission "reacquired jurisdiction, it had the discretion to reconsider the whole of its original decision").

[323] *See* 42 U.S.C. § 7171(e) ("Actions of the Commission shall be determined by a majority vote of the members present.").

[324] 42 U.S.C. § 7171(c).  The Chairman is responsible for the conduct of all Commission executive and administrative functions.  *See* 18 C.F.R. §§ 376.103, 376.105 (2021).

[325] 42 U.S.C. § 7171(i) ("Except as provided in section 518 of title 28, United States Code, relating to litigation before the Supreme Court, attorneys designated by the Chairman of the Commission may appear for, and represent the Commission in, any civil action brought in connection with any function carried out by the Commission pursuant to this Act or as otherwise authorized by law.").

[326] *Indianapolis Power & Light Co.*, 48 FERC ¶ 61,040, at 61,203 & n.29, *order on reh'g*, 49 FERC ¶ 61,328 (1989).

[327] 42 U.S.C. § 7171(e); *see Entergy Servs., Inc.*, 119 FERC ¶ 61,187, at P 52 n.44 (2007), *order on reh'g*, 122 FERC ¶ 61,216 (2008) (collecting cases for the proposition

Document Accession #: 20220728-3092     Filed Date: 07/28/2022

responsibilities for executive and administrative operations are undertaken "on behalf of the Commission."[328]

107.    Taking into account the Commission's authority, on the one hand, to act on substantive matters assigned to it by statute through duly-voted orders and, on the other hand, the Chairman's statutory responsibility for executive and administrative functions,[329] we find that the decision as to a motion for voluntary remand appropriately falls within the Chairman's responsibilities. Contrary to EPSA/P3's assertion, the motion for voluntary remand did not reflect "[s]ubstantive policy and regulatory determinations."[330] Most importantly, the motion for voluntary remand did not disturb the effectiveness of the 2020 Orders; a motion for voluntary remand does not and cannot overturn the decisions previously reached in a duly-voted Commission order. Instead, a motion for voluntary remand, if granted by the court, merely returns jurisdiction to the Commission for the purpose of reconsidering the decision and, if appropriate, acting as a body, to improve the decision to both better satisfy the Commission's substantive

---

that the Commission speaks through its orders, which are issued following a majority vote); *but see* 16 U.S.C. § 824d(g) (providing procedures for lack of quorum in matters under FPA section 205(d), 16 U.S.C. § 824d (d)).

[328] 42 U.S.C. § 7171(c).

[329] Both historically and at present, the Chairman often consults with fellow Commissioners on a wide-range of such decisions, including but not limited to certain litigation decisions. Over time, a tradition has developed of the Chairman "polling" fellow Commissioners on staff recommendations with regard to certain litigation decisions. Neither Commissioner Danly nor EPSA/P3 contend that this polling is equivalent to the vote required under 42 U.S.C. § 7171(e) for Commission action or that the Commission may act, within the meaning of 42 U.S.C. § 7171(e), through a pleading submitted in court proceedings. Thus, in arguing that "it is hard to see how the motion could have been filed on the Commission's behalf without adherence to its 'longstanding tradition of polling the Commissioners for major litigation decisions,'" EPSA/P3 Request for Rehearing at 32, EPSA/P3 arguably concede that a majority vote—the only vehicle for Commission action—is unnecessary. But, in any event, they identify no statutory requirement for either internal polling or a majority vote. Similarly, while EPSA/P3 seem to suggest that the Commission should employ different approaches depending on whether a litigation decision is major or minor, they likewise cite no support for this proposition.

[330] EPSA/P3 Request for Rehearing at 32 (citing Remand Order, 177 FERC ¶ 61,209 (Danly, Comm'r, dissenting at P 4)).

responsibilities and better withstand judicial review.[331]  Finally, as discussed above, the
record in this proceeding, including the fact that PJM was unable to garner sufficient
stakeholder support to present its proposal under FPA section 205, does not support
EPSA/P3's assertion that the proposal is either "broadly supported" or "badly needed."

108.    By contrast, the Remand Order reflects a substantive policy and regulatory
determination to affirm in part, and reverse in part, the Commission's 2020 Orders
granting PJM's complaint under FPA section 206.  As such, the Remand Order was duly
voted on by a quorum of the Commission upon the return of jurisdiction from the court,
with three out of four Commissioners voting in favor of the order.  Accordingly, we find
there is no basis on which to deem the Remand Order unlawful based on the manner in
which the motion for voluntary remand was developed.

The Commission orders:

    (A)    In response to the requests for rehearing, the Remand Order is hereby
modified and the result sustained, as discussed in the body of this order.

    (B)    PICOs' request for clarification is hereby dismissed as moot, as discussed
in the body of this order.

By the Commission.  Commissioner Danly is dissenting with a separate statement
                    attached.
                    Commissioner Phillips is not participating.

( S E A L )

                            Kimberly D. Bose,
                            Secretary.

---

[331] As it did in the Remand Order with respect to certain issues, *see supra* P 16, the
Commission has continued to reach the same result in orders on voluntary remand where
supported by the record.  *See ISO New England Inc.*, 155 FERC ¶ 61,023, at P 2 (2016)
(affirming prior finding following a voluntary remand); *Chehalis Power Generating,
L.P.*, 145 FERC ¶ 61,052, at P 1 (2013) (affirming finding on voluntary remand and
clarifying policy); *ISO New England, Inc.*, 113 FERC ¶ 61,055, at P 1 (2005); *Midwest
Indep. Transmission Sys. Operator, Inc.*, 106 FERC ¶ 61,302, at P 1 (2004); *Williston
Basin Interstate Pipeline Co.*, 68 FERC ¶ 61,357, at 62,427-28 (1994).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                    Docket Nos.    EL19-58-007
                                                             ER19-1486-004

(Issued July 28, 2022)

DANLY, Commissioner, *dissenting*:

1.      I dissent from today's order[1] because it continues to affirm in part and reverse in part[2] the determinations in the Commission's prior orders finding that PJM Interconnection, L.L.C.'s (PJM) Open Access Transmission Tariff and the Amended and Restated Operating Agreement provisions regarding the PJM reserve market are unjust and unreasonable and setting a replacement rate[3] under Federal Power Act section 206.[4]

2.      I write separately to highlight that I have previously explained both why I object to the process by which this proceeding had come before the Commission and why I dissent on the merits.[5]  As to process, the FERC Solicitor's office (Solicitor's Office)[6]

---

[1] *PJM Interconnection, L.L.C.*, 180 FERC ¶ 61,051 (2022).

[2] *PJM Interconnection, L.L.C.*, 177 FERC ¶ 61,209 (2022) (Remand Order); *see also PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,085 (2022) (Clarification Order) (order granting PJM's request for clarification as to how PJM should reflect the reserve price caps in its filing to comply with the Remand Order).

[3] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153 (May 2020 Order), *order on reh'g*, 173 FERC ¶ 61,123 (2020) (November 2020 Rehearing Order); *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134 (2020) (November 2020 Compliance Order), *order on reh'g*, 174 FERC ¶ 61,180 (2021) (March 2021 Compliance Rehearing Order).

[4] 16 U.S.C. § 824e.

[5] Commissioner Danly January 20, 2022 Dissent to Remand Order (Accession No. 20220120-3114); Clarification Order, 178 FERC ¶ 61,085 (Danly, Comm'r, dissenting).

[6] I refer to the lawyers who submitted the motion for voluntary remand as the "Solicitor's Office" because they acted at the Chairman's direction without the Commission's knowledge or assent.  The motion filed by the Solicitor's Office was not, in any meaningful sense, the *Commission's* motion.  *See* Motion of Respondent Federal Energy Regulatory Commission, *Am. Mun. Power, Inc. v. FERC*, Case Nos. 20-1372, 20-

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

Docket Nos. EL19-58-007, et al.                                           - 2 -

was directed by the Chairman to seek voluntary remand without the knowledge or acquiescence of the other Commissioners, which at least violated longstanding Commission practice and may have been unlawful.  Today's order acknowledges this long-standing tradition and does not deny the Chairman's failure to poll fellow Commissioners on the matter.[7]  On the merits, this order is reckless.  It arbitrarily retained certain of the Commission's prior findings while reversing others, absent further briefing or supplementation of the record.  The effect was to arbitrarily change a fundamental element of PJM's market design, over PJM's and litigants' objections, without a full understanding of the consequences of those decisions.[8]

For these reasons, I respectfully dissent.

_____
James P. Danly
Commissioner

---

1373, 20-1374, 21-1117 (D.C. Cir. Aug. 13, 2021).

[7] *PJM Interconnection, L.L.C.*, 180 FERC ¶ 61,051 at P 107 & n.329.

[8] *See* Clarification Order, 178 FERC ¶ 61,085 (Danly, Comm'r, dissenting).

Document Accession #: 20220728-3092    Filed Date: 07/28/2022

Document Content(s)

EL19-58-007.docx.......................................................1